**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Leslie A. Merritt, Jr.,<br><br>  Plaintiff,<br><br>v.<br><br>State of Arizona; Bill Montgomery, Maricopa County Attorney; Maricopa County; Heston Silbert; Chirsopher Kalkowski; Frank Milstead; Ken Hunter; Kelly M. Heape; Jennifer Pinnow; Anthony Falcone,<br><br>  Defendants. | No. CV17-4540-PHX-DGC<br><br>**ORDER** |

This action arises of out of Plaintiff Leslie Merritt's arrest, incarceration, and attempted prosecution for the I-10 freeway shootings in Phoenix, Arizona. Plaintiff asserts multiple claims for relief under 42 U.S.C. § 1983 and state law, including false arrest, false imprisonment, malicious prosecution, negligence, intentional infliction of emotional distress, and aiding and abetting. Doc. 8.

Plaintiff has filed a motion to limit or preclude the testimony of defense experts Matthew Noedel and Joseph Grant. Doc. 254. The motion is fully briefed, and the oral argument requested by Defendants will not aid the Court's decision. Docs. 261, 263. The Court will grant Plaintiff's motion in part as to Noedel and deny the motion as to Grant.

## I. Background.

Three of the I-10 freeway shooting incidents occurred on August 29, 2015, and a fourth occurred sometime between August 27 and 30, 2015. During its investigation of the shootings, the Arizona Department of Public Safety ("DPS") recovered bullets and bullet fragments and eventually identified Plaintiff's Hi-Point C9 9mm handgun as the source for all four incidents. Docs. 34 at 3, 6; 261 at 2. Plaintiff had possession of his firearm until he pawned it on August 30, 2015, at about 5:31 p.m. Doc. 261 at 2.

Plaintiff was arrested in September 2015. Plaintiff was released in April 2016 and the criminal case against him was dismissed without prejudice. Docs. 8 at 15; 34 at 10-11. After filing this action, Plaintiff settled with Defendants Maricopa County and William Montgomery. Doc. 203; 206. The remaining Defendants include the State of Arizona and DPS officers Heston Silbert, Christopher Kalkowski, Frank Milstead, Ken Hunter, Kelly M. Heape, Jennifer Pinnow, and Anthony Falcone. Doc. 34 at 2.

The fourth shooting incident involved Andrew Hackbarth's 2014 BMW model 535i. On August 30, 2015, Hackbarth landed at Phoenix Sky Harbor Airport around 9:00 p.m. and returned to his BMW in the Terminal 2 parking lot where it had been parked since August 27. Docs. 261-2 at 4. Hackbarth got into the vehicle and noticed that the low tire pressure gauge was displayed. *Id.* at 4-5. All four tires were slightly below normal pressure (about 32 or 33 PSI out of 35-36), but the low pressure alert was specifically for the left front tire. *Id.* at 6. Hackbarth had noticed no tire pressure indicators before he parked at the airport on August 27. *Id.* at 10.

On the way home, Hackbarth pulled off the freeway and stopped to fill up his tires. He noticed the left front tire was not filling, heard a hissing sound from inside the tire, and felt air coming out. He tried to drive home on surface streets rather than the freeway, but the air pressure in the tire continued to decrease to about 20 PSI and he had to pull over again. *Id.* at 11. Hackbarth eventually made it home and drove to the dealership the next day. A flattened bullet were found in the left front tire.

Plaintiff alleges that the shooting of Hackbarth's tire occurred after he left the airport on August 30, more than four hours after Plaintiff pawned his firearm at 5:30 p.m. Doc. 8 at 7. As a result, Plaintiff argues, he could not have been the shooter. Plaintiff asserts that Defense experts Matthew Noedel and Joseph Grant will offer unsupported and speculative opinions "to change the timing of the shootings to coincide with the availability of [his] firearm." Doc. 254 at 2-3. Defendants offer Noedel and Grant as rebuttal experts and to testify about the possibility that Hackbarth's tire was shot before Plaintiff's gun was pawned and yet retained air pressure for a time. Doc. 261.

**II.    Legal Standard.**

Under Rule 702, a qualified expert may testify on the basis of "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence," provided the testimony rests on "sufficient facts or data" and "reliable principles and methods," and "the witness has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). An expert may be qualified on the basis of "knowledge, skill, experience, training, or education." *Id.* The proponent of expert testimony has the burden of showing the expert is qualified and the testimony admissible. *See Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). The trial court must assure that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

**III.   Discussion.**

Plaintiff moves to exclude or limit Noedel and Grant's testimony pursuant to Rules 104, 403, 702, 703, *Daubert*, and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), stating that they offer "unquantified possibilities of what might have occurred rather than what probably happened," and that their proposed testimony is unreliable, speculative, lacks sufficient scientific basis, and would confuse the jury. Doc. 254 at 2.

**A.     Matthew Noedel**.

   **1.     Report and Testimony.**

Noedel is a forensic consultant for reconstruction of shooting incidents, with a degree in forensic science. Doc. 261-5 at 6:18-7:1, 11:8-13. He has received specialized training concerning shooting reconstruction involving tires, and also teaches shooting scene reconstruction courses that would include shooting and analyzing mounted tires. *Id*. at 37:9-13, 39:22-42:13, 43:18-44:17. He has observed 30-40 mounted tires shot, has read texts and articles on the subject, and has attended seminars and symposia with other experts in this field. *Id.* at 44:24-45:13, 45:24-46:4, 47:2- 6. In his work on this case, Noedel searched for and reviewed relevant literature on mounted tires being shot through the sidewall by a bullet. *Id.* at 46:22-47:1. He is a member of the American Academy of Forensic Scientists, Association of Crime Scene Reconstruction, and Northwest Association of Forensic Scientists. He has numerous publications and has testified as an expert witness in dozens of cases. Doc. 261-6.

Noedel examined the BMW's left front tire and the bullet jacket and core removed from it. His report describes the results of his examination and replica tire testing, and reviews the testing done by Plaintiff's experts. Doc. 254-1 at 2-13.

According to Noedel, the "central question surrounding the examination of the damaged tire [was] whether a Dunlap 'run on flat' tire [like the BMW's] can hold air pressure after being struck by a ricocheted bullet." Doc. 254-1 at 5. To answer that question, many inflated tires would need to be shot at ricocheted angles and that data evaluated – which Plaintiff's experts did not do. *Id.* And even with such studies, "duplicating the same damage profile and energy experienced by the [BMW's tire] may never be achieved because the irregular tumbling, spinning and bullet profile from a ricocheted bullet cannot be controlled and may not reproduce the action evidence situation." *Id.* at 6. Noedel also found that the BMW tire had several variables unique to its damage pattern that might never be able to be reproduced. *Id.*

Noedel performed a single test by firing and ricocheting a bullet on concrete pavement into the sidewall of a mounted tire like the BMW's. Docs. 254 at 3; 254-3 at 16-18. The tire began losing air pressure immediately, from 35 PSI to 10 at a consistent rate over approximately 11 minutes, which was consistent with Noedel's experience in 30-40 other instances of firing a bullet directly into a tire. Docs. 254-3 at 16-17; 254-1 at 4. Examination of the test tire showed that the ricocheted bullet created a much larger damage area than the BMW's tire. Doc. 254-1 at 4. Noedel's report stated that a single test was "not a sufficient sample size to draw conclusions for all tires," and that the test exemplified "the difficulty in reproducing the exact conditions that the evidence tire experienced." *Id.* Without doing additional testing, Noedel agreed that his analysis was not as complete as it could have been. Doc. 254-3 at 3-4. He was aware of no prior published data showing whether certain conditions could reduce the loss of air from a tire hit with a ricocheted bullet in its sidewall. *Id.* at 16-18.

Noedel's report discussed the following testing by Plaintiff's experts. Erik Brown, a criminalist, opined that the surface gouge on the inner tire occurred "at the same time the projectile was fired and struck the sidewall" based on color tests he had conducted for the presence of lead. Doc. 254-1 at 4. Noedel noted that "a product visually consistent with a positive lead color reaction was present throughout the entire test area of the tire's interior," not just at the tear. Thus, it was unclear "how the time of the gouge creation inside the tire was determined based on the color test results for the presence of lead." *Id.* He also noted that no result for the presence of copper from the bullet jacket was reported on the inner tire gouge area. *Id.*

John Daws, Ph.D., opined in part that the BMW's tire pressure monitoring system would alert low tire pressure within one second of a bullet penetrating the sidewall. Daws based this opinion on data gathered from testing the actual tire as it existed after the initial damage, including continued driving, dismounting, visual and chemical inspections, and subsequent remounting. *Id.* at 4-5. Noedel found that it could not "be determined if the activities involving the evidence tire that occurred between the actual shot to the tire and

- 5 -

the time of analysis changed the tire's ability to hold pressure." *Id.* at 5. Noedel stated that if changes to the exterior gouge or interior plug occurred after the original shot and before testing, then the test results Daws found would be inapplicable. *Id.* He continued that the "pressure loss curve developed from the engineering analysis" showed that the BMW's tire position at the time of the shot would have affected the loss rate of air. Thus, it was "reasonable to consider that after the original damage to the tire occurred, the inner plug . . . reduced or restricted air pressure," and it was "feasible that the tire could have been parked in an orientation that slowed the rate of [air] loss to such an extent that it was not revealed until" Hackbarth returned and started driving again. *Id.*

Noedel reached the following conclusions: the fired bullet and its core were flattened and show damage consistent with the bullet having ricocheted off a surface before entering the tire; the tire had "a slit like defect on the outer side of the tire and a hole with an attached 'plug' on the inside wall of the tire" where the bullet exited; and the approximately 2 mm plug "could have partially sealed the tire until it was disturbed by continued driving, testing, [or] dismounting." Doc. 254-1 at 4, 7. It is unknown how much alteration (stretching, kneading, compressing) of the tire's perforation occurred from continued driving, chemical testing and examination, and the dismounting and remounting processes on the tire. Noedel also concluded that testing the tire after it has already been dismounted, chemically examined, and remounted, could not accurately represent the tire's performance at the time it was shot. *Id.* at 7. He noted that Hackbarth's tire pressure was low when he arrived at his car before leaving the parking garage, which "supports that the tire may have been losing pressure before leaving the garage." Doc. 254-1 at 6. He also noted that because "rubber stretches to allow the passage of a projectile and then relaxes back after the object perforates, a cylindrical hole all the way through the tire was not observed [because] it had relaxed closed." *Id.* at 4.

Noedel agreed that he could offer no opinion, to a reasonable degree of probability, on where the shooting occurred, that the location affected whether the BMW tire could hold air pressure, that mounting and dismounting the tire or driving the tire after the

shooting changed the tire's ability to hold pressure, or that the hanging piece of rubber on the tire's inner wall restricted or reduced air pressure loss. Doc. 254-3 at 6-7, 9-10, 11-12, 14-15. Noedel also testified that he could not opine that the chemical testing changed the tire's ability to hold air. *Id.* at 13.

### 2. Analysis.

Defendants offer Noedel to testify about the flaws in Plaintiff's experts' testing, unknown variables, and lack of foundation for their conclusions. Doc. 261 at 10. They frame Noedel's opinion as stating that, "to a degree of scientific certainty, there are several unknown variables that make it impossible to say, based on analysis of the tire alone, where and when Hackbarth's tire was struck, and whether it retained air after being struck. Among the possibilities, none of which can be determined with any degree of certainty, is that the tire retained air after being shot." *Id.* at 7.

Plaintiff seeks to preclude Noedel from opining on the location of the shooting, whether post-shooting mounting or dismounting of the tire altered its interior damage, the effect of the post-shooting driving or chemical testing on the tire, the effect of any intrinsic part of the tire on the tire's air pressure loss, or whether the vehicle's weight affected the rate of air loss. Doc. 254 at 8. But these arguments seem to misunderstand the thrust of Noedel's report. Noedel does not opine that the BMW was shot at a specific time. His report asserts that even with multiple studies and replica testing (which, he contends, Plaintiff's experts did not do), testing may never be able to duplicate the same damage profile as the BMW's tire because of several unique and unknown variables with ricocheted bullets. *See id.* at 4-7. And because testing the damaged tire includes these variables, no testing on the current tire can replicate the tire's performance and ability to hold air pressure at the time it was shot. *Id.* at 7.

In other words, according to Noedel, neither he nor Plaintiff's experts can tell when the tire was shot by examining and testing the tire now. Contrary to Plaintiff's argument, this testimony clearly is relevant. Plaintiff asserts that his arrest was not justified because the BMW was shot after Hackbarth left the airport parking lot and after Plaintiff had

pawned his gun. The timing of the shooting is a key issue. Noedel's testimony is relevant because it challenges Plaintiff's experts on this question. Under Rule 702(a), Noedel's opinion "will help the trier of fact to understand the evidence or to determine a fact in issue" because he rebuts Plaintiff's experts' opinions that the tire was shot after Hackbarth left the airport. Fed. R. Evid. 702(a); *see* Doc. 254-1 at 4-5. To the extent such opinions are set forth in his report and deposition testimony (*see* Doc. 45 at 2-3), Noedel may testify to flaws in Plaintiffs' expert's opinions and the variables that make it difficult to replicate the tire's damage pattern or opine on when the tire was shot.

> Some of Noedel's statements, however, go further. His report states:
> It is reasonable to consider that after the original damage to the tire occurred, the inner plug (or partial containment of the plug) reduced or restricted air pressure loss. In addition, it is feasible that the tire could have been parked in an orientation that slowed the rate of loss to such an extent that it was not revealed until the car owner returned and started driving again.

Doc. 254-1 at 5. Although Defendants initially characterize Noedel as simply rebutting the opinions of Plaintiff's experts, they later assert that his testimony about tire characteristics and "their potential for retaining air" would help the fact-finder understand Hackbarth's testimony that the gauge had alerted when he returned to his vehicle on August 30, that air left the tire at a faster rate once he was on the freeway, and that the rate of air loss increased significantly after filling his tire with air. Doc. 261 at 12. Defendants state that Noedel's testimony will concern "the potential for Hackbarth's tire to retain air after being shot." *Id.* at 13.

The Court agrees with Plaintiff's arguments that such an opinion would amount to unsupported conjecture. *See* Doc. 254. Noedel himself testified in deposition that he could not opine to a reasonable degree of probability that the tire retained air pressure after being shot. Doc. 254-3 at 19. And his report provides no basis for such an opinion. To the contrary, the primary thrust of his report is that opinions about the nature and timing of the shot or the air loss cannot be reached with any level of confidence. And as Plaintiff notes, the only tire that Noedel actually shot by ricochet lost air immediately, consistent with

- 8 -

30-40 other tests he has seen involving directly-shot tires. Noedel knows of no publications studying whether a tire can retain air after a ricocheted puncture of its sidewall.

Defendants identify no basis for an affirmative opinion that the tire could hold air after being shot, citing only generally to Noedel's work experience, his review of materials from the case and Plaintiff's experts, and his examination of "numerous publications." Doc. 261 at 12. Defendants note that there is no published data on the loss of air pressure in tires with ricocheted bullets in the sidewalls. They assert, correctly, that "expert testimony may still be reliable and admissible without peer review and publication." Doc. 261 at 13 (quoting *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1235 (9th Cir. 2017)). But when an expert's testimony is not based on independent research or publications, he must present some "other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'" *Wendell*, 858 F.3d at 1235. Noedel's only ricochet test resulted in an immediate air loss, which does not support his opinion that it is reasonable to conclude that certain variables allowed the tire to retain air after it was punctured. Noedel conducted no other testing and cited no other findings showing such a result. The Court finds "too great an analytical gap between the data and the opinion" to support admissibility of Noedel's testimony that the tire feasibly could have retained air after being shot. *City of Pomona v. SQMN. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (internal quotation marks omitted)).[1]

---

[1] Much of Plaintiff's brief misses the mark, addressing mostly opinions Noedel does not offer and failing to differentiate between Noedel's rebuttal and affirmative testimony. Plaintiff states generally that Noedel's opinions are unreliable, confusing, and lack sufficient scientific basis, but develops no specific arguments under Rule 702 regarding his testimony. *See* Doc. 254. Plaintiff's reply makes new arguments, but the Court will not consider them. It is well established that courts will not consider arguments raised for the first time in a reply brief. *Surowiec v. Cap. Title Agency, Inc.*, 790 F Supp. 2d 997, 1002 (D. Ariz. 2011).

**B. Joseph Grant.**

**1. Report.**

Grant was employed as a tire engineer for more than 34 years, directing failure analysis of tires manufactured by Continental Tire and also analyzing other manufacturers' tires. Doc. 254-2 at 2. He had responsibilities for the design, development, testing, and forensic analysis of tires, including various generations of run flat tires. *Id.* He is a member of the Society of Automotive Engineers, the American Chemical Society and the American Society of Mechanical Engineers and has represented Continental Tire at the Rubber Manufacturers Association and Tire and Rim Association. *Id.* Grant has been engaged as an independent consultant in the field of tire failure analysis for 20 years and has qualified as an expert in the field of tire failure analysis in both State and Federal Courts in 23 states. *Id.* at 2, 11-15. He has several publications on the characteristics of tires and a reference list of 268 materials that represent a sample of materials he has reviewed throughout his career that inform his opinions. *Id.* at 16-25.

For this case, Grant examined the BMW tire and other case materials and took four pages of inspection notes, 51 digital photographs, and ten digital microscope photographs. *Id.* at 4. He reached the following conclusions to a reasonable degree of engineering certainty. *Id.* at 6-7.

First, at the time it was shot, the BMW tire may not have initially lost any air, or may have lost only minimal air, due to the relatively small size of the puncture, the angle of the puncture, and "the loose flaps of rubber including broken rayon cord inside" the puncture. *Id.* at 7.

Second, it "is well known and recognized in the tire industry[] that small punctures do not always leak immediately." *Id.* Some small punctures may never leak, some may not leak for a period of time, and some may have intermittent air loss over time. The puncture on the BMW tire "was a small cut/puncture that could easily be subject to time periods of no air loss to periods of time of intermittent and/or changing air loss." *Id.* The rate of air loss, if any, depends on the tire's puncture size and whether anything fills the

1 | puncture hole. Grant found that the small size of the BMW's puncture with the angled penetration through the relatively thick sidewall used in run flat tires created "a long puncture hole that can fill up with loose rubber and broken rayon cords (both visible in the puncture hole) which can fill up or clog the hole preventing or minimizing air loss for a period of time." The penetrating object might also lodge in the puncture hole, stopping or minimizing air loss until ejected. *Id.*

Third, Grant concluded that it is not possible to determine when the tire was shot to any degree of engineering certainty because of the sporadic nature of air loss Hackbarth experienced during his drive home from the airport. *Id.*

Fourth, Grant critiqued that Plaintiff's expert Daws conducted tests on the BMW tire which only reflected the tire's ability to hold air at the time it went flat and was removed from service. According to Grant, Daws' conclusions are unsupported because air loss from a puncture hole can be sporadic and stop at times, as evidenced by the sporadic loss Hackbarth testified to as he drove home from the airport and the fact that the tire lost air at a higher rate after being filled. *Id.* Plaintiff did not depose Grant. Doc. 261 at 5.

**2. Analysis.**

Plaintiff argues that Grant "suggests only vague possibilities about what might have happened," unsupported by evidence and lacking reliability. Doc. 254 at 8-9. The Court does not agree. Plaintiff does not dispute that Grant's 34 years of experience render him qualified to testify about tires and shooting reconstruction. Doc. 263 at 5. Based on this extensive experience and his detailed examination of the subject tire, Grant opines that it is well-recognized in the industry that small punctures do not always leak immediately or consistently. And that whether punctures leak at all often depends on the size of the puncture hole, whether the penetrating object lodges, and whether the tire's interior materials fill the hole. Grant considered the BMW tire, the size of its puncture, loose rubber and broken rayon cords visible in the puncture, its penetration angle, and the testimony of Hackbarth regarding how the tire lost air pressure. Grant found that this was the sort of puncture that might not have lost air immediately, or lost it only minimally, and that based

- 11 -

on the sporadic air loss Hackbarth described it was not possible to determine when the tire was originally shot. Grant rebutted Daws' testing of the tire after it had already gone flat, which did not replicate conditions of the tire at the time that it was sporadically losing air. Daws' opinion also failed to address Hackbarth's testimony that the tire began losing more air when he tried to fill it.

Plaintiff argues that Grant performed no tests on the tire, cited no supporting studies, and did not quantify the delay in loss of air pressure, arguing that he opines only on "general theoretical possibilities." Doc. 254 at 7-9. But Grant's testimony about general propositions in his field and their application to this case clearly will be relevant to the jury's consideration of Plaintiff's experts, and is the kind of testimony "whose reliability depends heavily on the knowledge and the experience of the expert, rather than the methodology or theory behind it." *Wilson v. Maricopa Cty.*, No. CV-04-2873 PHX-DGC, 2006 WL 3051870, at * (D. Ariz. Oct. 26, 2006) (quoting *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000)). Plaintiff concedes Grant's qualifications as an expert, and Grant conducted an extensive inspection of the subject tire. The Court is satisfied that Grant's opinions are grounded reliably in his knowledge and experience and his detailed examination of the BMW tire.[2]

**IT IS ORDERED** that Plaintiff's motion (Doc. 254) is **granted in part and denied in part**. Matthew Noedel will not be allowed to testify affirmatively that the tire could have retained air after it was shot, whether in the words quoted above from Doc. 254-1 at 5 or through similar opinions. Plaintiff's motion is otherwise denied.

Dated this 20th day of June, 2019.

*David G. Campbell*

David G. Campbell
Senior United States District Judge

---

[2] As with Noedel, Plaintiff raises for the first time in his reply several new and more specific arguments against Grant's testimony (*see* Doc. 263), which the Court will not consider.

- 12 -