1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                         **FOR THE DISTRICT OF ARIZONA**

8

9    Leslie A. Merritt, Jr.,                          No. CV-17-04540-PHX-DGC

10                    Plaintiff,                       **ORDER**

11   v.

12   State of Arizona; Bill Montgomery,
     Maricopa County Attorney; Maricopa
13   County; Heston Silbert; Christopher
     Kalkowski; Frank Milstead; Ken Hunter;
14   Kelly M. Heape; Jennifer Pinnow; Anthony
     Falcone; Ed Leiter; and Vanessa Losicco,
15
                     Defendants.
16

17

18          This action arises out of Plaintiff Leslie Merritt's arrest, detention, and prosecution

19   for the I-10 freeway shootings in Phoenix, Arizona.  Plaintiff asserts multiple claims for

20   relief under 42 U.S.C. § 1983 and state law.  Doc. 8.  Defendants have moved for summary

21   judgment.  Doc. 264.  The motion is fully briefed, and the Court heard oral argument on

22   October 2, 2019.  Docs. 270, 273, 277.  The Court will grant the motion in part and deny

23   it in part.

24   **I.     Background.**

25          The following facts are largely undisputed.  Where there is a dispute, the evidence

26   will be viewed in the light most favorable to Plaintiff, the nonmoving party, and all

27   justifiable inferences will be drawn in his favor.  *See Matsushita Elec. Indus. Co. v. Zenith*

28   *Radio Corp.*, 475 U.S. 574, 587 (1986).

Three shootings occurred on the I-10 freeway in the Phoenix metropolitan area on August 29, 2015, and a fourth occurred sometime between August 27 and 30, 2015. Docs. 265, 271 ¶¶ 1-2. Plaintiff was arrested and indicted for the shootings in September 2015. *Id.* ¶¶ 41, 44. He was released from custody and the charges against him were dismissed in April 2016. *Id.* ¶¶ 53-54.

The timing of the fourth I-10 shooting is at the heart of the parties' arguments. Plaintiff pawned a firearm around 5:30 p.m. on August 30, 2015, about four hours before Plaintiff alleges the fourth shooting occurred. Doc. 271 ¶¶ 4-5; *see* Doc. 261 at 2. The fourth shooting involved Alfred Hackbarth's BMW. Hackbarth landed at Phoenix Sky Harbor Airport shortly before 9:00 p.m. on August 30 and returned to his BMW in the Terminal 2 parking garage, where he had parked it three days earlier. Doc. 265-2 at 4-6, 34. Hackbarth noticed a low-tire pressure alert on the dashboard when he started the vehicle. *Id.* at 4, 35, 43. All four tires were slightly below normal pressure. *Id.* at 6, 12, 36.

As he drove home from the airport, Hackbarth noticed that the front left tire was losing pressure rapidly. *Id.* at 9. He pulled off the freeway and stopped at a gas station to fill up the tires. *Id.* He noticed the front left tire was not filling, heard a hissing sound from the inside edge of the tire, and felt air coming out. *Id.* at 5, 9-10, 41. He tried to drive home on surface streets rather than the freeway, but the air pressure in the tire continued to decrease and he pulled over again. *Id.* Hackbarth learned from roadside assistance that his BMW tires could be driven while flat, so he drove home and took his car to the dealership the next day. *Id.* at 7. The dealership recovered a bullet from the front left tire. *Id.*

The Arizona Department of Public Safety ("DPS") recovered four bullets during its investigation of the four shootings. Docs. 265-1 at 7. On September 7, 2015, the DPS crime lab identified all four bullets as coming from a Hi-Point C9 9mm handgun. *Id.*; *see* Doc. 265-3 at 2-11. Investigating officers obtained a range of possible serial numbers for such guns, and then used a pawn shop database to find any pawned guns associated with the serial numbers. Doc. 265-1 at 71.

On September 17, 2015, officers located eight Hi-Point C9 9mm handguns to submit to the DPS crime lab for ballistics testing. *Id.* at 71-72. On the morning of September 18, the crime lab identified one of the guns as the source of the bullets recovered in all four shootings. *Id.* at 72. A DPS officer reviewed the list for the pawned guns and identified Plaintiff as the owner of the gun in question. *Id.* at 72-73. The DPS officer also identified Plaintiff's Facebook page as containing several posts about the I-10 shootings. *Id.* at 72; *see* Doc. 265-1 at 37-47. Defendants arrested Plaintiff without a warrant on the evening of September 18. Docs. 265-1 at 73-74, 265-3 at 44-45. A grand jury indicted Plaintiff for the I-10 shootings six days later. Doc. 265-5 at 30-46.

In early February 2016, while preparing for trial, the Maricopa County Attorneys' Office asked Lucien Haag to conduct an independent firearms identification analysis. Doc. 265-6 at 173. In his report dated April 14, 2016, Haag concluded that the four evidence bullets could not be excluded or identified as having been fired from Plaintiff's gun. *Id.* at 174. Plaintiff was released from jail on April 19, and the charges against him were dismissed without prejudice six days later. Docs. 265-2 at 128, 265-6 at 186.

Plaintiff filed suit against Maricopa County, Maricopa County Attorney William Montgomery, Deputy County Attorneys Ed Leiter and Vanessa Losicco, the State of Arizona, and the following DPS officers: Director Heston Silbert, Criminalist Christopher Kalkowski, Colonel Frank Milstead, Lieutenant Colonel Ken Hunter, Major Kelly Heape, Captain Jennifer Pinnow, and Detective Anthony Falcone. Docs. 1, 8. The amended complaint asserts ten claims: false arrest, false imprisonment, and malicious prosecution under § 1983 and state law (Counts 1-3 and 5-7); a § 1983 *Brady* violation (Count 4); and negligence, intentional infliction of emotional distress, and aiding and abetting tortious conduct under state law (Counts 8-10). Doc. 8 at 16-24. Plaintiff dismissed the claims against the County Defendants. Docs. 41, 224.

The remaining Defendants – the State of Arizona and the DPS officers – argue that summary judgment is warranted on all claims because: (1) probable cause existed for Plaintiff's arrest, imprisonment, and prosecution; (2) qualified immunity bars the § 1983

tort-based claims; (3) independent prosecutorial judgment bars the malicious prosecution claims; (4) common law immunity bars the negligence claim; (5) no evidence shows that Defendants knew they were aiding and abetting a tort; (6) there can be no *Brady* violation without a conviction; and (7) no evidence supports the extreme and outrageous conduct element for intentional infliction of emotional distress.  Doc. 264 at 9-18.

## II.    Summary Judgment Standard.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, *see Matsushita*, 475 U.S. at 587, shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, *see* Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  Only disputes over facts that might affect the outcome of the suit will preclude summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.   Probable Cause.

The existence of probable cause to arrest or indict is a defense to claims arising from the arrest or indictment.  *See Gasho v. United States*, 39 F.3d 1420, 1427 (9th Cir. 1994) ("Under Arizona law, probable cause is an absolute defense to a claim of false arrest and imprisonment."); *Lacy v. Cty. of Maricopa*, 631 F. Supp. 2d 1183, 1193 (D. Ariz. 2008) ("Probable cause to arrest or detain is an absolute defense to any claim under § 1983 against police officers for wrongful arrest or false imprisonment[.]"); *Lassitter v. City of Bremerton*, 556 F.3d 1049, 1054-55 (9th Cir. 2009) ("[P]robable cause is an absolute defense to malicious prosecution."); *Hockett v. City of Tucson*, 678 P.2d 502, 505 (Ariz.

Ct. App. 1983) ("The law is well settled that the existence of probable cause is a complete defense to claims of false imprisonment and malicious prosecution."); *Hansen v. Garcia, Fletcher, Lund & McVean*, 713 P.2d 1263, 1265 (Ariz. Ct. App. 1985) (granting summary judgment on negligence claims because "the officers made [the] arrest with probable cause"); *Tillotson v. City of San Francisco*, 739 F. App'x 887, 889 (9th Cir. 2018) (intentional infliction of emotional distress claim "failed because the officers' arrest was based on probable cause").

Probable cause to arrest exists when, "'under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability'" the defendant committed a crime. *Gasho*, 39 F.3d at 1428 (quoting *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986)). Because probable cause "deals with probabilities and depends on the totality of the circumstances," it is a "fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules." *Maryland v. Pringle*, 540 U.S. 366, 370-71 (2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Gates*, 462 U.S. at 243 n.13; *see District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (same). Although conclusive evidence of guilt is not necessary to establish probable cause, "mere suspicion, common rumor, or even strong reason to suspect are not enough[.]" *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984); *see Gasho*, 39 F.3d at 1428 ("Probable cause is more than mere suspicion.")

Whether a given state of facts constitutes probable cause usually is a question of law for the court. *Sarwark Motor Sales, Inc. v. Wooldridge*, 354 P.2d 34, 36 (Ariz. 1960). But where "the evidence is conflicting, so that on one conclusion as to the facts therefrom probable cause exists, while from another it does not, it is then for the jury to determine the true state of facts and to apply the law as laid down by the court to those facts." *Id.*; *see McKenzie*, 738 F.2d at 1008 ("[I]n a § 1983 action the factual matters underlying the

judgment of reasonableness generally mean that probable cause is a question for the jury[.]").

### A. Probable Cause Issues in This Case.

In Arizona, a grand jury must return an indictment "if, from all the evidence taken together, it is convinced that there is probable cause to believe the person under investigation is guilty of [a] public offense." A.R.S. § 21-413. Defendants argue that the grand jury's probable cause finding in this case defeats all of Plaintiff's claims, including his false arrest claims. Doc. 264 at 11. The Court does not agree.

Probable cause to arrest Plaintiff was required six days before the grand jury indictment — when Defendants arrested Plaintiff without a warrant. Courts must consider whether "the facts available to the officers *at the moment of the arrest* would 'warrant a man of reasonable caution in the belief' that an offense has been committed." *Beck v. Ohio*, 379 U.S. 89, 96 (1964) (citation omitted; emphasis added); *see also Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) (the probable cause analysis for a warrantless arrest involves "the facts known to the officer at the time of the arrest"); *Reams v. City of Tucson*, 701 P.2d 598, 601 (Ariz. Ct. App. 1985) (probable cause for an arrest must be evaluated by "the facts as they existed at the time of the arrest, and not afterward").

While a post-arrest indictment "cuts off the length of detention, and thus damages, stemming from [a] false arrest, the indictment does not absolve the officer from liability for [an] initial arrest made without . . . probable cause." *Jones v Cannon*, 174 F.3d 1271, 1286 n.8 (11th Cir. 1999); *see Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (explaining that "the presumption of probable cause arising from an indictment 'applies only in causes of action for malicious prosecution and is totally misplaced when applied in false arrest actions'") (citation omitted); *Reams*, 701 P.2d at 601-02 (finding the post-arrest indictment irrelevant to the plaintiff's false arrest claim because "[a]fter-the-fact judicial participation cannot validate an unlawful arrest").[1]

---

[1] During oral argument, Defendants cited *Martinez v. United States*, No. CV-13-00955-TUC-CKJ, 2018 WL 3359562, at *7 (D. Ariz. July 10, 2018), for the proposition that a post-arrest indictment is sufficient to establish probable cause so long as the evidence

The Court accordingly must decide whether Plaintiff's arrest was, as a matter of undisputed fact, supported by probable cause at the time of his arrest. As discussed below, issues of fact prevent the Court from finding probable cause as a matter of law, and therefore from granting summary judgment on Plaintiff's claims arising from his arrest.

The Court then will address the effect of the grand jury's indictment on the existence of probable cause to prosecute Plaintiff and whether the indictment supports summary judgment on claims arising from the indictment. As discussed below, the Court concludes that Plaintiff cannot overcome the presumption of probable cause created by the indictment and that his claim for malicious prosecution, and any damages accruing after the date of indictment, must be dismissed by summary judgment.

## B. Probable Cause to Arrest.

Plaintiff asserts claims for false arrest (Counts 1 and 5) and false imprisonment (Counts 2 and 6) against the State of Arizona. Doc. 8 ¶¶ 106-17, 134-44. Defendants identify the following evidence as creating the requisite probable cause to arrest and detain Plaintiff: (1) the DPS crime lab identified Plaintiff's gun as the source of the bullets recovered from all four shootings, the lab is fully accredited with an excellent track record, and ballistics analysis rarely makes false identifications;[2] (2) Plaintiff had personal possession of his gun between August 22 and 30, 2015; (3) the date of the BMW shooting was not clear from the evidence, considering that the low-tire pressure alert came on in the

known to the arresting officers is not materially different from the evidence presented to the grand jury. *See* Court's LiveNote Transcript ("TR") at 4:1-21. But Defendants do not identify the evidence presented to the grand jury in this case. Defendants' reliance on *DeGroot v. United States*, No. 17-56674, 2019 WL 4200958, at *2 (9th Cir. Sept. 5, 2019), is misplaced because the Ninth Circuit applied a presumption of probable cause created by the indictment to the plaintiff's false arrest and false imprisonment claims without distinguishing between the two claims or stating how long the plaintiff was imprisoned. The presumption may have applied to any post-indictment false imprisonment claim the plaintiff asserted, but it is not clear from *DeGroot* that the presumption should also apply to pre-indictment false imprisonment or false arrest claims.

[2] Both parties assert that ballistics evidence is highly reliable with a very low error rate. The Court need not decide whether this is correct in order to rule on this motion, but notes that credible scientists have raised serious questions about the reliability of ballistics evidence in many criminal cases. *See* President's Council of Advisors on Science and Technology, Report to the President Forensic Science in Criminal Courts (September 2016) 107-112, https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensic_science_report_final.pdf. (last visited Oct. 27, 2019).

airport garage and the driver did not hear a shot as he drove home; and (4) Plaintiff's Facebook page had several links to the I-10 shootings.  Docs. 264 at 11-12, 273 at 2-3.  Plaintiff counters that Defendants' facts rely on fabricated ballistics evidence and that reasonable officers would not have reached the same conclusions.  Doc. 270 at 1-12.  Because the Court agrees that Plaintiff's "reasonable officer" argument raises a genuine issue of fact when the evidence is viewed in his favor, it need not address his other contentions in addressing the arrest-related claims.[3]

Plaintiff asserts that a reasonable officer would have resolved the discrepancy between the ballistics evidence and the timing of the BMW shooting before arresting him.  Doc. 270 at 10.  He argues that the officers knew the crime lab's results were not credible because Plaintiff's gun was in the pawn shop when the BMW shooting occurred.  *Id.*  He contends that it was not reasonable to believe the lab over the BMW driver's report, particularly when there was no evidence the driver was wrong.  *Id.*

"It is well-established that a 'person may not be arrested, or must be released from arrest, if previously established probable cause has dissipated.'"  *Nicholson v. City of Los Angeles*, 935 F.3d 685, 691 (9th Cir. 2019) (quoting *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005)).  As the Ninth Circuit explained in *Ortiz-Hernandez*:

> If probable cause is established at any early stage of the investigation, it may be dissipated if the investigating officer later learns additional information that decreases the likelihood that the defendant has engaged, or is engaging, in criminal activity. . . .  As a corollary of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause.

---

[3] Plaintiff argues that "at a minimum, probable cause to arrest and prosecute him would have involved Defendants producing credible facts (1) identifying his firearm as used in the shootings, <u>and</u> (2) placing him at a shooting scene."  Doc. 270 at 9 (emphasis in original).  Plaintiff asserts that because Defendants had no evidence placing him at a shooting scene, they lacked probable cause.  *Id.* at 10.  But probable cause requires only a substantial chance of criminal activity, not an actual showing of such activity.  *See Gates*, 462 U.S. at 243 n.13.  If Defendants' ballistics evidence linking Plaintiff to the four shootings gave rise to a substantial chance that he was the shooter, and other evidence known to the Defendants did not dissipate probable cause, it does not matter that Defendants lacked direct evidence placing him at a shooting scene.

427 F.3d at 574 (citation and alterations omitted); *see United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007) (explaining that the execution or continuation of an arrest becomes illegal where "additional information obtained at the scene may indicate that there is less than a fair probability that the defendant has committed or is committing a crime"). Where probable cause has dissipated during an investigation, police officers have a duty to conduct further inquiry and reestablish probable cause before arresting the suspect. "It will not suffice that, at some earlier point in time – before the police gleaned certain 'dissipating' facts – the police may have had probable cause." *United States v. Lopez*, 482 F.3d 1067, 1073 (9th Cir. 2007); *see Merriman v. Walton*, 856 F.2d 1333, 1335 (9th Cir. 1988) (finding that any probable cause had dissipated when the alleged victim of the kidnapping had returned and noting that "[a] reasonable officer would have made further inquiry before effecting a warrantless arrest"); *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1444 (9th Cir. 1991) (citing *Merriman* and noting that "the police officers had a duty to conduct an investigation into the basis of the witness' report"); *Ovasapyan v. City of Glendale*, No. CV 08-194-CAS (JWJx), 2009 WL 10699128, at *5 (C.D. Cal. Apr. 27, 2009) (denying judgment as a matter of law where "evidence showed that, rather than making further inquiry, defendants arrested plaintiff and ignored plaintiff's alibi and cellular records placing him five miles away from the crime site").

Construing the evidence in Plaintiff's favor, the Court cannot conclude as a matter of undisputed fact that Defendants sufficiently resolved the serious question raised by the fact that Plaintiff's gun was in a pawn shop when the BMW's tire rapidly lost air on the freeway on August 30, 2015. The timing of events is important. Plaintiff pawned his gun at 5:31 p.m. that day. Doc. 265-1 at 76. Hackbarth drove his BMW home from the airport, and the front left tire rapidly lost air on the freeway, sometime between 9:30 and 10:00 p.m. that night. Docs. 265-1 at 65, 265-2 at 4-7. Thus, if the BMW's tire was shot at the time when the tire rapidly lost air, it could not have been shot by Plaintiff's gun.

On the morning of September 18, 2015, Criminalist Christopher Kalkowski informed Detective Graff that a Hi-Point C9 9mm handgun with serial number P1893054

had been forensically linked to the bullets from all four shooting incidents, including the shooting of the BMW tire. Doc. 265-1 at 72. Detective Graff then reviewed the list of the pawned guns and learned that the gun with the serial number in question had been pawned by Plaintiff on August 30, 2015 at 5:31 p.m. *Id.* Plaintiff was arrested later that evening. *Id.* at 73-74; *see* Doc. 265 ¶¶ 34-39.[4]

Hackbarth's BMW has a tire pressure monitoring system which sheds some light on timing. A symbol on the dashboard illuminates when one or more of the tires is below normal pressure. Doc. 265-2 at 36. The system allows the driver to then identify the specific PSI for each tire. *Id.* The display changes colors – from green to yellow – when a tire falls below a safe PSI level. *Id.* at 9; *see* Docs. 265 ¶ 6, 271-3 at 9.

Defendants interviewed Hackbarth on September 3, 2015, and have provided a written transcript of the recorded interview. Doc. 265-2 at 2-14; *see also* Doc. 265-1 at 64-66 (DPS investigative report recounting the interview). Hackbarth explained that when he started his BMW in the airport garage on the evening of August 30, he noticed that all four tires were slightly below normal pressure – about 32 or 33 PSI out of 35. Doc. 265-2 at 5-6. This was not unusual because the vehicle had been parked at the airport for a few days, and Hackbarth felt comfortable driving home because the pressure in each tire was at a "reasonable level." *Id.* at 5, 12. Hackbarth noticed that the front left tire's pressure began to decrease on the transition from the I-10 freeway to State Route 51, and "when [he] got on the 51 it was dropping pretty hard[.]" *Id.* at 9; *see id.* at 13. This is when Hackbarth pulled over to put air in the tires and found the leak on the inside edge of the tire. *Id.* at 10.

---

[4] Collectively, Defendants knew of the gun's pawn shop status before Plaintiff's arrest. Sergeant Mapp testified that Defendants knew this fact before the arrest. Doc. 271-2 at 10. Captain Pinnow testified that one of the grounds for arresting Plaintiff was that there had been no shootings after the gun was pawned – a conclusion that could only have been reached if the officers knew when the gun was pawned. Doc. 265-2 at 24-25. There is some evidence that individual Defendants may not have been aware until after the arrest (*see* Doc. 271-2 at 87-88), but Defendants' motion makes no Defendant-specific arguments in support of summary judgment.

Based on his flight landing around 8:48 p.m. and a text message he sent to his wife about the flat tire at 10:12 p.m., Hackbarth's "best estimate" is that the tire lost air rapidly sometime between 9:30 and 10:00 p.m. *Id.* at 4, 6. Hackbarth told the officers that he was "aghast" to learn from the dealership that a bullet was found in the tire because shootings cannot happen in a parking garage. *Id.* at 12. Although he later stated that the shooting potentially could have occurred in the garage, this "seemed less likely [because] the tire would've [been] going down quicker." *Id.* at 13.

As noted above, the ballistics match to Plaintiff's gun was made on the morning of September 18, 2015, and Plaintiff was arrested that evening. In their summary judgment briefing, Defendants fail to provide information about how, before they arrested Plaintiff, they resolved the serious issue raised by the timing of the gun's pawn and the tire's rapid loss of air. *See* Docs. 264 at 6-8, 273 at 2-3. Defendants made clear during oral argument that they did nothing to resolve this timing issue before they arrested Plaintiff. Tr. 19:18-20:6; *see* Doc. 276.

DPS crime lab supervisor John Maciulla testified that he theorized that a bullet fragment could have lodged in the side wall of the BMW tire and prevented the tire from deflating for days. Doc. 265-2 at 95; *see* Doc. 271-1 at 51. This is the theory Detective Baroldy presented at the grand jury hearing on September 24, 2015. Doc. 271-3 at 20-21. But Defendants do not explain when Maciulla developed this theory or why they accepted it as reasonably trustworthy. If the theory was incorrect – if the BMW tire was in fact shot when Plaintiff's gun was in the pawn shop – then the ballistics evidence upon which Defendants relied so heavily was incorrect. The ballistics evidence found that all four bullets were fired by the same gun; if that gun could not have shot the BMW tire, then it could not have shot the other vehicles either.

Defendants have failed to provide evidence from which the Court can conclude as a matter of law that they reasonably addressed the significant factual discrepancy between the time of the gun's placement in the pawn shop and the time of the BMW tire's rapid deflation. Law enforcement officers "may not disregard facts tending to dissipate probable

cause." *Ortiz-Hernandez*, 427 F.3d at 574. Defendants' arguments to the contrary are unavailing.

Defendants note that Hackbarth did not hear a loud bang while driving home from the airport, which suggests that the BMW's tire was shot earlier. Doc. 264 at 5, 12. But Hackbarth explained during the September 3 interview that he had the radio on and his BMW is "pretty quiet so you don't here much outside[.]" Doc. 265-2.

Defendants also rely on Plaintiff's purported Facebook "obsession" with the I-10 shootings. Doc. 264 at 7, 11; *see* Docs. 265 ¶ 39, 265-3 at 22-36. But the I-10 shootings were a matter of significant public interest in the Phoenix area and generated much media attention. Defendants do not explain how the posting of links to news stories about the shootings on social media supports a finding of probable cause to arrest Plaintiff for the shootings.

Defendants cite *Yousefian v. City of Glendale*, 779 F.3d 1010 (9th Cir. 2015), to argue that the lack of a clear date and time for the BMW shooting does not negate probable cause. Doc. 264 at 11-12; *see* Tr. at 15:3-7. But *Yousefian* involved a police officer "who [found] an elderly and infirm man bleeding profusely from a head wound admittedly inflicted by a younger man without significant injuries[.]" 779 F.3d at 1014. Both the victim and his wife told the officer that the attack had occurred without provocation. *Id.* The officer considered Yousefian's explanation that he had struck the victim in self-defense, but found the victim and his wife's version of events to be more credible. *Id.* Even though the officer's credibility determination was later rejected by the trial jury, the court concluded that no reasonable jury could find that the facts known to the officer were plainly insufficient to establish probable cause. *Id.*

*Yousefian* does not change the Court's analysis. Hackbarth had no reason to be untruthful to the DPS officers regarding the timing of the rapid tire deflation. Hackbarth, unlike Yousefian, was not a criminal suspect. And the officers in this case were dealing not with a mere credibility determination, but with contradictory evidence – the time of the gun's placement in the pawn shop and the time of the tire's rapid deflation.

1    Defendants further argue that they were only required to show that one bullet

2    matched Plaintiff's gun for the arrest to be valid. Doc. 264 at 11-12. But as noted above,

3    if Plaintiff's gun could not have fired the BMW bullet, then it could not have fired the other

4    three bullets if one accepts Kalkowski's conclusion — as Defendants did — that a single

5    gun fired all four bullets. *See* Doc. 265 ¶¶ 27, 34; Doc. 270 at 10-11.

6    Finally, Defendants assert that the Court should apply the collective knowledge

7    doctrine for determining probable cause. Doc. 264 at 10. That doctrine allows courts to

8    impute the collective knowledge of all officers involved in an investigation to the arresting

9    officer. *See United States v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010). But the doctrine

10   does not help in this case because Defendants do not identify any officer who had resolved

11   the timing discrepancy before Plaintiff was arrested and whose resolution of the issue could

12   be attributed to all of the officers.

13   Having considered the totality of the circumstances, the Court cannot conclude as a

14   matter of law that Defendants relied on reasonably trustworthy information when they

15   arrested Plaintiff. The factual issues raised by Plaintiff prevent the Court from granting

16   summary judgment on the basis of probable cause to arrest.

17   **C.    Probable Cause Between the Arrest and the Indictment.**

18   Recognizing the discrepancy between when the gun was pawned and when the

19   BMW tire lost air, Defendants decided to re-interview Hackbarth after Plaintiff's arrest.

20   Doc. 271-2 at 49-51, 117-18. The interview occurred on September 22, 2015 – two days

21   before the grand jury indicted Plaintiff. It did not resolve the issue.

22   According to an officer's report of the interview, Hackbarth stated that he had no

23   problem with the BMW's tires as he drove to the airport on the morning of August 27, and

24   the vehicle's low pressure alert was not illuminated that morning. Doc. 271-3 at 10.[5]

25   Consistent with his description of events in the initial interview, Hackbarth reported that

26   _____

27       [5] Defendants criticize Plaintiff for citing the officer's report of the interview rather
     than the actual interview transcript (Doc. 273 at 7), but Defendants do not provide the
28   transcript themselves, nor do they explain how the officer's report of the interview is
     incorrect. Further, the officer's report reflects what was understood by Defendants after
     the interview.

13

all four tires were "slightly low" – ranging from 32 to 33 PSI – when he returned to his car on the evening of August 30. *Id.* at 9. Hackbarth stated that he saw the alert for the front left tire change from green to yellow as he merged onto State Route 51 from the I-10 freeway. *Id.* Hackbarth also told the interviewing officers that "it was impossible for a bullet to strike his vehicle . . . in the [airport] garage based on where he had parked," which was "three or four cars in from the aisle, with cars parked on either side of him when he parked and when he returned to his vehicle." *Id.* at 10.

Although Hackbarth provided somewhat different answers in his deposition in this case (*see* Doc. 265-2 at 36, 43), the September 22 interview was the inquiry specifically made in response to information about when Plaintiff's gun was pawned. If accurate, the interview made it highly likely that the BMW tire was not shot while parked at the airport for three days. Rather, the interview suggested that the tire was shot after the BMW left the airport garage at about 9:30 p.m. on August 30, while Plaintiff's gun was in the pawn shop.

A jury reasonably could conclude from the evidence that Defendants lacked probable cause to detain Plaintiff from the time of his arrest until he was indicted. The Court will deny summary judgment on the time between the arrest and indictment.

### D. Probable Cause After the Grand Jury Indictment.

The analysis changes significantly for claims arising after the grand jury indictment on September 24, 2015. Doc. 265-5 at 30-36. Because the indictment raises a presumption of probable cause, Plaintiff cannot succeed on his post-indictment claims without showing that the indictment was procured fraudulently, with bad faith and malice. This is a significantly higher burden than is required for Plaintiff's arrest-based claims.

Defendants argue that Plaintiff cannot rebut the presumption of probable cause created by the indictment. Doc. 264 at 11, 273 at 4. Plaintiff contends that he can overcome the presumption because Defendants acted with malice, fabricated inculpatory evidence, and withheld exculpatory evidence from the grand jury. Doc. 270 at 7-8, 12-14. The Court will first address the presumption created by an indictment under Arizona law, and then

will consider whether Plaintiff has presented sufficient evidence for a reasonable jury to find that Defendants engaged in the wrongful conduct required to overcome the presumption.

### 1.     The Indictment Raises a Presumption of Probable Cause.

Plaintiff asserts malicious prosecution claims under § 1983 and state law (Counts 3 and 7). Doc. 8 ¶¶ 118-25, 145-51. Arizona law governs the state law claim because the criminal charges against Plaintiff were brought in Arizona and he filed suit here. *See Campbell v. Fernando-Sholes*, No. CV-05-0880-PHX-SMM, 2009 WL 2030561, at *6 (D. Ariz. July 9, 2009) ("When an allegedly wrongful case is prosecuted in Arizona and when a related malicious prosecution complaint is filed in Arizona, Arizona state law applies."); *Xcentric Ventures LLC v. Borodkin*, No. CV-11-1426-PHX-GMS, 2012 WL 692976, at *5 (D. Ariz. Mar. 1, 2012) ("[I]n Arizona, the governing law for malicious prosecution actions is generally 'the local law of the state where the proceeding complained of occurred'") (citation omitted).[6] The Court must also look to Arizona law to determine the legal effect of the indictment on the § 1983 malicious prosecution claim. *See Awabdy v. City of Adelanto*, 368 F.3d 1062 (9th Cir. 2004) ("We look to [the forum state's] law to determine the legal effect of the state court's action because we have incorporated the relevant elements of the common law tort of malicious prosecution into our analysis under § 1983.") (citations omitted); *Mills v. City of Covina*, 921 F.3d 1161, 1169 (9th Cir. 2019) ("Federal courts rely on state common law for elements of malicious prosecution.") (citing *Awabdy*, 368 F.3d at 1066).

Under Arizona law, a grand jury may return an indictment only where "it is convinced that there is probable cause to believe the person under investigation is guilty of [a] public offense." A.R.S. § 21-413. Because the grand jury must find probable cause before indicting, an indictment returned by a validly constituted grand jury would seem to

---

[6] The Court has subject matter jurisdiction over this action based on the § 1983 claims, *see* 28 U.S.C. § 1131, and is exercising supplemental jurisdiction over the related state law claims, *see* 28 U.S.C. § 1367(a). *See also* Doc. 1 at 2-3. The Court must apply state substantive law to the pendent state law claims. *See Indep. Living Ctr. of S. Cal., Inc. v. Kent*, 909 F.3d 272, 283 (9th Cir. 2018).

create a presumption of probable cause. But no Arizona court has decided this issue. *See Reams*, 701 P.2d at 601 (declining to decide the issue because the plaintiff asserted a false arrest claim); *Redmond v. Shilosky*, No. 1 CA-CV 09-0316, 2010 WL 1998058, at *4 (Ariz. Ct. App. May 18, 2010) (declining to decide the issue because the evidence was sufficient to show that the defendant acted in a reasonably prudent manner in pursuing criminal charges); *Gonzales v. City of Phoenix*, 52 P.3d 184, 187-88 (Ariz. 2002) (finding the evidence sufficient to support the jury's finding of no probable cause on a malicious prosecution claim without addressing the legal effect of the indictment). The Court therefore "must use its best judgment to predict how the Arizona Supreme Court would decide the issue." *Silving v. Wells Fargo Bank, NA*, 800 F. Supp. 2d 1055, 1062 (D. Ariz. 2011) (citation and alterations omitted); *see In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990) (explaining that "a federal court must predict how the highest state court would decide the issue [of first impression] using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance").

"In the absence of legal authority to the contrary, Arizona courts follow the Restatement (Second) of Torts." *Sprint Commc'ns Co., L.P. v. W. Innovations, Inc.*, 618 F. Supp. 2d 1101, 1119 (D. Ariz. Mar. 9, 2009); *see Roberson v. United States*, 382 F.2d 714, 718 n. 4 (9th Cir. 1967) (same); *Espinoza v. Schulenburg*, 129 P.3d 937, 939 (Ariz. 2006) (same). The Restatement teaches that an indictment is prima facie evidence of probable cause: "The indictment of the accused by a grand jury is evidence that the person who initiated the proceedings had probable cause for initiating them." Restatement § 664(2); *see Hobbs v. City of Long Beach*, 534 F. App'x 648, 649 (9th Cir. 2013) (citing § 644(2) for the proposition that "[a] grand jury indictment is prima facie evidence of probable cause"); *Reams*, 701 P.2d at 601 (noting "the position of the Restatement with respect to the relevance of an indictment to the issue of probable cause in an action for malicious prosecution").

Arizona courts also find decisions from other jurisdictions persuasive in deciding issues of first impression. *Hull v. DaimlerChrysler Corp.*, 99 P.3d 1026, 1028 (Ariz. Ct.

App. 2004); *see Tritschler v. Allstate Ins. Co.*, 144 P.3d 519, 527 (Ariz. Ct. App. 2006) ("Where no other Arizona court has directly addressed [an] issue[,] . . . we look for guidance to other jurisdictions that have addressed [the] issue."). Many other jurisdictions hold that a grand jury indictment creates a presumption of probable cause for purposes of a malicious prosecution claim. *See, e.g.*, *Conrad v. United States*, 447 F.3d 760, 768 (9th Cir. 2006) ("[U]under California tort law, a grand jury indictment creates a presumption in favor of the malicious-prosecution defendant that probable cause existed for the underlying prosecution."); *White v. Frank*, 855 F.2d 956, 961 (2d Cir. 1988) (under New York law, "an indictment by a grand jury is generally considered prima facie evidence of probable cause in a subsequent civil action for malicious prosecution"); *Delaney v. Miss. Dep't of Pub. Safety*, No. 3:12-CV-229-TSL-MTP, 2013 WL 286365, at *10 (S.D. Miss. Jan. 24, 2013) ("[U]nder Mississippi law, the existence of an indictment does not conclusively establish probable cause but rather is prima facie evidence of probable cause[.]"); *Hamlet v. West Virginia*, No. CIV.A. 1:06-0181, 2009 WL 261450, at *3 n.7 (S.D.W. Va. Feb. 3, 2009) ("Generally, an indictment is prima facie evidence of probable cause in an action for malicious prosecution[.]"); *Beckett v. Ford*, 613 F. Supp. 2d 970, 982 (N.D. Ohio 2009) ("For purposes of an Ohio malicious prosecution claim, an indictment is prima facie evidence of probable cause and a plaintiff must bring forward substantial evidence to rebut this.") (citations omitted); *Law v. S.C. Dep't of Corr.*, 629 S.E.2d 642, 649 (S.C. 2006) ("South Carolina has long embraced the rule that a true bill of indictment is prima facie evidence of probable cause in an action for malicious prosecution."); *Ala. Power Co. v. Neighbors*, 402 So. 2d 958, 967 (Ala. 1981) ("In malicious prosecution the general rule is that the finding of an indictment by a grand jury against one charged with crime is prima facie evidence of the existence of probable cause[.]") (citation omitted); *Freides v. Sani-Mode Mfg. Co.*, 211 N.E.2d 286, 289 (Ill. 1965) ("'Prima facie probable cause' is established by the return of the indictment by the grand jury but it is not conclusive evidence of probable cause.'").

Based on Restatement § 644(2), decisions from other jurisdictions, and Arizona's grand jury statute, the Court concludes that the Arizona Supreme Court would hold that an indictment creates a presumption of probable cause for purposes of a malicious prosecution claim.[7]

## 2. Plaintiff's Evidence Does Not Rebut the Presumption.

The presumption of probable cause created by the grand jury indictment can be overcome by a showing that the indictment "was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith." *DeGroot*, 2019 WL 4200958, at *2 (quoting *Awabdy*, 368 F.3d at 1067); *see White*, 855 F.2d at 962 (the "presumption may be rebutted by proof that the defendant misrepresented, withheld, or falsified evidence"); *Delaney*, 2013 WL 286365, at *10 (requiring "evidence that the indictment was induced by fraud, subornation, suppression of testimony, or other like misconduct"); *Hamlet*, 2009 WL 261450, at *3 n.7 (requiring "proof that the indictment was obtained by false or fraudulent testimony or other improper means"); *see also Cardenas v. Maslon*, 93 F. Supp. 3d 557, 574 & n.11 (N.D. Miss. 2015) (under the Restatement, "an indictment may be 'refuted' if the plaintiff shows that the indictment was obtained 'by false testimony offered by the prosecutor or given in his behalf[.]'") (quoting Restatement § 663 cmt. h, § 664 cmt. b).

Thus, Plaintiff must come forward with enough evidence for a reasonable jury to find that Defendants falsified the evidence used to obtain the indictment or otherwise acted with malice and bad faith. *See McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir. 2009) (the "plaintiff must be 'able to prove the allegations in his complaint that the criminal proceedings were initiated on the basis of the defendants' intentional and knowingly false accusations and other malicious conduct'") (quoting *Awabdy*, 368 F.3d

---

[7] As seen in several of the parenthetical quotations above, courts sometimes say that an indictment constitutes "prima facie evidence" of probable cause and other times say that an indictment creates a "presumption" of probable cause. Some cases use the terms interchangeably. *See DeGroot*, 2019 WL 4200958. The Court does not view these terms as having significantly different meaning because prima facie evidence is evidence "[s]ufficient to establish a fact *or raise a presumption* unless disproved or rebutted[.]" Black's Law Dictionary (11th ed. 2019) (prima facie) (emphasis added).

at 1067); *West v. City of Mesa*, 128 F. Supp. 3d 1233, 1245-47 (D. Ariz. 2015) (granting summary judgment on the plaintiff's malicious prosecution claim where he provided no evidence that his prosecution was based on fabricated evidence or any improper conduct). "[T]heory, speculation, and an advocate's suppositions cannot 'do duty for probative facts' and valid inferences." *McSherry*, 584 F.3d at 1136 (quoting *Poppell v. City of San Diego*, 149 F.3d 951, 962 (9th Cir. 1998)). Plaintiff must identify evidence that Defendants acted inappropriately. *See Lacy*, 631 F. Supp. 2d at 1206-11 (plaintiff rebutted the presumption with evidence that the medical examiner deliberately changed his calculation of an exit wound after the defense expert opined that the defendant's bullet could not have made the original exit wound); *Fields v. McQueen*, 768 F. App'x 785, 786 (9th Cir. 2019) (defense relied on a police report falsely stating that the suspect had consented to a search).

If Plaintiff fails to come forward with such evidence, his post-indictment claims cannot survive summary judgment. As noted above, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Plaintiff's evidence must be "such that a reasonable jury could return a verdict" in his favor. *Anderson*, 477 U.S. at 248.

Plaintiff argues that he can meet this high burden because Defendants withheld exculpatory information from the grand jury, acted with malice, fabricated evidence, and committed perjury. Doc. 270 at 7-8, 12-14. In making these argument, Plaintiff identifies a host of alleged deficiencies in the grand jury proceedings. As explained in detail below, the Court concludes that none of them — whether considered individually or collectively — would support a jury finding of fabrication, malice, and bad faith necessary to overcome the presumption of probable cause in this case.

### a. Exculpatory Material.

Plaintiff asserts that Defendants withheld the following exculpatory material: (1) a license plate reader ("LPR") report that did not show Plaintiff's car in the area of the shootings; (2) the fact that Defendants lacked evidence placing Plaintiff at the shooting

scenes; (3) the fact that Defendants never received any information from the "honeypot" website linking Plaintiff to the crime;[8] (4) the report of Hackbarth's second interview; and (5) evidence obtained from pole cameras. Doc. 271 ¶¶ 57-61.

Plaintiff presumably asserts that the failure to disclose this information amounted to fraud or other bad faith conduct sufficient to overcome the presumption of probable cause created by the indictment. But under Arizona law, a "county attorney is not obligated to present all exculpatory evidence to the grand jury[.]" *Trebus v. Davis*, 944 P.2d 1235, 1239 (Ariz. 1997). The attorney must present "clearly exculpatory evidence," which is "evidence of such weight that it might deter the grand jury from finding the existence of probable cause." *Id.*

Plaintiff cites *Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014), for the proposition that police officers are required to disclose all exculpatory evidence to protect a criminal defendant's due process rights at all post-arrest proceedings. Doc. 270 at 13. But *Tatum* found a defendant's constitutional rights violated when officers failed to disclose "compelling exculpatory evidence" – evidence that another individual had confessed to some of the crimes for which defendant was accused and that additional crimes with the same modus operandi occurred while the defendant was in custody. 768 F.3d at 809. The Court sees no reason to distinguish "clearly exculpatory evidence" from "compelling exculpatory evidence." *See id.* at 818.

### i.        LPR Report.

Plaintiff argues that Defendants withheld a report that LPRs in the area of the shootings failed to place him anywhere near the shooting. Doc. 270 at 16. He further asserts that officers lied to prosecutors when they said LPR data was unavailable for the shooting sites. *Id.*

As support, Plaintiff provides the results of a request made to the Arizona Vehicle Theft Task Force to access the National Vehicle Location Service database and determine

---

[8] The honeypot website concerned the I-10 freeway shootings and was created by law enforcement to identify people who had a heightened interest in the shootings. Doc. 265 ¶ 48.

whether there were any license plates that appeared repeatedly in areas and times related to the I-10 freeway shootings. Doc. 271-1 at 170. Sergeant Mapp requested eight incident locations and times, and the report presumably gave a list of vehicles seen around those locations and times, noting that five vehicles were seen at four of the locations. *Id.* at 171.[9] The report noted that these "hits" were "mostly from resident locations just north of the freeway incident locations and can be deemed normal travel to and from work or considered normal travel for the resident's area." *Id.* at 172. Sergeant Mapp did not consider this report helpful because the LPRs were not on the freeway and were owned and operated outside of DPS, and he was not sure where they were located. Doc. 265-1 at 28-29. Aside from asserting that this report is "highly exculpatory" for failing to place Plaintiff anywhere near the shootings, Plaintiff offers no explanation about how to interpret the report. Doc. 270 at 16.

The nondisclosure of the report does not rise to the level of bad faith. It is from an outside database derived from LPRs stationed in unidentified areas around, but not actually at, the shooting sites, and Plaintiff has not shown that the LPRs covered all relevant areas or shooting times. *See* Doc. 265-1 at 29. With these unknowns, it is not clear what conclusions, if any, the report supports with respect to Plaintiff's presence in the areas of the shootings. Even when drawing all inferences in Plaintiff's favor, no juror could reasonably find that the inconclusive report would have deterred the grand jury from finding probable cause. Further, considering that the DPS did not itself use LPRs in the investigation, and that the DPS officers learned nothing of value from the report, it is not at all clear that the officers lied when they testified that LPRs were not used to investigate these shootings.

Plaintiff stresses that Major Heap testified that he was "pretty certain" they ran Plaintiff's license plate and it was arguably exculpatory. *See* Doc. 271-2 at 99. But arguably exculpatory is not clearly exculpatory. Major Heap's testimony, only a portion

---

[9] The report does not specify the dates and times the vehicles appeared at specific locations, but, as Sergeant Mapp provided a list of the shooting locations and times, the Court assumes that the results correspond with that list.

1  of which has been provided by the parties, does not change the Court's interpretation of
2  the actual evidence.

3  ### ii.  No Evidence Placed Plaintiff at the Scene.

4  As noted above, the Court concludes that a lack of evidence placing Plaintiff at the
5  scene of the shootings is not fatal to probable cause if Defendants otherwise had evidence
6  establishing a "probability or substantial chance of criminal activity." *Gates,* 462 U.S.
7  at 243-44 n.13. Plaintiff does not contend that Defendants presented false evidence to the
8  grand jury regarding his presence at the shooting scenes, and it is difficult to see how the
9  grand jury was defrauded or misled if Defendants presented no evidence regarding this
10  fact. The grand jury certainly knew that no evidence of Plaintiff's presence at the shooting
11  scenes had been presented.

12  ### iii.  Honeypot Website.

13  Plaintiff asserts that Sergeant Mapp testified in deposition that no evidence from the
14  honeypot website linked Plaintiff to the freeway shooting. *See* Docs. 270 at 8, 271 ¶ 58.
15  But Plaintiff fails to respond to Defendants' evidence that "only law enforcement officers
16  accessed the website, and it was only up for a day or two." Doc. 265 at 11 ¶ 48; *see also*
17  Docs. 265-1 at 20-24; 265-2 at 29-30.

18  ### iv.  Hackbarth's Second Interview Report.

19  Plaintiff argues that Defendants did not timely disclose the report of Hackbarth's
20  second interview. *See* Docs. 270 at 8, 271 ¶ 57. According to Plaintiff, DPS policy
21  required the written report of the second interview, dated September 22, 2015, to be turned
22  over to prosecutors within five days, or by September 27, 2015. Doc. 271 ¶ 57. Defendants
23  did not turn it over to defense counsel until February 29, 2016. *Id.* The significance of this
24  argument is unclear, however, because Plaintiff was indicted on September 24, 2015,
25  before the report was due even under Plaintiff's timeline. *See* Doc. 265-5 at 30-36.

26  Plaintiff argues that Hackbarth's statements in the second interview "debunked the
27  entire DPS forensic testing." Doc. 270 at 14. As discussed above, Hackbarth stated that
28  he had no issues with his tires when he drove to and parked at the airport on the morning

of August 27, 2015, and that he heard a hissing sound from the tire losing air only when he filled it at the gas station on his way home on the night of August 30. Doc. 271-3 at 10. He was sure the low pressure alert was not on when he first parked at the airport, and he stated that it was impossible for a bullet to strike his vehicle while it was parked in the airport garage. *Id.*

Plaintiff argues that Defendants misrepresented Hackbarth's interviews to the grand jury (Doc. 271 ¶¶ 49-50), but this argument is difficult to assess because Plaintiff has provided only five largely non-consecutive pages of a grand jury transcript that spanned more than 73 pages. *See* Doc. 271-3 at 17-22 (PSOF Ex. 35, including only transcript pages 41, 42, 45, 46, and 73). In these pages, Detective Baroldy testified as follows: when Hackbarth drove to the airport on August 27, he did not notice anything out of the ordinary and did not receive a low-tire-pressure indication from his car (*id*. at 18); as he drove home from the airport on the evening of August 30, Hackbarth did not see anything on the interstate that concerned him, but the car's sensor indicated that he was starting to lose tire pressure in the front left tire at a concerning rate (*id.*); Hackbarth assumed or guessed that the shooting could have occurred at the airport terminal or on the drive home, but did not know one way or the other (*id.* at 18-19); given the extra thickness of the tire wall in Hackbarth's run-flat tire,[10] it is possible that the tire was struck by the bullet before Hackbarth arrived at the airport on August 27, lodged in the sidewall, and did not cause the tire to deflate until the drive home on August 30 (*id.* at 20-21); the bullet most likely was shot from behind and to the right of the BMW, in a downward angle, and skipped off the road surface before entering the inner wall of the left front tire (*id.* at 21); the vehicle was not parked in an area at the airport where a stray bullet could have struck it (*id.* at 22); when Hackbarth got into his vehicle after 9:00 p.m. on the evening of August 30, Plaintiff's gun had already been in the pawn shop for about three and a half hours (*id.* at 22).

---

[10] The evidence shows that Hackbarth's BMW had run-flat tires with extra thick sidewalls, and that the tires could be driven up to 50 miles while flat. Doc. 271-3 at 19. Plaintiff does not dispute this fact.

From these excerpts, the Court cannot conclude – and a reasonable jury could not conclude – that Defendants misled the grand jury. Baroldy accurately described the time and circumstances of Hackbarth's drive to and from the airport, when the tire-pressure warning was illuminated, when the tire rapidly lost pressure, and how long Plaintiff's gun had been in the pawn shop by that time. Baroldy did state inaccurately that Hackbarth thought the shooting could have occurred at the airport terminal or on the drive home, when in fact Hackbarth said in his second interview that it was impossible for the vehicle to have been shot at the airport given where it was parked (Doc. 271-3 at 10), but this misstatement did not mislead the grand jury because Baroldy himself said the vehicle could not have been shot at the airport "based on the location where it was parked." Doc. 271-3 at 22. Baroldy did assert that it was definitely possible the tire could have been shot before Hackbarth arrived at the airport and not lost pressure until he drove home on the August 30, but he did not attribute this view to Hackbarth. *See id.* at 21 ("That is definitely a possibility due to the thickness of the sidewall on a run flat tire."). In short, Plaintiff has not presented evidence from which a reasonable jury could conclude that Defendants misled the grand jury with respect to Hackbarth's interviews.

Plaintiff also asserts that numerous Defendants reviewed "the investigative report" knowing it omitted exculpatory material and failed to correct the report before sending it to prosecutors. Doc. 270 at 16. But Plaintiff does not identify the report he is referring to or the alleged exculpatory information omitted from it. The only investigative report in the record is dated October 29, 2015 and could not have affected the September 24 grand jury determination. *See* Doc. 265-1 at 49-140 (date at the bottom of each page).

### v.    Pole Cameras.

Plaintiff argues that pole cameras were used by DPS as part of this investigation and that Defendants withheld exculpatory data obtained by those cameras. Doc. 271 ¶ 61. Plaintiff cites the following evidence: (1) testimony from Ed Leiter when he was shown a document that "purports to reference . . . an entry for September 14th referencing a trooper assisting in reviewing pole camera video in terms of the I-10 shooter detail"; and

(2) Plaintiff's expert report concluding that the County Attorney should have known that DPS suppressed exculpatory evidence including "pole camera information." Docs. 271-2 at 24, 271-3 at 14. But Plaintiff does not provide any actual evidence of pole camera usage, much less any evidence that the pole camera data was clearly exculpatory.

### b. Malice and Perjury.

Plaintiff argues that Defendants are not entitled to the presumption of probable cause because the indictment was tainted by the malicious actions of government officials. Doc. 270 at 12-13. Plaintiff asserts the following evidence: (1) two officers testified in depositions that they still believe Plaintiff is the freeway shooter; (2) Defendants asserted a BMW shooting date for which they had no evidence; (3) Detective Baroldy lied when he testified that a bullet could have lodged in the BMW's tire prior to the vehicle being parked at the airport; and (4) Baroldy withheld evidence that Hackbarth's statements in his second interview "debunked the entire forensic testing." *Id.* at 14.

### i. Officers' Statements.

Plaintiff points to deposition testimony indicating that some officers still think he is guilty. *See* Doc. 271 ¶ 63. But Plaintiff makes no arguments about how the officers' belief in his guilt shows that they pursued his indictment with malice or bad faith. To the contrary, this testimony would tend to suggest that the officers pursued charges they believed to be correct. Plaintiff does not identify any specific actions these officers took during the investigation or grand jury testimony that show malice, nor does he explain how their continuing belief in Plaintiff's guilt somehow retroactively taints work they did in 2015.

In any event, malice is not a state of mind that exists four years after the fact. "Malice is present where the defendant initiated or procured the proceedings primarily for a purpose other than that of bringing an offender to justice." *West*, 128 F. Supp. 3d at 1246 (citations omitted); *see Estate of Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1030 (9th Cir. 2008) ("The 'malice' element of the malicious prosecution tort relates to the subjective intent or purposes with which the defendant acted in initiating the prior

action[.]"). Plaintiff seems to suggest that no reasonable person could doubt his innocence and that any contrary view must be held in bad faith, but the Court does not find this proposition self-evident, particularly when the 2015 freeway shootings have never been solved.

### ii. BMW Shooting Date and the Lodged Bullet Theory.

Plaintiff argues that Defendants acted in bad faith because they knew they had no evidence to support their assertion that the BMW shooting occurred between August 22 and 27, 2015. Doc. 270 at 13. Plaintiff also asserts that Detective Baroldy fabricated testimony that the bullet could have lodged in the BMW's tire before Plaintiff's gun was in the pawn shop. Doc. 270 at 14.

Plaintiff points to testimony by Sergeant Mapp and Captain Pinnow indicating they did not have any evidence supporting a particular date between August 22 and 27 as the most likely date of the BMW shooting. Docs. 271 ¶ 47, 271-2 at 17-18, 121-22. But lacking evidence for one particular date is not the same as lacking evidence for a range of dates. The record suggests that the officers based their view of the date range on the ballistics evidence and their view that the BMW could have been shot before Hackbarth arrived at the airport on August 27, 2015. *See* Doc. 265-2 at 84, 124-25.

Plaintiff argues that Defendants' assertion that the BMW shooting occurred between August 22 and 27 contradicted Hackbarth's statement that the tire's rapid deflation occurred on August 30, 2015, after he left the airport and after Plaintiff's gun was already in a pawn shop. Doc. 270 at 13. As noted above, however, the grand jury was clearly told when and where the tire deflated and that Plaintiff's gun was in the pawn shop more than three hours earlier.

Plaintiff has not presented evidence from which a reasonable jury could conclude that Defendants acted with malice or bad faith when they described the possibility that the tire was shot on the 27th and deflated later. Doc. 271-3 at 20-21. Defendants note that the bullet found inside the BMW tire ricocheted off the pavement, flattened, and entered the tire wall at an angle that created a narrow slit rather than a round hole. *See* Docs. 254-1

at 3-4, 265-2 at 95.  And the Court has concluded that Defendants may present expert testimony at trial in support of their theory that the tire was shot before Hackbarth arrived at the airport:

> Plaintiff does not dispute that Grant's 34 years of experience render him qualified to testify about tires and shooting reconstruction.  Doc. 263 at 5. Based on this extensive experience and his detailed examination of the subject tire, Grant opines that it is well recognized in the industry that small punctures do not always leak immediately or consistently.  And that whether punctures leak at all often depends on the size of the puncture hole, whether the penetrating object lodges, and whether the tire's interior materials fill the hole.  Grant considered the BMW tire, the size of its puncture, loose rubber and broken rayon cords visible in the puncture, its penetration angle, and the testimony of Hackbarth regarding how the tire lost air pressure.  Grant found that this was the sort of puncture that might not have lost air immediately, or lost it only minimally, and that based on the sporadic air loss Hackbarth described it was not possible to determine when the tire was originally shot.

Doc. 269 at 11-12.

Nor does Plaintiff's other evidence prove perjury in the grand jury proceeding. Plaintiff points to statements by the BMW mechanic who removed the bullet that the tire would have leaked immediately and the low pressure alert would have illuminated one mile from where the tire was punctured, statements by Hackbarth that DPS's lodged bullet theory was highly unlikely, and testimony that an expert had never heard or seen a tire that was perforated by a bullet and did not lose air.  Doc. 271 ¶¶ 6, 50.[11]  But this evidence only shows that the date of the BMW shooting remains hotly contested to this day.  A reasonable jury could not rely on such disputed evidence to find that Defendants deliberately lied to the grand jury, particularly when they had ballistics evidence – which had not been challenged at the time of the grand jury proceeding – that Plaintiff's gun had fired the bullet that hit the BMW.

---

[11] Plaintiff also asserts that DPS did not test or examine the tire to see if their theory was even possible.  Doc. 271 ¶ 50.  But the citation Plaintiff provides does not support this statement.

The validity of an indictment is "not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence." *United States v. Calandra*, 414 U.S. 338, 344 (1974); *see United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996) (noting that a defendant "may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence"). If this is true in a regular criminal prosecution where a criminal defendant has no burden of proof and has a due process right to challenge the government's case, then inadequate or incompetent evidence certainly is not sufficient to satisfy Plaintiff's higher burden in this civil action to show that the grand jury's indictment was induced through fraud, malice, or bad faith.

### iii.    Hackbarth's Interview.

Finally, Plaintiff argues that Baroldy withheld evidence that Hackbarth's statements in his second interview "debunked" the forensic testing. But as explained above, the pages of the grand jury transcript provided by Plaintiff show that Baroldy accurately presented the facts from Hackbarth to the grand jury, including statements made in his second interview.[12] No reasonable jury could conclude that Baroldy's explanation of the facts amount to fraud, malice, or bad faith.

### c.    Fabricated Evidence.

Plaintiff argues that ballistics expert Kalkowski claimed to observe striated marks on the recovered bullets, but that the marks did not exist and no other ballistics technician has been able to replicate Kalkowski's findings. Doc. 270 at 3-7, 11-12. According to Plaintiff, Kalkowski therefore must have fabricated his ballistics results. *Id.* Plaintiff's argument relies on four propositions: (1) Defendants have produced no photographic evidence memorializing the identification of Plaintiff's gun; (2) three independent

---

[12] The one exception, as explained above, is Baroldy's statement that Hackbarth thought the shooting could have occurred at the airport terminal or on the drive home. In fact, Hackbarth said in his second interview that it was impossible for the vehicle to have been shot at the airport given where it was parked. Doc. 271-3 at 10. But this misstatement did not mislead the grand jury because Baroldy himself said the vehicle could not have been shot at the airport "based on the location where it was parked." Doc. 271-3 at 22.

ballistics experts failed to replicate the crime lab's results; (3) expert testimony questioned the crime lab's methods; and (4) ballistics identification's low error rate "credibly suggests" that the evidence was fabricated. *Id.*

The Court concludes that while Plaintiff has presented significant evidence to suspect the crime lab's methods and conclusions were erroneous, he has failed to provide sufficient evidence from which a jury reasonably could find that the ballistics results were intentionally fabricated. The Court will address each of Plaintiff's assertions.

### i. No Photographic Evidence.

Plaintiff's statement that Defendants failed to provide a photograph memorializing the ballistics identification does not support an inference of fabrication. Plaintiff's expert, Stephen Deady, testified that photographs were produced by Kalkowski, but he did not think they supported an identification between the test fires and Plaintiff's gun. Doc. 271-1 at 117. This comports with Haag's testimony that the crime lab's photographs were produced, but were dark. Doc. 265-3 at 40; *see also* Doc. 271-1 at 85-86 (expert testifying that some photographs were blurry). While this evidence may suffice to show careless or negligent photography, it is not sufficient to show fabrication. *See Devereaux v. Abbey*, 263 F.3d 1070, 1076-77 (9th Cir. 2001) ("Failing to follow guidelines or to carry out an investigation in a manner that will ensure an error-free result is one thing; intentionally fabricating false evidence is quite another[.]"); *Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003) (mere carelessness is insufficient).

### ii. Independent Verification.

Three independent experts hired by the State of Arizona and Maricopa County – Lucien Haag, John Murdock, and Gregory Klees – reviewed the crime lab's evidence, test-fired bullets, and found insufficient evidence to identify Plaintiff's gun as the source of the bullets from the four shooting incidents. Docs. 270 at 6, 271-1 at 51. Plaintiff asserts that the experts' conclusions are "mutually exclusive" from the crime lab's conclusion, and that the chance is small that all three experts are incorrect and the crime lab is correct. Docs. 271 ¶ 26, 271-1 at 53-54, 97-98.

Plaintiff asserts that the independent experts' findings indicate that there were no marks or evidence tying the physical evidence to Plaintiff's gun, but the relationship is more nuanced. As Murdock testified, a finding of identification and a finding of inconclusiveness are both based on a "person's subjective estimate of the agreement [of the marks] that [are] seen or not seen" in the physical evidence. Doc. 271-1 at 87. Haag testified that a false identification could be made from an individual "assigning more importance to some matching stria than they deserve" when the marks do not "rise to the level necessary to exclude, as a practical matter, other firearms of the same class characteristics." *Id.* at 93. Haag further testified that he did not know whether Kalkowski's opinion was incorrect, and that it may be correct, but the evidence was just inconclusive. *Id.* at 94. Ballistics experts suggest that there was enough comparison evidence to associate Plaintiff's gun, but not enough to identify it as the only source of the fired bullets. *Id.* at 95 (Haag testifying that his comparisons "never rose to the level of an identification"); *see* Doc. 265-2 at 107-08 (Maciulla testifying that this was a difficult comparison, and with a difficult comparison it would be reasonable to expect one examiner to find identification and the other to find the evidence was inconclusive).[13]

The evidence from the independent experts certainly could support a jury finding that Kalkowski's match was incorrect, even negligent, but it does not follow that Kalkowski intentionally fabricated his conclusions. Plaintiff's own expert, who states that Kalkowski's identification was not reasonable and failed to follow DPS protocols, does not conclude that the erroneous identification resulted from fabrication. Doc. 271-1 at 51-56. He even opined that issues with the investigation may have stemmed from DPS allowing discretionary adherence to protocol and standards. *Id.* at 67.

///

///

---

[13] Plaintiff also emphasizes Haag's testimony that this was a troubling case, and argues that it supports Plaintiff's assertion that Kalkowski fabricated his results. Doc. 271 at 6 ¶ 52. But Haag's testimony suggests he felt this way because he knows all of the people in the case with whom he was disagreeing. Doc. 271-1 at 100. This does not indicate that Haag believed the crime lab results were fabricated.

### iii.     Crime Lab's Methodology.

Plaintiff argues that Defendants tested only Plaintiff's gun and did not match the gun to all of the recovered bullets or bullet fragments, that Defendants purposely chose to use a weaker microscope magnification, and that Defendants purposely chose not to align the test-fired and evidentiary bullets.  Docs. 270 at 6, 271 ¶ 13.

Plaintiff's expert, Stephen Deady, testified that he saw documentation that three guns were test fired and there were test bullets obtained from them, but there was no evidence that the bullets were compared to the physical evidence.  Doc. 271-1 at 119. Kalkowski testified that he compared all of the test-fired bullets to the physical evidence, but he did not maintain photo documentation of the comparison.  Doc. 265-2 at 151-52. Plaintiff cites his police procedures expert – Roger Clark – who testified that it was his understanding that the crime lab stopped testing bullets after firing Plaintiff's gun. Docs. 271-1 at 144, 271-2 at 133.  Clark does not indicate how he drew this conclusion, and nothing in his expert report addresses the crime lab's methodology.  It also seems that he did not review any evidence relating to the crime lab's methods.  Clark reviewed mandatory disclosure documents, a prosecution memo, deposition testimony of several involved officers (but not the ballistics criminalists), and other records related to the officers.  Doc. 271-1 at 145.  This evidence does not refute Kalkowski's assertion that all of the bullets were compared.  But even if Plaintiff is correct that an incomplete comparison was made, this evidence would support a finding of error, but does not indicate that the lab intentionally fabricated the evidence.  Plaintiff does not present evidence that a ballistics expert who finds a matching bullet must then proceed to test all other possible bullets.

Plaintiff asserts that Kalkowski did not directly compare bullets from two of the four shootings.  Doc. 271 at 8-9 ¶ 13.  Kalkowski testified that he may have compared the test bullets to the fired bullets, or he may have intercompared the test bullets.  Doc. 271-1 at 109.  He also testified that this is a standard practice if he concludes that all of the bullets come from the same firearm.  *Id.* at 106.

Murdock testified to various deficiencies in the crime lab's methods, which Plaintiff highlights. Doc. 270 at 6. Particularly, Murdock opined that 60x magnification was necessary to view the test bullets in this case, but the crime lab only used 40x magnification. Doc. 271-1 at 78. He testified that criminalists choose not to view evidence using a greater magnification because "they didn't think it was necessary." *Id.* at 79. Plaintiff attempts to parlay this into evidence of fraud, but it simply suggests that Kalkowski did not think higher magnification was necessary.

Murdock testified that there was one comparison where DPS did not line up the driving edges of the bullets. Doc. 271-1 at 80. He could not explain why the bullets were not lined up and stated that it would have been a conscious choice by the examiner. *Id.* at 81-82. He further testified that these deficiencies demonstrate that DPS erroneously completed their examination of the evidence. *Id.* at 84-85. But he never opined that theses errors demonstrated fraud or fabrication by the crime lab. And Plaintiff's argument that "[l]ining up the points and increasing the magnification would have demonstrated the identification was erroneous" (Doc. 270 at 6) similarly indicates that Defendants' crime lab analysis and conclusions may be faulty, but it does not show they were fabricated.

In short, while Plaintiff presents evidence from which a reasonable jury could conclude that Kalkowski's ballistics opinion was incorrect or even negligent, he has not presented evidence that Kalkowski knowingly falsified evidence. Even the expert witness hired by Plaintiff to criticize Kalkowski's findings did not opine that he fabricated evidence, a fact Plaintiff acknowledged during oral argument. *See* Tr. at 29:8-11. When asked about this lack of opinion, Plaintiff cited *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006), for the proposition that a jury reasonably could infer that Kalkowski fabricated evidence because his findings were "far afield of what any reasonable forensic examiner would find from the evidence[.]" Tr. at 29:8-21 (quoting *Gregory*, 444 F.3d at 744). But the forensic examiner in *Gregory* was alleged to have falsely reported that all of the hairs recovered from the victim's pantyhose matched the plaintiff's hair while knowingly withholding the existence of two non-matching hairs. *Gregory*, 444 F.3d

at 744. Plaintiff presents no similar withholding of evidence on the part of Kalkowski. The Court concludes that Plaintiff has failed to provide sufficient evidence from which a reasonable jury could find that Defendants fabricated the ballistics evidence.

### iv.    Ballistics Low Error Rate.

Plaintiff argues that because ballistics analysis has a low error rate, the errors in the ballistics testing suggest that it was fabricated. But he presents no evidence that the purportedly rare errors in ballistics testing are always the result of fabrication, which would be an implausible suggestion that ballistics experts never err if they are honest. Doc. 270 at 12. And "mere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Sudre v. The Port of Seattle*, NO. C15-0928JLR, 2016 WL 7035062, at *7 (W.D. Wash. Dec. 2, 2016) (quoting *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996)); *see also Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 59 (1st Cir. 2011) ("theoretical possibilities alone are inadequate to block the swing of the summary judgment ax").

### v.    Verification.

In the DPS crime lab, each identification must be independently verified by having a second forensic scientist conduct an independent analysis of the evidence under a microscope. Doc. 265-2 at 162. Verification occurs if the second scientist independently arrives at the same conclusion or identification as the primary forensic scientist. *Id.* In this case, ballistics expert Cade Shaw verified Kalkowski's identification of Plaintiff's gun. Docs. 265-2 at 150, 265-3 at 5. Crime lab supervisor John Maciulla also verified the match. Doc. 265-2 at 99-102.

Plaintiff argues that Shaw did not do "an independent complete examination." Doc. 271 ¶ 34. Plaintiff cites his expert's testimony that Shaw knew Kalkowski's results and examined the evidence under the microscope with those results in mind. Doc. 271-1 at 37-38. But Plaintiff does not provide evidence of what an "independent complete examination" is and how it differs from the crime lab's methods. And the expert did not

give any reasoning to support the assertion that Shaw was biased by Kalkowski's identification. This is not evidence of fabrication.

### vi. Under Pressure.

Plaintiff argues that Kalkowski was "under pressure to make a match" between the fired bullets and Plaintiff's gun. Doc. 271 ¶ 13. Plaintiff relies entirely on deposition testimony by Sergeant Gary Birtcher that prosecutor Vanessa Losicco said she sought another ballistics expert to testify at Plaintiff's trial because she did not think Kalkowski would "testify well on the stand" and "she felt that he was under pressure to make a decision." Doc. 271-1 at 8. In addition to the fact that Sergeant Birtcher's statement is hearsay – Plaintiff presents no evidence from Ms. Losicco, who was a Defendant in this case, or from the Maricopa County Attorney's Office that prosecuted Plaintiff – Birtcher testified that he did not know why Losicco thought Kalkowski was under pressure, or from whom. *Id.* at 9. Even if admissible, a reasonable jury would be unable to discern the significance of Kalkowski being "under pressure" from this indirect testimony, and, absent more, to conclude that Kalkowski engaged in fabrication of evidence.

### vii. Fabrication Conclusion.

The DPS crime lab identified the four bullets as coming from Plaintiff's gun, and this identification was verified by Shaw and Maciulla. Doc. 265-2 at 99. Plaintiff has provided evidence from which a reasonable jury could find that the crime lab's results were incorrect and even question the appropriateness of the crime lab's methods. But none of that evidence would support a finding that the certified laboratory technicians fabricated the evidence against Plaintiff with malice and bad faith.

### d. Conclusion.

Plaintiff has failed to present evidence sufficient to rebut the presumption of probable cause created by the grand jury indictment. The Court accordingly will grant summary judgment on the claims for malicious prosecution (Counts 3 and 7). Further, a post-arrest indictment "cuts off the length of detention, and thus damages, stemming from [a] false arrest[.]" *Jones*, 174 F.3d at 1286 n.8. Plaintiff's damages on the arrest-related

1    claims therefore will be limited to the period between Plaintiff's arrest on September 18,

2    2015, and his indictment on September 24, 2015.

3    **IV.    Qualified Immunity Under § 1983.**

4          A defendant in a § 1983 action is entitled to qualified immunity from suit if his

5    conduct does not violate a clearly established constitutional right of which a reasonable

6    person would have known.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The

7    Supreme Court has established a two-step inquiry for resolving a qualified immunity

8    defense: the constitutional inquiry and the qualified immunity inquiry.  *See Saucier v. Katz*,

9    533 U.S. 194, 200 (2001).  The first step asks whether, taken in the light most favorable to

10   the plaintiff, the facts show that the officer's conduct violated a constitutional right.  *Id.*

11   at 201.  The second step asks whether the right was clearly established at the time of the

12   violation.  *Id.*

13         Defendants are entitled to qualified immunity under the second step because

14   Plaintiff's rights were not clearly established at the time of his arrest.  "Unsurprisingly, it

15   is clearly established that an arrest without probable cause violates a person's Fourth

16   Amendment rights."  *Knox v. Sw. Airlines*, 124 F.3d 1103, 1107 (9th Cir. 1997).  It is also

17   "well-established that a 'person may not be arrested, or must be released from arrest, if

18   previously established probable cause has dissipated.'"  *Nicholson*, 935 F.3d at 691

19   (quoting *Ortiz-Hernandez*, 427 F.3d at 574).  But these clearly established rights are too

20   general to defeat Defendants' defense of qualified immunity.

21         The Supreme Court has "repeatedly stressed that courts must not 'define clearly

22   established law at a high level of generality, since doing so avoids the crucial question

23   whether the official acted reasonably in the particular circumstances that he or she faced.'"

24   *Wesby*, 138 S. Ct. at 590 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).  Thus,

25   the second step in the qualified immunity analysis "must be undertaken in light of the

26   specific context of the case, not as a broad general proposition."  *Saucier*, 533 U.S. at 201.

27   "The 'clearly established' standard . . . requires that the legal principle clearly prohibit the

28   officer's conduct in the particular circumstances before him.  The rule's contours must be

35

so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Wesby*, 138 S. Ct. at 590 (quoting *Saucier*, 533 U.S. at 202). "This requires a high 'degree of specificity.'" *Id.* (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015)). "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"[T]he 'specificity' of the rule is 'especially important in the Fourth Amendment context.'" *Id.* (quoting *Mullenix*, 136 S. Ct. at 308). Probable cause turns on "the assessment of probabilities in particular factual contexts" and cannot be "reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. "Given its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in 'the precise situation encountered.'" *Wesby*, 138 S. Ct. at 590 (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017)). As a result, officers are entitled to qualified immunity on a false arrest claim where the plaintiff "fail[s] to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). "While there does not have to be 'a case directly on point,' existing precedent must place the lawfulness of the particular arrest 'beyond debate.'" *Wesby*, 138 S. Ct. at 590 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Plaintiff "bears the burden of showing that the rights allegedly violated were 'clearly established.'" *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (citations omitted). Plaintiff asserts that by 2015 the law clearly held that fabricating evidence to justify an arrest violates the arrestee's constitutional rights. Doc. 270 at 17 (citing *Devereaux*, 263 F.3d at 1074-75). But as explained above, Plaintiff has presented no evidence from which a jury reasonably could find that Defendants fabricated evidence to establish probable cause for his arrest or to obtain the indictment.

Defendants' failure to resolve the discrepancy between the ballistics evidence and the timing of the BMW shooting creates a factual issue on the question of probable cause for Plaintiff's arrest, but Plaintiff identifies no case that presents "sufficiently similar

factual circumstances to have 'placed the constitutional question beyond debate.'" *Emmons v. City of Escondido*, 921 F.3d 1172, 1174 (9th Cir. 2019) (quoting *al-Kidd*, 563 U.S. at 741). Nor has Plaintiff identified a case sufficiently similar to Defendants' procurement of the indictment in this case — where officers provided an accurate description of the relevant facts, provided a theory of how the facts (deflation of the BMW tire) were consistent with Plaintiff's guilt, and failed to describe irrelevant or marginally relevant facts — which found a violation of Fourth Amendment rights.

The Court will grant summary judgment on the § 1983 arrest-related claims based on qualified immunity, and also finds qualified immunity to be a second basis for summary judgment on the indictment-related claims. *See id.* at 1175 (officer was entitled to qualified immunity where the plaintiff failed to identify "a case so precisely on point with this one as to satisfy the [Supreme] Court's demand for specificity"); *Shafer*, 868 F.3d at 1118 ("Because Shafer fails to identify sufficiently specific constitutional precedents to alert Deputy Padilla that his particular conduct was unlawful, Deputy Padilla is entitled to qualified immunity.")[14]

## V. Plaintiff's § 1983 *Brady* Claim (Count 4).

Under *Brady v. Maryland*, 373 U.S. 83 (1963), police investigators and prosecutors are required to disclose exculpatory evidence to criminal defendants. *See Smith v. Almada*, 640 F.3d 931, 939 (9th Cir. 2011). To establish a claim under *Brady*, the plaintiff must show that (1) the withheld evidence was favorable either because it was exculpatory or could be used to impeach, (2) the evidence was suppressed by the government, and (3) the nondisclosure prejudiced the plaintiff. *Id.*

Defendants argue that Plaintiff's *Brady* claim fails because it requires a conviction and Plaintiff's case never went to trial. Doc. 264 at 17 (citing *Strickler v. Greene*, 527 U.S. 263, 281 (1999) ("[T]here is never a real '*Brady* violation' unless the nondisclosure was

---

[14] Plaintiff asserts that Defendants have waived the defense of qualified immunity, but presents no legal authority in support of this assertion. Doc. 270 at 17. Plaintiff's prejudice argument is without merit because he was granted additional time to conduct discovery and respond to Defendants' initial summary judgment arguments, which included qualified immunity on the § 1983 claims. *See* Docs. 63 at 13-15, 98 at 3.

so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.")). Citing *Tatum*, 768 F.3d at 816, Plaintiff counters that a criminal defendant need not go to trial to prevail on a § 1983 claim based on failure to disclose exculpatory material. Doc. 270 at 15-16. But *Tatum* allowed a due process claim for unjustified loss of liberty due to the investigative officers' failure to disclose potentially dispositive exculpatory evidence to the prosecutors during a suspect's pretrial detention. 768 F.3d at 816. *Tatum* did not decide whether *Brady* extends to a situation where the suspect never goes to trial. *Id.* at 816 & n.5.

The Court need not resolve this issue because it has already determined that the evidence identified by Plaintiff as exculpatory and withheld from defense counsel was largely inconsequential. It would not have changed the outcome of the pretrial proceeding or the length of the incarceration. The prejudice arguments made by Plaintiff rely on allegations of fabricated evidence and conclusory statements about what the prosecutors would have done with the information, which is not the test for *Brady*. Doc. 270 at 16. The Court will grant summary judgment on Count 4.

## VI.    Plaintiff's Remaining State Law Tort Claims.

### A.    Negligence and Gross Negligence (Count 8).

Defendants argue that Arizona has established common-law immunity from mere negligence for police officers investigating crimes, and Plaintiff's proffered facts cannot support a claim for gross negligence. Doc. 264 at 16. The Court agrees.

"Common law qualified immunity generally provides public officials, including police officers, limited protection from liability when 'performing an act that inherently requires judgment or discretion.'" *Spooner v. City of Phoenix*, 435 P.3d 462, 466 (Ariz. Ct. App. 2018) (quoting *Chamberlain v. Mathis*, 729 P.2d 905, 909 (Ariz. 1986)). Thus, an officer performing a discretionary act within the scope of his public duties may be liable only if grossly negligent. *See id.* at 467. "By its very nature, investigative police work is discretionary and appropriate for exemption from suit for simple negligence." *Id.*; *see Landeros v. City of Tucson*, 831 P.2d 850, 851 (Ariz. Ct. App. 1992); *Walls v. Ariz. Dep't*

38

*of Pub. Safety*, 826 P.2d 1217, 1220 (Ariz. Ct. App. 1991). Count 8, therefore, can survive summary judgment only if the facts, taken in Plaintiff's favor, support a claim for gross negligence.

Gross negligence "is highly potent, and when it is present it fairly proclaims itself in no uncertain terms. It is 'in the air,' so to speak. It is flagrant and evinces a lawless and destructive spirit." *Cullison v. City of Peoria*, 584 P.2d 1156 (Ariz. 1978); *see Landeros*, 831 P.2d at 851. Plaintiff has made no such showing in this case.

Plaintiff asserts that the record contains numerous examples of conduct showing that Defendants acted willfully or with reckless indifference to Plaintiff's rights. Doc. 270 at 19. But the Court has already disagreed with Plaintiff's purported inferences of malice, perjury, and the deliberate fabrication or withholding of evidence. Although Defendants may have acted unreasonably when they arrested Plaintiff without resolving the discrepancy between the ballistics evidence and the timing of the BMW shooting, this conduct does not amount to such a flagrant violation of the duty of care as to constitute gross negligence. Nor would Plaintiff's evidence with respect to the grand jury enable a reasonable jury to find that Defendants acted with a lawless and destructive spirit. *See Marlowe v. Pinal County*, No. CV-06-1347-PHX-PGR, 2008 WL 4264724, at *12 (D. Ariz. Sept. 15, 2008) (finding no gross negligence where officer went to the wrong house and detained the wrong person while ignoring many obvious signs of his errors). The Court will grant summary judgment on Count 8.

**B.    Intentional Infliction of Emotional Distress (Count 9).**

The tort of intentional infliction of emotional distress requires proof of three elements: (1) the conduct must be "extreme and outrageous"; (2) the defendant must intend to cause emotional distress or recklessly disregard that such distress will, with a near certainty, occur from his conduct; and (3) severe emotional distress must occur as a result of the defendant's conduct. *Citizen Publ'g Co. v. Miller*, 115 P.3d 107, 110 (Ariz. 2005) (citing *Ford v. Revlon*, 734 P.2d 580, 585 (Ariz. 1987)). To satisfy the "extreme and outrageous" element, a defendant's conduct must be "so outrageous in character and so

extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community." *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 905 P.2d 559, 563 (Ariz. Ct. App. 1995).

Defendants argue that Plaintiff cannot prove the first element – extreme or outrageous conduct. Doc. 264 at 17-18. Plaintiff counters that the following facts show Defendants' extreme and outrageous conduct: (1) fabrication of ballistics evidence; (2) generating high publicity that branded Plaintiff as the I-10 shooter; (3) committing perjury; (4) withholding exculpatory information; and (5) placing Plaintiff under surveillance for eight months after dismissal of his criminal case. Doc. 270 at 19. Because Plaintiff has not provided sufficient facts to show perjury or withholding exculpatory information, the Court will not address those arguments.

Plaintiff argues that a post-dismissal press conference, where the officer stated that he still thought Plaintiff was the correct suspect, is evidence of extreme and outrageous conduct intended to cause Plaintiff distress. Doc. 271 ¶ 63. According to the deposition testimony cited by Plaintiff, Defendant Milstead made the following statement at a press conference on April 29, 2016: "I believe we have enough evidence to develop probable cause to believe [Plaintiff] is the correct suspect." Doc. 271-3 at 68. This is not the type of intolerable conduct intended to be covered by the tort. Plaintiff presents no evidence that Defendant Milstead spoke untruthfully when he stated his view of the evidence. And such a statement by a law enforcement leader, in a case of high public importance, is not "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community." *Mintz*, 905 P.2d at 563; *see Rondelli v. Pima Cty.*, 586 P.2d 1295, 1302 (Ariz. Ct. App. 1978) (conduct by officers was not outrageous even though the plaintiff was stereotyped as a "Mafioso," detained with his family for an hour without explanation, searched and handcuffed outside his car in full view of motorists on a street frequently used by his neighbors and friends, treated as a dangerous criminal, and falsely arrested).

Plaintiff cites deposition testimony of several officers that Plaintiff was placed under physical surveillance following his release from jail, and asserts that the surveillance was a violation of Defendants' policy. Docs. 76-1 at 9, 271 ¶ 62. But Plaintiff remained a suspect in the unsolved freeway shootings after his release (Doc. 271-2 at 89-90), and he presents no facts showing that the police surveillance was undertaken for an improper purpose or was so extreme and outrageous that it should be considered tortious behavior. Mere surveillance is not sufficient. *See United States v. Gonzalez*, 328 F.3d 543, 548 (9th Cir. 2003) (police may conduct surveillance and recordings in public areas). The Court will grant summary judgment on Count 9.

**C.    Aiding and Abetting Tortious Conduct (Count 10).**

A claim for aiding and abetting tortious conduct requires proof of three elements: (1) the primary tortfeasor must commit a tort that causes injury to the plaintiff; (2) the defendant must know the primary tortfeasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach. *See Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 23 (Ariz. 2002).

Defendants move for summary judgment based on an alleged lack of evidence to prove scienter – the second element of the claim. Doc. 264 at 17. But Defendants' motion makes no Defendant-specific arguments as to the alleged lack of knowledge of a primary tort. *See id.* In seeking summary judgment, Defendants bear the initial burden of "identifying those portions of [the record] which [they] believe[] demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Defendants have failed to meet their burden.

The Court will deny summary judgment as to whether Defendants aided and abetted Plaintiff's alleged false arrest and pre-indictment imprisonment. Because the tort claims for malicious prosecution, negligence, and intentional infliction of emotional distress fail as a matter of law, however, the derivative claim of aiding and abetting these primary torts also fails. *See Wells Fargo Bank*, 38 P.3d at 23 (aiding and abetting is a derivative tort for

which a plaintiff may recover only if he establishes an independent primary tort). The Court will grant summary judgment in this respect.

**VII.   Conclusion.**

The Court recognizes that this case concerns difficult circumstances on all sides. The four apparently-random freeway shootings in August 2015 presented an immediate and serious threat to residents of the Phoenix metropolitan area and rightly prompted an urgent and large-scale response by law enforcement. Upon receiving a report from DPS ballistics experts that Plaintiff's gun had fired the freeway-shooting bullets, Defendants acted quickly to arrest him and mitigate the public risk. On the other hand, Plaintiff was arrested, held in custody for seven months, and subjected to widespread press reporting that he was the freeway shooter, only to have all charges against him dropped when the ballistics conclusion could not be replicated. The Court understands why both sides feel strongly. But the law provides that Defendants were obligated to resolve a serious discrepancy in the evidence before they arrested Plaintiff, subjecting them to state law false arrest and imprisonment claims. The law also places high burdens on Plaintiff to overcome the presumption of probable cause raised by the grand jury's indictment and the protection afforded law enforcement officers through qualified immunity, burdens he has not overcome.

The Court will grant summary judgment on the § 1983 false arrest and imprisonment claims (Counts 1 and 2) based on qualified immunity. The Court will grant summary judgment on the malicious prosecution claims (Counts 3 and 7) because Plaintiff has failed to rebut the presumption of probable cause created by the grand jury indictment and on the basis of qualified immunity. The Court will deny summary judgment on the state law false arrest and imprisonment claims (Counts 5 and 6) with respect to any pre-indictment damages because Defendants have failed to show, as a matter of undisputed fact, that they had probable cause to arrest and detain Plaintiff. The Court will grant summary judgment on the § 1983 *Brady* claim (Count 4) and the state law tort claims for negligence and intentional infliction of emotional distress (Counts 8-9) because Plaintiff

42

has failed to present sufficient facts to support these claims. The Court will deny summary judgment on the aiding and abetting tort claim (Count 10) for Plaintiff's alleged false arrest and pre-indictment imprisonment, and grant summary judgment on the claim with respect to the primary torts of malicious prosecution, negligence, and intentional infliction of emotional distress.

**IT IS ORDERED:**

1. Defendants' motion for summary judgment (Doc. 264) is **granted in part** and **denied in part** as set forth above.

2. The Court will hold a telephone conference on **December 4, 2019, at 3:00 p.m.** for the purpose of setting the final pretrial conference and trial in this matter. Counsel for Plaintiff shall initiate a conference call to include counsel for all parties and the Court. If a dial-in number is to be used, counsel for Plaintiff shall provide the dial-in information to counsel for all parties and the Court no later than **December 2, 2019,** at **4:00 p.m.**

Dated this 15th day of November, 2019.

David G. Campbell
Senior United States District Judge