# Exhibit
# A

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**


*Leslie Merritt, Jr. v. State of Arizona, et. al.*
*US District Court, District of Arizona No: CV17-4540-PHX-DGC*


**Fed.R.Civ.P 26(a)(2)(B) Expert Report of Todd J. Weller**
**October 5, 2018**


<u>Introduction</u>

I have been retained by counsel for the plaintiff in *Leslie Merritt, Jr. v. State of Arizona, et al.*, US District Court, District of Arizona No: CV17-4540-PHX-DGC.  I have been asked to review related documents to determine whether the firearm and toolmark examination work performed by the Arizona Department of Public Safety (DPS) crime lab, including whether the casework violated the professional standards for forensic scientists, and whether the DPS crime lab's conclusions are valid and reliable.


<u>Qualifications</u>

I am the president and owner of Weller Forensics, LLC, a Burlingame, Califonia-based forensic science consulting firm.  I am the current chair of Organization of Scientific Area Committees (OSAC) Firearms and Toolmarks Subcommittee and the past-President of the California Association of Criminalistics.  I am a certified diplomate of the American Board of Criminalistics (ABC).  I have worked as an independent forensic consultant since October 2016. Before that, I was employed as a forensic scientist for over 16 years at the Oakland Police Department.  I have performed firearm and toolmark examinations on thousands of evidence items during my career.  I have been recognized by the trial courts in California and Missouri as an expert in the area of firearms identification.[1]  I hold a Bachelor of Arts in Biochemistry/Molecular Biology from Dartmouth College and received my Master of Science in Forensic Science from the University of California, Davis.  I have specialized training and experience in Firearm and Toolmark Identification, shooting reconstruction, drug analysis, forensic biology (DNA), crime scenes, and crime lab operations.

I am a member of the Association of Firearm and Toolmark Examiners (AFTE), California Association of Criminalistics (CAC), and Academy of Forensic Sciences (AAFS).  A copy of my CV is attached as Exhibit A.

---

[1] I have also been recognized as an expert in the areas of DNA analysis, crime scene analysis and drug analysis in California trial courts.

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

My current hourly fee for casework, which includes but may not be limited to reviewing records, producing reports, and testimony is $150 per hour.  Daily rate for travel and/or testimony is $2100 plus costs.

Over the past five years, have testified as an expert witness twenty-three times:[2]

1. October 2013, Alameda County, CA; Firearms Examination, OPD Case # 12-008473
2. November 2013, Alameda County, CA; Firearms Examination, OPD Case # 11-020181
3. February 2014, Alameda County, CA; Firearms Examination, OPD Case # 10-041583
4. July 2014, Alameda County, CA; Firearms Examination, OPD Case # 12-050675
5. August 2014, Alameda County, CA; Firearms Examination, OPD Case # 13-041987
6. December 2014, Alameda County, CA; Firearms Examination, OPD Case # 13-032775
7. January 2015, Alameda County, CA; Firearms Examination, OPD Case # 13-004548
8. February 2015, Alameda County, CA; Firearms Examination, OPD Case # 12-0066141
9. April 2015, Alameda County, CA; Firearms Examination, OPD Case # 13-041842
10. May 2015, Alameda County, CA; Firearms Examination, OPD Case # 13-039356
11. May 2015, Alameda County, CA; Firearms Examination, OPD Case # 12-066141
12. July 2015 Alameda County, CA; Firearms Examination, OPD Case # 15-020442
13. August 2015, Alameda County, CA; Firearms Examination, OPD Case # 13-016510
14. August 2015, Alameda County, CA; Firearms Examination, OPD Case # 10-013651 & 10-013775
15. February 2016, Alameda County, CA; Firearms Examination, OPD Case # 14-033602
16. February 2016, Alameda County, CA; Firearms Examination, OPD Case # 12-033289
17. August 2016, Alameda County, CA; Firearms Examination, OPD Case # 13-000861
18. September 2016, Alameda County, CA; Firearms Examination, OPD Case # 11-015824
19. November 2016, Alameda County, CA; Firearms Examination, OPD Case # 13-039356
20. March 2017, Jackson County, MO; Firearms Examination, State of Missouri v. Ceantonyo Deqon Kennedy
21. May 2017, San Francisco County, CA; DNA Examination, SFPD Case # 160-987-998
22. January 2018, Alameda County, CA; Firearms Examination, OPD Case # 15-048347
23. July 2018, Alameda County, CA; Firearms Examination, OPD Case # 08-059390

I have authored these articles for publication:

- Weller T, Zheng A, Thompson R, Tulleners F. The Confocal Microscopy Analysis of Breech Face Marks on Fired Cartridge Cases from Ten Consecutively Manufactured Pistol Slides, J Forensic Sci, July 2012, Vol 57(4) pp. 912-917.
- Weller T, Brubaker M, Duez P, Lilien, R. Introduction and Initial Evaluation of a Novel Three-Dimensional Imaging and Analysis System for Firearm Forensics AFTE Journal, 2015, Vol 47(4) pp. 198-208

[2] I have testified a total of thirty-seven times in firearm and toolmark identification since 2008.

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

- Murdock J, Petraco N, Thornton J, Neel M, Weller T, Thompson R, Hamby J, Collins E. The Development and Application of Random Match Probabilities to Firearm and Toolmark Identification, J Forensic Sci, May 2017, Vol 62(3) pp. 619-625
- Duez P, Weller T, Brubaker M, Hockensmith II R, Lilien R.  Development and Validation of a Virtual Examination Tool or Firearm Forensics.  J Forensic Sci, 2018, Jul;63(4): 1069-1084.

<u>**Sources of Information**</u>

To date, I have reviewed these documents and exhibits:

**Court Documents**
- 2017-12-08 Second Amended Complaint
- Minute entry in State v. Merritt, CR2015-144211-001, dated 4-25-2016

**AZ DPS Policies and Procedures**
- 2015-03-04 SAB GPM 249
- 2015-08-25 AZ376911 Firearms Protocol
- AZDPS SAB QAM 2015
- AZ DPS SAB QAM 2016

**DPS Produced Documents**
- Chris Kalkowski Photos
- Chris Kalkowski Reports
- Lisa Peloza Reports and Evofinder pptx files
- 2016-06-21  John G. Maciulla Affidavit

**Independent Examiner Work Product**
- Illustrated Report of April 14, 2016 in matter of State v. Merritt by Lucien Haag.
- John E. Murdock & Associates, Laboratory No. PCF 16-2, dated April 29, 2016.
- U.S. Department of Justice Laboratory Report, by Gregory S. Klees, Lab Number 16N0177(1) dated April 29, 2016.

**Depositions and Exhibits**:
- 2017-10-19 Christopher Kalkowski (October 19, 2017, Exhibits 1-17)
- 2017-06-06 and 2017-08-30 Criminalist and Firearms Examiner, Lucien Haag (Vol 1 June 6, 2017- Exhibits 1-13) and (Vol II August 30, 2017- Exhibits 14-32)
- 2017-06-13 Criminalist and Firearms Examiner, John Murdock (June 13, 2017- Exhibits 1-20)

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



### Report of Analysis

- 2016-08-23, Det. Trevor Graff Deposition (August 23, 2016)
- 2018-08-24 Vince Figarelli (August 24, 2018; Exhibits 1-14)
- 2018-06-29 Cade Shaw (June 29, 2018; Exhibits 1-8)
- 2018-09-07 John Maciulla (September 7, 2018; Exhibits 1-11)

**Additional Documents**
- Case Memorandum, dated June 28, 2016, From Ed Leiter and Vanessa Losicco, To Mark Faull, Re: Status of I-10 Shooter Case
- ISO/IEC 17025:2005 International Standard, "General requirements for the competence of testing and calibration laboratories" 2005-05-15
- ASCLD/LAB-International "Supplemental Requirements for the Accreditation of Forensic Science Testing Laboratories" 2011 Edition, November 22, 2011
- the SWGGUN[3] (Scientific Working Group for Firearms and Toolmarks) "Guidelines for the Standardization of Comparison Documentation."
- The AFTE Theory of Identification[4]

### The Science of Firearm & Toolmark Examination

The science of firearm and toolmark examination has been practiced for approximately 100 years.[5]  The techniques, instrumentation and methods of analysis of the profession were first memorialized in textbook format. [6,7,8,9] Additionally much of the foundational knowledge has been published in peer-reviewed scientific journals.  Nichols wrote a review highlighting some of the past research.[10]  The accepted methodology has been published and generally accepted for at least a half of a century.

Firearm and toolmark examination is a two-part test.  The first step involves characterizing any class characteristics present on fired evidence.  When comparing two items, if discernible class

---

[3] SWGGUN was the predecessor to OSAC.  It was a body of subject matter experts (firearms examiners) who wrote guidelines for the profession.  While these guidelines were not standards (an auditing agency did not use them to conduct an audit), they do provide an accepted of minimum standard of practice for the profession.

[4] "Theory of Identification as it Relates to Toolmarks: Revised" AFTE Journal, Volume 43(4) Fall 2011 at pg 287

[5] Hamby J "The History of Firearm and Toolmark Identification" AFTE Journal 1999 Volume 31, Number 3 (Summer), pp. 266-284

[6] Gunther, JD, Gunther CO The Identification of Firearms John Wiley & Sons, Inc., New York, New York 1935.

[7] Hatcher JS, Jury FJ, Weller J, Firearms Investigation, Identification and Evidence The Stackpole Company, Harrisburg, Pennsylvania, 1957

[8] Davis J, An Introduction to Tool Marks, Firearms and the Striagraph, Charles C Thomas-Publisher, Springfield Illinois, 1958

[9] Matthews J, Firearms Identification Volumes I&II Charles C Thomas-Publisher, Springfield, Illinois, 1962.

[10] Nichols, R., "Defending the Scientific Foundations of the Firearms and Tool Mark Identification Discipline: Responding to Recent Challenges", Journal of Forensic Sciences, Vol 52(3), May 2007, 586-594.

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



### Report of Analysis

characteristics agree, then an examiner will proceed to the second step.  If the class characteristics disagree, then the items being compared must have originated from different sources.  The second examination step involves the use comparison microscopy to compare individual toolmarks.  If an examiner compares two items and observes sufficient agreement of individual toolmarks, then the AFTE Theory of Identification states an examiner can conclude common origin.

Firearm and toolmark examination is used in every major United States crime laboratory as well by international laboratories.  The science, when performed using accepted methodology and properly trained examiners, has been shown to have low error rates.  Examiners have participated in numerous error rate studies, and rates of error have been found to be 1.0% or less.[11,12,13,14,15,16,17,18]

The job of the firearm and toolmark examiner is to use accepted scientific method and principles to reach objective and verifiable conclusions consistent with the known facts.  One of the fundamental concepts of science is reproducibility.  A forensic test should be reproducible by any similarly trained and competent criminalist.  It is because of this concept that forensic science is such a powerful and useful tool for the justice system.  To allow for reproducibility the firearms examiner is trained to take detailed, contemporaneous laboratory notes.  The trier of fact need not weigh the credibility of a forensic science witness because the documentation, testing, and results can be reproduced by a second scientist.

[11] Hamby, J.E., Brundage, D.J., and J.W. Thorpe. "The identification of bullets fired from 10 consecutively rifled 9mm Ruger pistol barrels: a research project involving 507 participants from 20 countries." AFTE Journal, Vol. 41, No. 2 (2009): pp. 99-110

[12] Fadul, T.G., Hernandez, G.A., Stoiloff, S., and S. Gulati. "An empirical study to improve the scientific foundation of forensic firearm and tool mark identification utilizing consecutively manufactured Glock EBIS barrels with the same EBIS pattern." National Institute of Justice Grant #2010-DN-BX-K269, December 2013

[13] Stroman, A. "Empirically Determined Frequency of Error in Cartridge Case Examinations Using a Declared Double Blind Format." AFTE Journal, Vol. 46, No. 2 (2014): pp. 157-175.

[14] Maryland B, Tucker C "Validation of Obturation Marks in Consecutively Reamed Chambers" AFTE Journal, Vol 44(2) Spring 2012, pp. 167-9.

[15] Fadul, T.G., Hernandez, G.A., Stoiloff, S., and S. Gulati. "An empirical study to improve the scientific foundation of forensic firearm and tool mark identification utilizing 10 consecutively manufactured slides." AFTE Journal. Vol. 45, No. 4 (2013): pp. 376-93

[16] Baldwin, D.P., Bajic, S.J., Morris, M., and D. Zamzow. "A study of false-positive and false-negative error rates in cartridge case comparisons." Ames Laboratory, USDOE, Technical Report #IS-5207 (2014)

[17] Keisler, M. "Isolated Pairs Research Study" AFTE Journal, Vol 50(1) Winter 2018, pp56-58

[18] Smith, T., Smith, G.A., Snipes, J.B. "A Validation Study of The Bullet and Cartridge Case Comparisons Using Samples Representative of Actual Casework." Journal of Forensic Sciences, 2016, Vol. 61, No. 4: pp. 939-946

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

**Method of Analysis:**

I have reviewed the material and compared the actions of the DPS crime lab to determine whether they followed accepted standards of practice in the forensic community.  The standards followed by reasonable criminalists are contained within: ISO standard 17025:2005, ASCLD/LAB Supplemental Requirements 2011 Edition, SWGGUN Guidelines and the AFTE Theory of Identification.   The written policy, procedure and protocol manuals of DPS such as the 2015-03-04 SAB GPM 249; 2015-08-25 AZ376911 Firearms Protocol; AZDPS SAB QAM 2015 in many instances reflect the professional standards in the community.

**Summary of Findings:**

1.       The job of the firearms examiner is to use accepted scientific methods and principles to reach objective and verifiable conclusions consistent with the evidence.  Under the facts, Leslie Merritt's Hi-Point C-9 firearm could not have fired Item DW1.  This invalidates the DPS conclusion that Leslie Merritt's firearm was used at each of the shooting scenes.[19]

Three independent examinations found insufficient agreement to conclude Leslie Merritt's Hi-Point C-9 pistol had fired the recovered bullets.  The three Independent analyses agree with each other and contradict the DPS conclusion.  It is not reasonable to positively identify Leslie Merritt's Hi-Point pistol as having fired the bullets recovered from each of the shooting scenes. The DPS misidentification resulted in Mr. Merritt's arrest.

2.       DPS violated professional standards and department policy numerous times and communicated erroneous results to law enforcement.   The failure to adhere to and enforce quality assurance standards and procedures likely contributed to the scientific errors in this case.

3.       The DPS staff responsible for supervision and enforcement of DPS Quality Assurance (QA) program failed to conduct a thorough contemporaneous or post-analysis review analysis. Given the unwillingness of DPS to confront the potential quality issues that exist, it is reasonable to suspect that errors in other cases have occurred both before and after the DPS analysis of the "I-10 Freeway" shootings.[20]

---

[19] The undersigned is familiar with the civil legal standard of reasonable degree of probability.  All findings in this report meet or exceed that threshold.

[20] Baldwin, D.P., Bajic, S.J., Morris, M., and D. Zamzow. "A study of false-positive and false-negative error rates in cartridge case comparisons." Ames Laboratory, USDOE, Technical Report #IS-5207 (2014).  In this error rate study, the authors found that most misidentifications were committed by a small group of examiners.  This provides evidence that if an examiner is prone to error, he/she may have committed additional errors.

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

**<u>Summary of Examinations Performed and Conclusions in the I-10 Freeway Shooting Case.</u>**

The Arizona Department of Public Safety (DPS) crime lab system consists of several publicly operated crime laboratories that provide forensic science analysis for law enforcement agencies throughout the State of Arizona.

This case involved the "I-10 Freeway Shootings", four shootings which occurred in Arizona on these days: [21]

-Case # 2015038784: August 29, 2015 at 1103 involving a Cadillac Escalade
-Case # AZ1500010702: August 29, 2015 at 1109 involving a passenger bus
-Case # AZ1500010709: August 29, 2015 at 2215 involving a Kia vehicle
-Case # AZ1500010964 August 30, 2015 between 2145 and 2215 involving a BMW vehicle

On August 31, 2015, DPS crime lab staff analyzed and compared the bullets and bullet fragments recovered from three shooting incidents.[22]  On September 3, an additional bullet was submitted to the crime lab.[23]  DPS staff compared the evidentiary items and concluded bullets and fragments from all four incidents were fired in a single firearm with certain class characteristics.  Based on the rifling characteristics present on some of the fired evidence the make and model of the firearm was determined to be a Hi-Point model C9.

On September 17, 2015, DPS investigators collected 8 Hi-Point C9s from local area pawn shops and submitted them to the crime lab.  DPS investigators requested the crime lab test and examine Leslie Merritt's firearm first.[24]

On September 18, 2015, at 8:08 am, laboratory staff called and informed investigators there was a definitive match to Leslie Merritt's firearm.[25]  The laboratory reports that summarized these findings are dated October 9, 2015.

The Hi-Point firearm had been surrendered to the Pawn Shop on August 30 at approximately 5:31 pm (several hours before the BMW was shot).[26]  The firearm identified by the DPS crime laboratory as having fired the evidence, and specifically Item DW1, could not have been fired by

---

[21] Leslie Merritt vs State of Arizona, Case No.: CV17-4540-PHX-DGC, Second Amended Complaint, Filed 12/08/17, at pg 4
[22] Case #s 2015038784, AZ1500010702, and AZ1500010709
[23] Case # AZ1500010964
[24] Deposition of Vince Figarelli, August 24, 2018 at pg 70.
[25] Deposition of Trevor Graff, August 23, 2016 at pg 54.
[26] Leslie Merritt vs State of Arizona, Case No.: CV17-4540-PHX-DGC, Second Amended Complaint, Filed 12/08/17, at pg 7.

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



### Report of Analysis

this firearm since it had been surrendered to the pawn shop.   In September of 2015, a DPS criminalist informed DPS investigators that that it was possible that a bullet/bullet fragment could have lodged in the side wall of the BMW tire, preventing the tire from deflating for days.[27]

An independent firearm and toolmark examiner, Lucien Haag, was hired by prosecutors to review the work performed by the DPS crime lab.  Mr. Haag compared the evidence and test fires for a month, and met with the primary DPS examiner.  Mr. Haag concluded there was an insufficient agreement for an identification.[28]  Mr. Haag also examined the BMW tire and testified that a bullet did not become lodged in the side wall of the tire.[29]

On or around April 25, 2016, the judge dismissed the criminal charges against Leslie Merritt.[30]

A second independent firearm and toolmark examiner, John Murdock, compared evidence and test fires.  This report was dated April 29, 2016 and there was insufficient agreement for identification.[31]  John Murdock's analysis included a detailed review of comparison photographs taken by DPS staff.  At least one photograph showed that DPS criminalist failed to properly align the bullets.  Mr. Murdock testified this was not correct technique for bullet comparison.[32]

A third independent firearm and toolmark examiner, Gregory Klees, compared evidence and test fires.  The report, dated April 29, 2016, concluded there was insufficient agreement for identification.[33]

---

[27] John Maciulla deposition, September 7, 2018 at pg 60.

[28] "The four (4) evidence bullets, AF1, DW1, KG1 and KG2 could neither be excluded or identified as having been fired in the Hi-Point C9 Pistol…The areas demonstrated by Mr. Kalkowski on February 29 and illustrated in the note packages in his various reports on these shooting incidents, in the opinion of this examiner, were insufficient to constitute an identification" Illustrated Report of April 14, 2016 in matter of State v. Merritt by Lucien Haag, bates # 014732.

[29] Deposition of Lucien Haag, June 6, 2017 at pg 78.

[30] Minute entry in State v. Merritt, CR2015-144211-001, dated 4-25-2016

[31] "In summary, there was no agreement found that suggests that any of the four questioned bullets were fired in the Merritt Hi-Point pistol as represented by the Independence test-fired bullets T4A, T3B and T4C." John E. Murdock & Associates, Laboratory No. PCF 16-2, dated April 29, 2016

[32] "…there was at least one DPS photomicrograph of this same area, and in my opinion, when you line up what looks like agreement, the driving edges are not in register, and the driving edge is the benchmark.  You always line up the driving edges and then you move up and see if you have agreement" Deposition of John E. Murdock, June 13, 2017 at 108

[33] U.S. Department of Justice Laboratory Report, by Gregory S. Klees, Lab Number 16N0177(1) dated April 29, 2016.

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

The crime lab staff performed additional firearm and toolmark examinations.  Prosecutors were informed of this additional testing on during a meeting on June 16, 2016:

> "Ms. Peloza discussed some official and unofficial analyses that she conducted. The unofficial analyses were not documented.  She also attempted to go through the photographs that she used as part of her analysis. During our meeting she was unable to decipher one photograph from another. She stated that 'in her mind' the 9mm test fires were the same as the .357 test fires. We have since asked for her photographs to be relabeled so that others understood what they were.  As of the date of this memo, [June 28, 2016] DCAs Losicco and Leiter have not received those relabeled photographs
>
> Ms. Peloza also indicated that she test fired the copper jacketed bullets found in Mr. Merritt's home to determine if they could be compared to the evidence bullets. Ms. Peloza stated that she did not write a report regarding this event because the bullets were "more or less" of no additional assistance to her. Since, we have asked Ms. Peloza to author a report regarding this event. As of the date of this memo, DCAs Losicco and Leiter have not received a report."[34]

In March or April of 2016, DPS staff transported the evidence to California and conducted additional testing using an Evofinder, an instrument used in firearm and toolmark examination.[35]  No report was produced regarding the Evofinder testing.

A DPS supervisor produced an affidavit, dated June 21, 2016, indicating that DPS crime lab maintains its original conclusion that Leslie Merritt's firearm fired the bullets in the I-10 Freeway Shooter case.[36]

**<u>FINDINGS</u>**

**1.      DPS Misidentified Merritt's Firearm and Did Not Consider the Possibility of a Misidentification**

---

[34] Case Memorandum from MCAO Deputy County Attorneys Ed Leiter and Vanessa Losicco, June 28, 2016. Bates # AZ469026
[35] Deposition of John Maciulla, September 7, 201 at pg 180.
[36] John Maciulla Affidavit, dated June 21, 2016, 2 pages.

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



### Report of Analysis

Mr. Merritt's firearm was in a pawn shop during the BMW shooting.  It could not have been used to fire the bullet DW1 (case # AZ1500010964).  The conclusion of Identification by the DPS crime lab is impossible given the facts.

The DPS crime lab also concluded that Items KG1 & KG2[37] (AZ1500010709), KG1 & KG2 (2015038784), and AF1 (AZ1500010702) were all fired in the same firearm.  Mr. Haag also concluded that evidence bullets were fired from a single firearm.[38]  Mr. Haag concluded there was insufficient agreement for identification when comparing evidence items to test fires from the Hi-Point pistol.  This provides evidence that DPS had insufficient data to conclude an identification to the Hi-Point for any of the evidence.  Mr. Haag's analysis is supported by two additional independent examinations that also concluded there was insufficient toolmark agreement to reach an identification conclusion.  One analysis was conducted by Mr. Murdock and the other by Mr. Klees.  The evidence has undergone substantial reanalysis.  None of the re-analysis supports the DPS conclusion that Merritt's Hi-Point pistol fired the recovered evidence.  All three independent examiners, Lucian Haag, John Murdock and Gregory Klees, reached an inconclusive result.  This means that when these examiners compared evidence items to test fires from Item 4, they concluded there was insufficient agreement of firearm produced marks to reach an opinion of identification.  This is different to the Arizona DPS results, where it was determined there was sufficient agreement to reach an identification.  Given the low error rates of the profession, the chance of all three independent examiners reaching the same conclusion and all being incorrect is not reasonable.

DPS staff have argued that conclusions of identification and inconclusive are compatible and do not raise concern:[39]

> "Q. Do you believe -- how do you reconcile Luke Haag's opinion in this case with the DPS crime lab's opinion?
> A.  Again, it's the same as with the ATF lab. Luke Haag was an inconclusive result. And as I said, an inconclusive is not a wrong answer in the world of CTS when we have an identification."[40]

---

[37] Item KG2 under AZ1500010709 was later identified to the Hi-Point pistol, see Bates# AZ138656-AZ138657
[38] Deposition of Lucien Haag, Volume II-8/30/2017 at pg 31: "I did inter-compare early on in the evidence items and was satisfied -- a little stronger than in the slide you have there -- that we are dealing with one gun.  So the responsible gun leaves reproducible marks.  They aren't great, but sufficient to associate one gun with these three vehicles: the Kia, the bus, and the BMW."
[39] Deposition of John Maciulla, September 07, 2018 at pg 124
[40] This testimony is not accurate.  When taking a CTS test and comparing same-source samples, an answer of "inconclusive" will be highlighted as incorrect.  For an example, see CTS Test 16-527 Summary Report.

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

Identification and inconclusive are mutually exclusive conclusions.  The suggestion by DPS that the science of firearm examination permits examiners to reach an identification while others reach an inconclusive reflects a mischaracterization of the reliable scientific basis of the profession.  This would mean that opinions of identification are not as conclusive as typically expressed in reports and testimony.  One examiner could reach an identification and another examiner could conclude inconclusive, and this would be both acceptable and also not unexpected.  For an "identification" result to be believed to be as a conclusive and correct result, then the trier of fact should be convinced that other properly trained examiners would also reach the same "identification" conclusion.  A summary of sensitivity rates found in validations studies is shown in Appendix C.  These rates provide strong support that when sufficient agreement is present, all reasonable examiners will conclude identification. The type of misidentification in the I-10 Freeway Shooter case is extremely rare in the profession. Mr. Haag testified this case "has been one of the most troubling and disconcerting endeavors in my 50-plus years as a criminalist… We should be able to come to the same conclusion when examining the same evidence, but we have not."[41] The misidentification of Merritt's firearm is below the expectation of reasonable forensic scientists.  The prosecutor's office relied on the DPS misidentification when deciding to charge Merritt in this case.[42]

## 2.   DPS Casework Violated Forensic Standards and Department Policy Through the Communication of Results and Casework Documentation

The professional standards and forensic laboratory policies of documentation and communication are designed to ensure accuracy.

## A.   The Verbal Release of Test Results Without Required Review Violated Important Laboratory Policy

It is reasonable to expect forensic scientists to release accurate information to law enforcement.  This is to ensure that law enforcement act only on reliable information.  The release of inaccurate results can lead to false arrests.  DPS recognizes this risk associated with preliminary reporting in their policy.

**General Procedures Manual Section 4.6.1 & 4.10**

---

[41] Deposition of Lucien C. Haag 6/6/2017 at pg124.

[42] Case Memorandum from MCAO Deputy County Attorneys Ed Leiter and Vanessa Losicco, June 28, 2016. Bates # AZ469024 "When the case was charged, MCAO relied on the ballistics evidence as reported by DPS Criminalist Chris Kulkawski [sic]…The circumstantial evidence, although not a perfect fit, was explained by the ballstics conclusions and the strength of that evidence."

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



### Report of Analysis

The General Procedures manual provides two routes for the release of testing results.  The first is through a hard copy report and the second is the release of "preliminary" results via non-hard copy reports (such as telephonic).  The General Procedures Manual Section 4.6.1 states "The routine dissemination of SAB Scientific Examination Reports is a hard copy to the case officer or via secure web release to the officer and/or prosecutor."  The primary method of communicating a result of testing is through a written report.  This is a reasonable method of result dissemination because this ensures that the released information has been peer-reviewed (through technical and administrative reviews).  However, sometimes, information may need be released before all analysis being completed.  The DPS General Procedures Manual Section 4.10 provides a procedure for "Preliminary Reporting of Examination Results." Section 4.10 states: "Preliminary results may not be released until a technical review has been performed and documented in LIMS."  Section 4.10.1 then states that any telephonic/verbal communication will include "The test(s) performed are preliminary in nature.  The preliminary test(s) do not conclusively identify the substance (e.g., drug, semen, etc.) in question. Laboratory protocol requires that additional test(s) be completed to conclusively identify the substance. The examiner (or designee) will record in the case notes, the date, time, and name of the person receiving the preliminary results."

In the case record for AZ1500010815, are several emails with the subject line "High Point Firearm Search Results" (Bates #011974-011977).  The content of the emails shows law enforcement personnel searching for recovered/impounded Hi-Point firearms.  The emails mention several times the firearm has 3-Left barrel class characteristics.  The emails are dated 9/3/2015.  From the emails police knew, based on the examination of recovered evidence, they were searching for a Hi-Point firearm with a three-left class characteristic barrel.  The hard copy reports associated with this case are dated 10/9/15.  Therefore, the police were informed of a preliminary conclusion as result of an examination of the evidence.  No evidence has been provided from the LIMS system to determine that a technical review had been documented per Section 4.10.[43]  There is no written record of the date, time and name of person who received the preliminary results.  The notes are noncongruent the General Procedures manual Section 4.10.1 and may also violate section 4.10 (depending on whether technical review had occurred and was documented in LIMS).

The telephone conversation between Christopher Kalkowski and Detective Trevor Graff on September 18, 2015 is not recorded in the laboratory case record, as required in General

---

[43] Note: a deposition of DPS staff clouds this issue.  See Deposition of Vince Figarelli dated August 24, 2018 at pg 190: "Q. But if a case file is being presented for an audit, then it would not include information that's solely on LIMS; true? A**. Well, the tech review is documented in the case file.**  And that's the official record, and that's the important part of the technical review other it's, in fact, tech reviewed."  This answer suggests if a preliminary technical review had occurred, then it should be documented in the case file.  If this is the case, the undersigned does not see documentation of a preliminary technical review, and only the final review occurring in October 2015.

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

Procedures Manual Section 4.10.1.[44]  Additionally, Section 4.10.1 requires that criminalists clarify that "The test(s) performed are preliminary in nature".  No evidence has been provided to show this occurred.

When viewing the date and time for the case records' photographs, there are only two photographs (showing comparison between Item 4 test fires and evidence) with a date and time taken before the 8:08 am phone call.  The two photos show a comparison between Item DW1 and Item 4.  Several additional photographs are taken in the afternoon of the same day.  Given the time of photographs, it is unlikely the technical review of the analysis occurred, as required in Section 4.10.  The documentation for the comparison of Item DW1 was incomplete: no photographs had been taken that show an identification between DW1 and the other evidence items.  A full technical review should have found this issue, which would have required documenting Item DW1 matching the other evidence prior to releasing the conclusion that Item 4 had fired bullets at <u>each</u> of the different shootings.  DPS staff likely did not follow General Procedures Manual Section 4.10 and completed a technical review before releasing this information.[45]  Had the technical review occurred, a competent technical review would have noticed the missing documentation.  This was a critical moment since a competent technical review would have caught the missing documentation and required laboratory staff to slow down, re-compare and document the conclusions before releasing results.  This would have been a chance for the analysts to reevaluate the findings, catch the error and not report the misidentification.[46]  Failing to conduct a competent technical review violated professional standards and was a causative factor in reporting the misidentification.

---

[44] Quality Assurance Manual Section 5.10.7 also requires that if a report is transmitted by telephone, the communication be recorded in the case record.

[45] Technical review includes review of the entire case file, and is defined in the DPS Quality Assurance manual on page 11: "The review of examination documentation, data, and other documents that form the basis for a scientific conclusion."  ASCLD/LAB ISO Supplemental requirements also defines the required components of a technical review in Section 5.9.4.1: "Conformance with proper technical procedures (test methods) and applicable laboratory policies and procedures; Accuracy of test reports and that the data supports the results and/or conclusions in the test report; Associations are properly qualified in the test report; and the test report contains all required information." DPS suggests that verification constitutes a full technical review.  See Deposition of Vince Figarelli dated August 24, 2018 at pg 191 to 192.  But verification is only one part of the technical review and fails to satisfy the requirements under GPM Section 4.10.  If verification were all that was required by technical review, then the case records would not have undergone subsequent technical review before publication.   The undersigned sees no allowance in DPS policy for partial results based only on verifications.  The policy allows only for hard-copy release of information or preliminary results.

[46] Once the identification result was released, it appears laboratory (at least some) staff were not open to the possibility of being wrong.  See Cade Shaw deposition, dated June 29, 2018 at page 140: "Q. Did you, at that point, have any room in your mind to consider that Luke Haag, John Murdock, and Gregory Klees from ATF were correct and that the crime lab was wrong in making an identification? A. No"

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

**B.      The Written Case Records Violates Forensic Standards by Failing to Support the
Reported Conclusions**

**Arizona DPS SAB Quality Assurance manual section 4.13.2.1**

Arizona DPS SAB Quality Assurance Manual Section 4.13.2.1 states "Technical records (i.e., case
records) shall contain sufficient supporting information to facilitate an audit trail and, if
possible, identify factors affecting the uncertainty and to enable the test to be repeated under
conditions as close as possible to the original."[47] Two additional forensic standards/guidelines
provide similar requirements.  The first is the ASCLD/LAB Guiding Principles of Professional
Responsibility for Crime Laboratories and Forensic Scientists part 15:

> "Make and retain full, contemporaneous, clear and accurate records of all examinations
> and tests conducted, and conclusions drawn, in sufficient detail to allow meaningful
> review and assessment of the conclusions by an independent person competent in the
> field."

The second is the SWGGUN[48] (Scientific Working Group for Firearms and Toolmarks)
"Guidelines for the Standardization of Comparison Documentation."  Section 2 states:

> "2.1 The case record must contain documentation of observations that support a
> reported conclusion.  2.2 At a minimum, the documentation must include depictions or
> descriptions of the agreement or disagreement of individual and/or class characteristics
> to the extent that another qualified firearm and toolmark examiner, without the benefit
> of the evidence itself, can review the case record, understand what was compared, and
> evaluate why the examiner arrived at the reported conclusion."

These standards and guidelines about the level of detail required in forensic documentation are
fundamentals to the scientific process.  Scientific findings are credible because they are
reproducible.  Experiments performed by different scientists at different times and locations
that obtain the same results provide strong evidence that test results are correct.  To allow
testing to be reproduced, a scientist is trained to take detailed, contemporaneous laboratory

---

[47] ISO 17025:2005 section 4.13.2.1 has the same requirement: "The laboratory shall retain records of original
observations, derived data and sufficient information to establish an audit trail, calibration records, staff records
and a copy of each test report or calibration certificate issued, for a defined period. The records for each test or
calibration shall contain sufficient information to facilitate, if possible, identification of factors affecting the
uncertainty and to enable the test or calibration to be repeated under conditions as close as possible to the
original.
[48] SWGGUN was the predecessor to OSAC.  It was a body of subject matter experts (firearms examiners) who wrote
guidelines for the profession.  While these guidelines were not standards (an auditing agency did not use them to
conduct an audit), they do provide an accepted minimum standard of practice for the profession.

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

notes.  This allows follow-up experiments to be performed using the same methods and same conditions.  The professional standards and guidelines direct firearms examiners to practice this basic tenant of science.  They require examiners to take sufficiently detailed notes that a second and competent examiner could understand what was done, the basis for conclusions and repeat the testing.  A review of DPS records found multiple instances where this threshold was not met.

In case # 1500010964, the case notes state Items KG1 & KG2 (2015038784), AF1 (AZ1500010702), KG1 (AZ1500010709) & DW1 (AZ1500010964) were all identified as having been fired in the same firearm and this was verified on September 4, 2015.[49]  There are no photographs[50] showing any comparisons between Item DW1 and the other identified items.  The lack of documentation makes it impossible to review the basis for the conclusion (which was reached on September 4) that Item DW1 was fired in the same firearm as Items KG1 & KG2 (2015038784), AF1 (AZ1500010702), and KG1 (AZ1500010709).  This case record is noncongruent with DPS SAB Quality Assurance Manual Section 4.13.2.1.

The report for case # 2015038784 states in part "The test shots from Item 4 (AZ1500010815) were compared to Items KG1 and KG1 (2015038784).  Items KG1 and KG2 (2015038784) were identified as having been fired from Item 4 (AZ1500010815)."  There are no comparison photographs between Items KG1 & KG2 to Item 4.  This case record is noncongruent with DPS SAB Quality Assurance Manual Section 4.13.2.1.  It may be argued that the "Results Summary Sheet" corrects this, and points a reviewer to other case notes.  In a different case record, another evidence was compared to Item 4.  However, there is no documentation of comparison results between KG1 & KG2 and Item 4.  ASCLD/LAB-International "Supplemental Requirements for the Accreditation of Forensic Science Testing Laboratories" section 5.9.4.1 states that a technical review shall include the assessment of examination records to ensure they contain, in part, "Accuracy of test reports and that the data supports the results and/or conclusions in the test report."  The report for 2015038784 implies that Items KG1 and KG2 were directly compared and identified to test fires from AZ1500010815.  The case notes fail to support the reported result.[51]

The report for case # AZ1500010709 states in part "The test shots from Item 4 (AZ1500010815) were compared to Items KG1 and KG2 (AZ1500010709).  Item KG1 (AZ1500010709) was

---

[49] See bates # 011983
[50] Arizona DPS Firearms and Toolmarks Analytical Protocol Section 1.4.2 requires photographs to document the basis for an identification conclusion: "Photographically preserve a representative sample of matching marks in laboratory notes".
[51] The case should have stated that Items KG1 & KG2 were compared to AF1 (AZ1500010702).  It could then point the reader to the case where it was documented that AF1 was compared to Item 4.  This would be an accurate summary of analysis that is supported by the case record.

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

identified as having been fired from Item 4 (AZ1500010815)."  There are no comparison photographs between Item 4 and KG1.[52]  This case record is noncongruent with DPS SAB Quality Assurance Manual Section 4.13.2.1 & ASCLD/LAB-International "Supplemental Requirements for the Accreditation of Forensic Science Testing Laboratories" section 5.9.4.1. The case notes fail to support the reported result.

The report for case # AZ1500010815 states "The test shots form Item 4 (AZ1500010815) were compared to Items KG1 and KG2 (2015038784), AF1 (AZ1500010702), KG1 thru KG3 (AZ1500010709) and DW1 (AZ1500010964).  Items KG1 and KG2 (2015038784), AF1 (AZ1500010702), KG1 (AZ1500010709) and DW1 (AZ1500010964) were all identified as having been fired from Item 4."  The case record includes only comparison photographs of AF1 to Item 4 and DW1 to Item 4.  There are no comparison photographs to support the connection of Items KG1 and KG2 (2015038784) and Item KG1 (AZ1500010709) to Item 4.  This case record is noncongruent with DPS SAB Quality Assurance Manual Section 4.13.2.1 & ASCLD/LAB-International "Supplemental Requirements for the Accreditation of Forensic Science Testing Laboratories" section 5.9.4.1. The case notes fail to support the reported result.

### ISO 17025:2015 Section 5.10.1
ISO 17015:2015 section 5.10.1 states "The results of each test, calibration, or series of tests or calibrations carried out by the laboratory shall be reported accurately, clearly, unambiguously and objectively, and in accordance with any specific instructions in the test or calibration methods."

Similar to ISO 17025:2005 section 4.13.2.1, this Standard is also a reflection of sound scientific practice.  Where Section 4.13.2.1 requires proper notes and documentation, Section 5.10.1 requires the complete and clear reporting of testing.  This is especially important in forensic science because litigation decisions (e.g., should a prosecutor charge a crime, should a judge dismiss a case) are often based on the details in a forensic science report.  Additional case records, such as bench notes, are often not discovered when these decisions are made.  To properly serve the justice system, forensic sciences are directed to accurately report the testing conducted.  Toolmark examiners know or should know that the failure to accurately report testing may mislead litigators and judges about the proper strength of the evidence and have dire consequences on legal advice and decisions.

The notes for AZ1500010815 include one page[53] that describes how Items 1 through 8 (eight different Hi-Point firearms) were test fired by a second analyst.  It then states "Items 1TF, 1TFA,

---

[52] The case record does support the reported result for Item KG2, and has written description of the comparison between KG2 and Item 3, conclusion, and basis for the conclusion.
[53] See Bates # 011969

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

2TF, 2TFA, 3TF, 3TFA, 3TFB used for comparisons.  4TF & 4TFA used for comparisons.  4TFB used for comparisons & identification."  The result of comparison of Items 1, 2, and 3 to the evidence is not included in notes.  Additionally, the report for AZ1500010815 does not report on the result of the comparison, despite the comparison noted as having occurred.  ISO 17015:2005 section 5.10.1 requires reporting the result of **each** test or series of tests.

**3.      The Quality Assurance Response was Inadequate**

The DPS laboratory has a Quality Assurance program.   The purpose of a Quality Assurance program and supervision in a lab is to ensure laboratory casework is accurate.  When the laboratory staff violate the Quality Assurance policy and procedures, or the policy and procedures are not enforced, there is greater risk for inaccurate results and laboratory error such as a toolmark misidentification.  In the I-10 Freeway Shooter case, the lack of enforcement of the QA policy has allowed the misidentification in this case to fester and remain uncorrected.

The following items are indicative of an inadequate QA program and lack of supervision and enforcement of crime lab policies:

**A.      Incomplete Scientific Analysis Requests and Documentation**

**Arizona DPS SAB Quality Assurance Manual Section 4.4.2**
Arizona DPS SAB Quality Assurance Manual Section 4.4.2 discusses the review of agency requests:

> "Within the case record, the SAB maintains records related to the customer request, including the 'Scientific Analysis Request' form and case-related discussions with the customer documented in a communications log."[54]

The same section then describes the review of the Analysis Request and the required documentation if a modification to the request is made (emphasis added):

> "Before analysis begins, a second review is conducted by the laboratory manager, Unit Supervisor, or designee to determine if there is anything more specific about the request and to determine if the SAB has the capability and resources to perform the services requested (i.e., adequate standards, controls and approved test methods).  If

---

[54] ISO 17025:2005 Section 4.4.2 has similar language: "Records of reviews, including any significant changes, shall be maintained. Records shall also be maintained of pertinent discussions with a customer relating to the customer's requirements or the results of the work during the period of execution of the contract."

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



### Report of Analysis

the SAB is unable to provide the requested service, the reviewer will inform the customer of this and discuss the possibility of a modified request. If the request cannot be modified then a withdrawal report shall be issued. **This discussion, including modifications accepted by the customer, will be documented in the communications log**."

Case requests are important in forensic analysis because they provide the forensic examiner guidance on what testing is necessary for the investigation.  A properly written case request will document what testing is necessary, and therefore when the examiner is assigned to the case, the examiner will know what evidence items to test and what forensic testing is needed. Failure to submit a sufficiently clear and detailed request can leave the primary analyst in the dark on what evidence items need analysis and what questions to answer.  A sufficiently clear case request has a second benefit, and that is to shield the primary analyst from having to contact investigators to seek clarification.  This would have the benefit of shielding the analyst from irrelevant and potentially biasing information and investigative pressures.  The DPS Quality Assurance Manual directs supervisory staff, and not primary examiners, to seek and document modifications to request information.  This also has the benefit of shielding examiners from ancillary and potentially biasing information.

In the I-10 Freeway shooter case, four of the five Scientific Analysis Requests lack an actual request for analysis, while the fifth requests a comparison, but does not describe what the evidence should be compared to.

The Scientific Analysis Request and Evidence Inventory (Bates # 009738) for case 2015038784 lists "bullet fragments" under the section "describe examination needed for each item and priority in which they are to occur if being analyzed by one unit."  "Bullet fragments" is not a request for analysis, but only an evidence description.

The Scientific Analysis Request and Evidence Inventory (Bates # 011978) for case AZ1500010815 is blank under the section "describe examination needed for each item and priority in which they are to occur if being analyzed by one unit."

The Scientific Analysis Request and Evidence Inventory (Bates # 011959) for case AZ1500010709 lists "Hold For Evidence" under the section "describe examination needed for each item and priority in which they are to occur if being analyzed by one unit."  This is not a request for analysis, as it does not tell what type of analysis is requested.

The Scientific Analysis Request and Evidence Inventory (Bates # 011988) lists "DW1, Item 1- compare bullet projectile to current samples" under the section "describe examination needed for each item and priority in which they are to occur if being analyzed by one unit."  While this

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

is a request for analysis, it is not clear what else DW1 should be compared to since this is only one evidence item.

The Scientific Analysis Request and Evidence Inventory (Bates # 011944) lists "HOLD" under the section "describe examination needed for each item and priority in which they are to occur if being analyzed by one unit." This is not a request for analysis as it does not explain what type of examination should be performed on this evidence.

In these circumstances, it is reasonable to expect that DPS staff should have followed their policy and procedures Section 4.4.2. This directs DPS management to contact the submitting investigator(s), modify the request for analysis and then document that modification in a communication log. DPS staff failed to do so. Given the subsequent analysis that was performed in this case, an intercomparison of evidence items, and test firing and comparison to test fires, case-related discussion between investigators and laboratory staff must have occurred. No communication logs are included in the case files documenting the discussion(s). These cases are noncompliant with DPS SAB Quality Assurance Manual Section 4.4.2.

Had laboratory staff followed their procedures, this analysis could have been treated like any other routine case request and the analyst could have had minimal or no contact with investigative staff. This would provide the examiner a buffer from potential investigative pressures.[55,56]

## B.     Failure to Document Verification Method

### Arizona DPS Firearms and Toolmarks Analytical Protocol Section 1.10.4

Arizona DPS Firearms and Toolmarks Analytical Protocol Section 1.10.4 states (emphasis added) "Each verification shall be documented in the examiner's notes with the verifier's initials, date and a **description of the verification method.**" The DPS Firearms and Toolmarks section allows for verification via comparison microscopy or review of comparison photographs. Since these two methods are permitted, it follows that the method of verification be documented. This enables a reviewer of the record to properly understand what was done and the basis for the verification.

---

[55] DPS sergeant Birtcher testified that Mr. Kalkwoski was under pressure to make a decision; see Deposition of Sergeant Gary Brian Birtcher 3/16/2017 at pg 95-96. Christopher Kalkowski testified he did not feel pressure to make an identification. See Deposition of Christopher Kalkowski 10/19/2017 at pg 138.

[56] DPS supervisors are aware of potential negative consequences of pressure on an examination. When asking the ATF to reexamine evidence: "Greg Klees was asked to do a complete blind reanalysis of the casework. And added to that, the -- fact that it had been previously looked at, obviously, I didn't want me being there also to add any additional pressures to -- to Greg." John Maciulla Deposition September 7, 2018 at pg 109.

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

Each comparison case notes have the same "Results Summary Sheet" dated 17Sep18 through 18Sep15.[57]  This sheet summarizes conclusions, namely that case numbers 2015038784, AZ1500010702, AZ1500010709 and AZ1500010964 all have evidence that was fired in a Hi-Point pistol under case AZ1500010815.  This result is verified on 18Sep15.  DPS failed to describe the method of verification (i.e., direct comparison or photographs) in these notes.

The "Bullet Worksheet" notes page[58] for case 2015038784 indicate Items KG1 & KG2 (2015038784), and Item AF1 (AZ1500010702) and KG1 (AZ1500010709), were all identified as having been fired in the same firearm and this is verified on 03Sep15.  DPS failed to record the method of verification.

The "Bullet Worksheet" notes page[59] for case AZ1500010709 indicates Item KG1 and Item AF1 (AZ1500010702) were identified as having been fired in the same firearm and this was verified on 02Sep15.  DPS failed to record the method of verification.

The "Bullet Worksheet" notes page[60] for case AZ1500010964 indicates Item DW1, Items KG1 & KG2 (2015038784), Item AF1 (AZ1500010702), and Item KG1 (AZ1500010709) were identified as having been fired in the same firearm and this was verified (date appears to be 04Sep15).  DPS failed to record the method of verification.

The "Bullet Worksheet" notes page[61] for case AZ15000010702 indicates Item AF1 and Item KG1 (AZ1500010709) were identified as having been fired in the same firearm and this was verified on 02Sep15.  DPS failed to record the method of verification.

The notes for each of the five cases fail to record the method of verification.  These case notes are noncompliant with Arizona DPS Firearms and Toolmarks Analytical Protocol Section 1.10.4.  The lack of subsequent corrective action in light of these violations indicates an inadequate QA program.

C.      **Failure to Record Contemporaneous Notes**

**Arizona DPS SAB Quality Assurance Manual Section 4.13.2.2**
Arizona DPS SAB Quality Assurance Manual Section 4.13.2.2 states (emphasis added):
"Observations, data and calculations shall be **recorded at the time they are made** and shall be

---

[57] See Bates #s 009731, 011965, 011948, 011982, and 011931
[58] See bates # 009732
[59] See bates # 011949
[60] See bates # 011983
[61] See bates # 011932

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

identifiable to the specific task."[62,63,64]  The case documentation, under Arizona DPS Firearms and Toolmarks Analytical Protocol Section 1.4.2.,[65] requires photographs of matching toolmarks where identifications were concluded.   The photographs record the areas of agreement and the observations made by the primary analyst when reaching a conclusion.  By recording observations contemporaneously with the analysis, the case record documentation is more likely to reflect accurately the analyst's observations when reaching a decision.  Specifically, the comparison of microscopic toolmarks requires considerable technique in adjusting lighting and samples to properly illuminate, observe and compare the marks.  Taking photographs contemporaneously, ensures the case record accurately documents what the examiner was observing when an identification was concluded.  A delay between the conclusion and taking photographs risks that the case record no longer accurately reflect what the examiner observed when reaching a conclusion.

Mr. Kalkowski's notes for each of the five cases have photomicrographs showing comparison of striated marks on fired bullets and bullet fragments.  Many photographs are repeated in more than one set of notes.  Appendix A lists each comparison photomicrograph, the corresponding bates # and the date the photograph was taken as stored in the digital metadata.  These photographs serve as the primary support for the reported identifications.  The metadata indicates that Mr. Kalkowski took some photographs on September 20, 2018.  It was concluded that the Hi-Point pistol had fired evidence items on September 18, 2015 as documented by the verification of the conclusion in each of the case notes.[66] Mr. Kalkowski notified DPS investigators of the alleged identification to Merritt's firearm on the morning on September 18, 2015.[67]

---

[62] ISO 17025:2005 has the same requirement: "Observations, data and calculations shall be recorded at the time they are made and shall be identifiable to the specific task."
[63] The ASCLD/LAB Guiding Principles of Professional Responsibility for Crime Laboratories and Forensic Scientists also requires the production of contemporaneous notes (emphasis added): "15. **Make and retain full, contemporaneous, clear and accurate records of all examinations and tests conducted**, and conclusions drawn, in sufficient detail to allow meaningful review and assessment of the conclusions by an independent person competent in the field."
[64] DPS SAB General Procedures Manual (effective date 03/04/2015) Section 4.2.2 "Case notes shall be taken concurrently with the examination of evidence."
[65] Section 1.4.2 states "Photographically preserve a representative sample of matching marks in laboratory notes."
[66] Most of the photographs taken on September 20 are comparisons of test fire to test fire bullets.  The test fire to test fire comparisons are performed in order to observe and document the capacity of a particular firearm to reproduce marks from bullet to bullet.  As documented by Haag and Murdock, test fire to test fire comparisons were difficult.  Documentation of test fire agreement should have occurred prior to reaching a conclusion of identification.
[67] See Deposition of Detective Trevor Graff at pages 52-53.

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

The photographs in case notes under AZ1500010964 have photographs dated on September 18 and September 20.[68]  However, it was concluded Item DW1 was fired in the same firearm as other items on September 4 (see bates # 011983).  Therefore, the case required documentation occurred 14 and 16 days late, respectively.

DPS noted some observations and support for their conclusions (in photographs) days later.  The case notes are noncompliant with professional standards and the Arizona DPS SAB Quality Assurance Manual Section 4.13.2.2.[69] To ensure accuracy, the photographs supporting the conclusions should be recorded when the conclusion is reached.  The lack of subsequent corrective action in light of these violations indicates an inadequate QA program.

**D.      DPS Conducted Undocumented Testing**

In a memorandum from Maricopa County Deputy County Attorneys Ed Leiter and Vanessa Losicco to Mark Faull, dated June 28, 2016, titled "Status of I-10 Shooter Case", the authors of the memo describe a meeting with a DPS staff member to discuss additional testing that had occurred in this case:

> "Ms. Peloza also indicated that she test fired copper jacketed bullets found in Mr. Merritt's home to determine if they could be compared to the evidence bullets.  Ms. Peloza stated that she did not write a report regarding this event because the bullets were 'more of less' of no additional assistance to her.  Since, we have asked Ms. Peloza to author a report regarding this event.  As of the date of this memo, DCAs Losicco and Leiter have not received a report".[70]

This testing may have been conducted in case report AZ1500010815, dated June 13, 2016.[71,72]  There is a mention of Items PM15 and PM5, in which the analyst sought permission

---

[68] Photographs under AZ1500010709 show a comparison between DW1 and KG2 (these are dated September 4), however this comparison was determined to be inconclusive and thus does not support an identification conclusion.

[69] A DPS staff supervisor argues in a deposition that photographs are "supplemental" to notes, and thus do not fall under normal note documentation requirements.  See Maciulla deposition dated September 7, 2018 at pg 154. This does not conform with DPS QAM Section 4.13.1.1 (emphasis added) "Technical records (i.e. case records) include all administrative and examination documentation generated in the processing of a case, including but not limited to: the request for scientific analysis, original notes, observations, charges, graphs, **photographs, digital images**, case related communications and laboratory reports."

[70] See Bates # AZ469026

[71] See Bates # AZ138656 through AZ138711

[72] This additional testing is unusual, since the case request included in the case record is the original submitted by investigator Graff on September 17, 2015.  The examination request section remains blank.  The undersigned is unsure, based on the case record, why this additional testing was conducted, or who requested this analysis.

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

from Sgt Mapp to use evidence ammunition for testing.[73]  There is no record (written or photographic) of the result.  The report does not mention that evidence ammunition was used for testing, nor the result.  The result, especially since evidence ammunition was fired, should have been reported.[74]

**E.      Root Cause Inquiry**

DPS supervisory/quality assurance staff knew of Mr. Haag's reexamination and conflicting conclusion.[75]  DPS Quality Assurance staff initiated a Quality Inquiry on April 21, 2016 and the Inquiry was closed on July 8, 2016.[76]  Under the "Root Cause" the inquiry states, in whole:

> "Still re-analyzing evidence with new test fires using larger diameter bullets.  Images were shown to Luke Haag and evidence with test fires will be were [sic] input into EvoFinder.  I believe all our policies were followed and the analysis was correct.  Five different examiners from DPS have looked at some if not all the evidence all agree with the identification"

From case records, it has been documented three DPS examiners (Kalkowski, Shaw, and Peloza) examined or verified the evidence.  There is no documentation of which two additional criminalists examined the evidence, when these examinations occurred, how much information these DPS examiners knew before their examinations and how extensive these reexaminations were.  A DPS Supervisor testified that he viewed the evidence but produced no report.[77]  Without documenting and reporting on these additional examinations, it is impossible to assess the seriousness of this portion of the inquiry.

DPS fails to address the report and results of Mr. Klees in this inquiry.  The reexamination of Mr. Klees was initiated by the DPS,[78] and the inquiry should have included his analysis.  The Quality Inquiry also failed to address the reexamination by Mr. Murdock.  The Murdock report was dated April 29, 2016 and DPS supervisory staff knew Murdock's results.[79]  Given the substantial independent reexamination of the evidence in this case that resulted in three consensus opinions contradictory to the DPS conclusion, the Quality Assurance response found in the Quality Inquiry is severely lacking.  The type of misidentification in the I-10 Freeway Shooter

---

[73] See bates # AZ138658
[74] ASCLD/LAB Supplemental requirements section 4.13.2.2 "NOTE When a test result or observation is rejected, the reason(s) should be recorded."  It is a best practice, but not strictly required to include all data in the case record.
[75] Deposition of John Maciulla, September 07, 2018 at pg 123
[76] "Quality Inquiry" Bates # AZ377042-AZ377044
[77] Deposition of John Maciulla, September 07, 2018 at pg 103-105
[78] Deposition of John Maciulla, September 07, 2018 at pg 103
[79] Deposition of John Maciulla, September 07, 2018 at pg 117

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

case is extremely rare in the profession. The Quality Inquiry fails to resolve these differences of opinions and avoids considering the possibility that the original analysis is wrong.  The Quality Inquiry stated "I believe all of our policies were followed…" and the inquiry notes that no SAB Policy was affected.  This provides further evidence that the Quality Inquiry was not thorough or taken seriously.

The knowledge of three separate and conflicting reexaminations should have initiated an extensive and thorough analysis that considered the possibility and cause of a misidentification. By doing so, the DPS laboratory would have discovered, at a minimum, that laboratory staff were not following quality assurance policy and producing lower quality casework.  The unwillingness of the laboratory, faced with three independent examinations and the timing and facts, to investigate the cause of error indicates an inadequate QA response that is below the professional standards of reasonable criminalists or crime labs.

DPS could have culture which features selectively choosing what procedures are mandatory.  A DPS superintendent was asked about whether adherence to verification documentation policy was discretionary (emphasis added):[80]

> Q. And at the subparagraph for 1.10.4, it indicates "Each verification **shall** be documented in the examiner's notes with the verifier's initials, date and a description of the verification method." Do you see that?
> A. Yes.
> Q. Is that a discretionary standard, or is that a mandatory standard?
> A. I'm sure there are circumstances under which it would be discretionary.

Nothing is discretionary about Section 1.10.4 of the firearms protocol.  The protocol uses the term "shall", indicating this requirement must be followed.  The unwillingness of DPS to admit to this fundamental concept of forensic standards indicates a flawed approach to management. How can we be assured laboratory staff adhere to quality assurance policy and testing methodology when laboratory leadership testifies that mandatory procedures are discretionary?

One of the fundamental concepts of science is reproducibility.  Forensic science is such a powerful and useful tool for the justice system because a forensic test should be reproducible by any similarly trained and competent criminalist.  The trier of fact need not weigh the credibility of a forensic science witness because the testing and results can be reproduced.  It is reasonable to expect that retesting would get the same result.

---

[80] Deposition of Vince Figarelli, August 24, 2018 at pg 179

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

In the "I-10 Freeway Shooting", the evidence was subjected to retesting initiated by prosecutors and the Arizona DPS.  All three of the independent retests reached the same conclusion: there were insufficient marks for an identification.  DPS should have initiated a thorough review of what went wrong.  The DPS quality inquiry failed to seek the cause of the error or identify any laboratory policy violations.  Additionally, laboratory staff know the timing of the shootings, specifically that the incident involving the BMW occurred after Merritt's firearm had been in the possession of the pawn shop.  Given these facts, it is reasonable to expect the laboratory to have initiated a thorough review to determine the cause of the misidentification.  Instead, DPS staff have suggested, performing no testing, that a bullet or a bullet fragment lodged in the tire sidewall and prevented the BMW tire from deflating for days.[81,82]  This possibility has been maintained by DPS staff despite contradictory testimony and empirical testing by Mr. Haag.[83,84]  By maintaining this possibility, no matter how unreasonable, DPS staff need not acknowledge that a misidentification occurred.  The DPS staff have allowed the error to remain uncorrected.  Given the unwillingness of DPS to confront the quality issues that exist, it is reasonable to suspect that errors in other cases could have occurred both before and after the DPS analysis of the "I-10 Freeway" shootings.

## Conclusion

The undersigned review of records involved in the "I-10 Freeway Shooting" case found multiple instances where the casework was noncompliant with professional standards.   This indicates a pattern of disregard for laboratory quality assurance policy and procedure.  Quality assurance policy, such as documenting requests for service, denoting the method of validation, and taking contemporaneous notes are not overly burdensome or difficult to adhere to.  These policy procedures exist so the laboratory casework conforms with international professional quality assurance standards.  If laboratory staff cannot adhere to routine quality assurance protocols, it draws into question what other policy or methodology short cuts will continue.

Under penalty of perjury, the above information to the best of my knowledge is true and correct.

---

[81] John Maciulla deposition, September 7, 2018 at pg 96; "Q Do you intend to testify in court regarding your opinion about the bullet or fragment lodging in the sidewall of the tire? THE WITNESS: Yes, I would agree that I would testify that I do not feel scientifically you can exclude that possibility…Q.· ·Do you have any data specific to the BMW tire in the freeway shooting case to support that opinion? A.  No, I do not."

[82] Week In Review, September 22-26, 2015 "DPS Ballistics expert reviewed photographs of shootings…He stated the bullet could have been lodged in the side of the BWM's tire for some time tin include August 22-30.  He will conduct some testing on the run flat tires to understand the dynamics of that particular tire" Bates # AZ302968

[83] "Illustrated Shooting Reconstruction Report of May 10, 2016 In the matter of State of Arizona v. Merritt" by Lucien C. Haag

[84] Deposition of Lucien Haag, 6/6/2017 at pg 78-80.

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

October 5, 2018
_____
Date

_____
Completed By
Todd Weller
Weller Forensics, LLC

**APPENDIX A**
**Comparison Photographs Included in Notes for Each Case**

| Photographs in Case # 2015038784 | | |
|---|---|---|
| **Photo Label** | **Bates #** | **Meta Data Date** |
| KG2 2015038784 to AF1 AZ1500010702 20x near base | 009733 | 9/3/2015 3:52 pm |
| KG2 2015038784 to AF1 AZ1500010702 20x towards nose more purple dot | 009733 | 9/3/2015 4:03 pm |
| KG1 2015038784 to AF1 AZ1500010702 at same Purple dot 20x | 009734 | 9/3/2015 4:48 pm |
| KG1 2015038784 to AF1 AZ1500010702 at same Purple dot 20x0001 | 009734 | 9/3/2015 4:55 pm |
| KG2 2015038784 ID to KG1 AZ1500010709 30x purple dot | 009735 | 9/3/2015 4:11 pm |
| TF4A to TF4C (Ind) (AZ1500010815) 20x below purple dot | 009736 | 9/20/2015 4:29 pm |
| TF4A to TF4C Ind 20x purple dot AZ1500010815 | 009736 | 9/20/2015 4:23 pm |

| Photographs in Case # AZ1500010815 | | |
|---|---|---|
| **Photo Label** | **Bates #** | **Meta Data Date** |
| TF4A to TF4C (Ind) (AZ1500010815) 20x below purple dot | 011966 | 9/20/2015 4:29 pm |
| TF4A to TF4C Ind 20x purple dot AZ1500010815 | 011966 | 9/20/2015 4:23 pm |
| AF1 (AZ1500010702) to TF4C) (Ind) (AZ1500010815) 30x | 011967 | 9/18/2015 2:08 pm |
| AF1 (AZ1500010702) to TF4A (Ind) (AZ1500010815) 20x purple dot | 011967 | 9/18/2015 4:57 pm |
| AF1(AZ1500010702) to TF4A (Ind) (AZ1500010815) 40x | 011967 | 9/18/2015 3:00 pm |
| DW1 (AZ1500010964) to TS 4C (Ind) (AZ1500010815) 30x-2 | 011968 | 9/18/2015 5:07 am |
| DW1 (AZ1500010964) to TS 4C (Ind) (AZ1500010815) 30x | 011968 | 9/18/2015 5:03 am |
| DW1 (AZ1500010964) to TF4C (Ind) (AZ1500010815) 20X | 011968 | 9/20/2015 4:51 pm |

| Photographs in Case # AZ1500010709 | | |
|---|---|---|
| **Photo Label** | **Bates #** | **Meta Data Date** |
| TF4A to TF4C (Ind) (AZ1500010815) 20x below purple dot | 011951 | 9/20/2015 4:29 pm |

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

| | | |
|---|---|---|
| TF4A to TF4C Ind 20x purple dot AZ1500010815 | 011951 | 9/20/2015 4:23 pm |
| AF1 AZ1500010702 to KG1 AZ1500010709 40x feathering area | 011954 | 9/2/2015 6:13 pm |
| AF1 AZ1500010702 to KG1 AZ1500010709 40 feathering area 2 | 011954 | 9/2/2015 7:01 pm |
| DW1 AZ1500010964 to KG2 AZ1500010709 at 30x (note inc conclusion 09Oct15[85]) | 011955 | 9/4/2015 7:46 pm |
| DW1 AZ1500010964 to KG2 AZ1500010709 at 30x-2 | 011955 | 9/4/2015 7:48 pm |
| KG2 2015038784 ID to KG1 AZ1500010709 30x purple dot | 011956 | 9/3/2015 4:11 pm |
| KG2 AZ1500010709 to AF1 AZ1500010702 at 40x (note inc conclusion 09Oct15[86]) | 011957 | 9/11/2015 2:13am |
| KG2 AZ1500010709 to AF1 AZ1500010702 20x feathering area red dot | 011957 | 9/2/2015 4:39 pm |

| Photographs in Case # AZ1500010964 | | |
|---|---|---|
| **Photo Label** | **Bates #** | **Meta Data Date** |
| DW1 (AZ1500010964) to TS 4C (Ind) (AZ1500010815) 30x-2 | 011985 | 9/18/2015 5:07 am |
| DW1 (AZ1500010964) to TS 4C (Ind) (AZ1500010815) 30x[87] | 011985 | 9/18/2015 5:03 am |
| DW1 (AZ1500010964) to TF4C (Ind) (AZ1500010815) 20x | 011985 | 9/20/2015 4:51 pm |
| TF4A to TF4C (Ind) (AZ1500010815) 20x below purple dot | 011986 | 9/20/2015 4:29 pm |
| TF4A to TF4C Ind 20x purple dot AZ1500010815 | 011986 | 9/20/2015 4:23 pm |

| Photographs in Case # AZ1500010702 | | |
|---|---|---|
| **Photo Label** | **Bates #** | **Meta Data Date** |
| TF4A to TF4C (Ind) (AZ1500010815) 20x below purple dot | 011986 | 9/20/2015 4:29 pm |
| TF4A to TF4C Ind 20x purple dot AZ1500010815 | 011986 | 9/20/2015 4:23 pm |
| AF1 AZ1500010702 to KG1 AZ1500010709 40x feathering area | 011935 | 9/2/2015 6:13 pm |
| AF1 AZ1500010702 to KG1 AZ1500010709 40x feathering area2 | 011935 | 9/2/2015 7:01 pm |
| KG2 2015038784 to AF1 AZ1500010702 20x near base | 011936 | 9/3/2015 3:52 pm |
| KG2 2015038784 to AF1 AZ1500010702 20x towards nose more purple dot | 011936 | 9/3/2015 4:03 pm |

---

[85] Hand written note; the file name does not include the hand written "note inc conclusion 09Oct15"

[86] Hand written note; the file name does not include the hand written "note inc conclusion 09Oct15"

[87] "TS" labeling appears to be a typo, but unsure since this was not caught/corrected by DPS technical and/or administrative review.   Same typo appears in sample above.

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

| | | |
|---|---|---|
| KG1 2015038784 to AF1 AZ1500010702 at same purple dot 20x | 011937 | 9/3/2015 4:48 pm |
| KG1 2015038784 to AF1 AZ1500010702 at same purple dot 20x0001 | 011937 | 9/3/2015 4:55 pm |
| KG2 AZ1500010709 to AF1 AZ1500010702 at 40x (note inc conclusion 09Oct15[88]) | 011938 | 9/11/2015 2:13am |
| KG2 AZ1500010709 to AF1 AZ1500010702 20x feathering area red dot | 011938 | 9/2/2015 4:39 pm |
| AF1 (AZ15000010702) to TF4C (Ind) (AZ1500010815) 30x | 011939 | 9/18/2015 2:08 pm |
| AF1 (AZ15000010702) to TF4A (Ind) (AZ1500010815) 20x purple dot | 011939 | 9/18/2015 4:57 pm |
| AF1 (AZ15000010702) to TF4A (Ind) (AZ1500010815) 40x | 011939 | 9/18/2015 3:00 pm |

**APPENDIX B**
**Diagram of Comparison Photographs Documented in C. Kalkowski Case Notes**



---

[88] Hand written note; the file name does not include "note inc conclusion 09Oct15"

Weller Forensics, LLC
PO Box 106
Burlingame, CA 94011
info@wellerforensics.com



**Report of Analysis**

**Appendix C: Sensitivity Rates from Validation/Error Rate Studies Involving Bullets[89]**

| Study Authors | Sensitivity Rate | Number of Participants |
|---|---|---|
| Hamby/Brundage[90] | 0.999 | 507 |
| Murphy, D.[91] | 0.912 | Not reported[92] |
| Fadul, T et al[93] | 0.991 | 165 |

---

[89] A forth study, Smith T. et al is not included in this table.  Unlike the three listed studies, the Smith study sent <u>different</u> kits to examiners, thus it is not of value when discussing if examiners reach the same conclusion of identification since they were not necessarily examining items from the <u>same</u> source.

[90] Hamby J. "The Identification of Bullets Fired from 10 Consecutively Rifled 9mm Ruger Pistol Barrels: A Research Project Involving 507 Participants from 20 Countries".  AFTE Journal 41(2) Spring 2009, pg 99-110.  This study had a total of 502 examiners.  There was a total of 15 unknowns each with a matching known, thus a total of 7530 possible identifications (15x502=7530).  There were 7522 correct identifications and 8 inconclusives. 7522/7530=0.999

[91] Murphy, D. "CTS Error Rates/1992-2005 Firearms/Toolmarks".  Paper presented at AFTE Annual Training Seminar, Henderson NV, May 2010.

[92] The total number of possible identifications was 2020.  The study did not report the total number of participants.

[93] Fadul, T. et al "An Empirical Study to Improve the Scientific Foundation of Forensic Firearm and Tool Mark Identification Utilizing Consecutively Manufactured Glock EBIS Barrels with the Same EBIS Pattern". National Institute of Justice Grant #2010-DN-BX-K269, December 2013. Available at: https://www.ncjrs.gov/pdffiles1/nij/grants/237960.pdf  The test consisted of 10 unknowns, 8 of which had a true match.  Thus 8 true matches x 165 participants=1320 true identifications possible.  A total of 8 false positives and 4 inconclusives were reported for these samples, thus 12 total non-identifications for these samples. 1308/1320=0.990.