**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Leslie A. Merritt, Jr.,

               Plaintiff,

v.

State of Arizona, et al.,

               Defendants.

No. CV-17-04540-PHX-DGC

**ORDER**

This order will address the pending motions in limine and one additional issue that has been briefed by the parties – whether evidence arising after the indictment date, but reflecting what was known on the date of arrest, should be admissible to prove lack of probable cause to arrest.  *See* Doc. 374.

**I.     Plaintiff's MIL 1 (Doc. 290) and Defendant's MILs 8 and 10 (Docs. 335, 336).**

The parties disagree on the admissibility of conclusions by several criminalists who considered whether Plaintiff's gun fired the bullets collected from the four freeway shootings (the "evidence bullets").   Plaintiff seeks to exclude evidence that Arizona Department of Public Safety's ("DPS") Cade Shaw conducted an independent ballistic analysis, claiming that he did not, but does not oppose evidence that Shaw verified Christopher Kalkowski's opinion that Plaintiff's gun fired the bullets.  Doc. 290 at 2-3. Plaintiff also seeks to exclude evidence that DPS's John Maciulla, Aaron Brudenell, or Lisa Peloza conducted independent ballistic analyses that confirmed Kalkowski's conclusion.  *Id.*

Defendant seeks to exclude evidence that criminalists John Murdock, Greg Klees, and Lucien Haig failed to find sufficient evidence to match Plaintiff's gun to the evidence bullets. The parties make various arguments. The Court will address those arguments, but is unable to make final decisions on some issues without additional briefing.

### A.     The Post-Arrest Opinions Are Relevant.

Both sides argue that criminalist opinions formed after Plaintiff's arrest are not relevant because probable cause must be based on information known to officers at the time of the arrest. *See* Doc. 290 at 2 (Plaintiff: "These criminalists reached their views about the ballistic evidence after Merritt's arrest and cannot relate to the probable cause determination before Merritt's arrest."); Doc. 343 at 2 (Defendant: "the Court should exclude from trial any reference or evidence relating to post-arrest analyses"). Plaintiff also argues, however, that post-arrest criminalist opinions that favor his position should be admitted on the question of whether Kalkowski's identification of Plaintiff's gun was reasonable. *See* Doc. 345 at 3 ("The evidence of Haag's ballistic comparison and results are relevant to impeach the defendant's claim of probable cause to arrest and to show the unreasonable nature of the crime lab personnel in instigating a false arrest."). The Court concludes that post-arrest opinions can be relevant in this case.

"Probable cause to arrest exists where the arresting officer has reasonably trustworthy information sufficient to lead a reasonable person to believe that an offense has been committed and that the person to be arrested committed it." *State v. Dixon*, 735 P.2d 761, 763 (Ariz. 1987); *In re Aubuchon*, 309 P.3d 886, 895 (Ariz. 2013) (citing *Dixon* standard). Probable cause must be evaluated by "the facts as they existed at the time of the arrest, and not afterward," *Reams v. City of Tucson*, 701 P.2d 598, 601 (Az. Ct. App. 1985), and must consider the "totality of the circumstances," *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994) (citation omitted). Although probable cause usually is a question of law for the court, *Sarwark Motor Sales, Inc. v. Woolridge*, 354 P.2d 34, 36 (Ariz. 1960), where "the evidence is conflicting, so that on one conclusion as to the facts therefrom probable cause exists, while from another it does not, it is then for the jury to

determine the true state of facts and to apply the law as laid down by the court to those facts." *Id.*

Thus, the jury in this case will be required to determine whether, at the time of Plaintiff's arrest, a reasonable person would have had reasonably trustworthy information from which to believe that Plaintiff committed the freeway shootings.  The jury must consider the totality of the circumstances, including the information known to all members of the investigation team whose knowledge is cumulated for purposes of determining probable cause.  *See* Doc. 374.  This includes the knowledge of Christopher Kalkowski, the DPS criminalist who made the primary match between Plaintiff's gun and the evidence bullets.  *Id.*  For the jury to decide whether a reasonable person with Kalkowski's knowledge would have made the match, the jury must determine whether Kalkowski's conclusion was reasonable and based on reasonably trustworthy information.

Conclusions of criminalists who agreed with Kalkowski and conclusions of other experts who did not are relevant to the jury's evaluation of whether Kalkowski's match was reasonable.  That is true even for conclusions reached after Plaintiff's arrest, because it is the basis and strength of the conclusions, not their timing, that sheds light on whether Kalkowski's conclusion was reasonable.  To be clear, post-arrest conclusions by any expert are not relevant as part of the facts known at the time of arrest – they were not known then.  But they are relevant on the question of whether Kalkowski's match was reasonable.

### B.      Were Rule 26 Expert Disclosures Required?

Plaintiff argues that Maciulla, Brudenell, and Peloza were never disclosed as experts and therefore cannot provide expert opinions at trial.  Doc. 290 at 2.  Defendant makes a similar argument, asserting that Lucien Haag, who has been disclosed as a fact witness and not an expert, "is precluded from testifying 'based on scientific, technical, or other specialized knowledge within the scope of Rule 702,'" and that "[t]here is no way to avoid such expert testimony given that Haag performed his analysis specifically as an expert retained by Maricopa County."  Doc. 335 at 2 (quoting  Fed. R. Evid. 701(c)).

Rule 26 requires a party to disclose information regarding any witness it may use at trial to present evidence under Rule 702. Fed. R. Civ. P. 26(a)(2). This includes the identity of such witness (26(a)(2)(A)), an expert report if the witness has been retained or specially employed to provide expert testimony or if her duties as the party's employee regularly involves giving expert testimony (26(a)(2)(B)), and, if a report is not required, a summary of the witness's opinions (26(a)(2)(C)).

"Whether a [witness's] testimony is expert testimony subject to Rule 702 or non-expert fact testimony (including non-expert opinions subject to Rule 701) must be determined by looking at the Federal Rules of Evidence." *Alsadi v. Intel Corp.*, No. CV-16-03738-PHX-DGC, 2020 WL 4035169, at *13 (D. Ariz. July 17, 2020). Rule 702 covers opinions based on the witness's "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Lay opinion testimony is admissible only if it is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). Thus, the Court must look at the nature of the offered evidence, and its basis, to decide whether it is expert opinion evidence subject to the admissibility requirements of Rule 702 and the disclosure requirements of Rule 26(a)(2), or lay opinion evidence admissible under the Rule 701. *See* S. Gensler, Federal Rules of Civil Procedure, Rules and Commentary, at 703 (2020 ed.) ("The relevant inquiry is the nature of the testimony rather than the status of the witness.").

Any witness who will testify in this case that Plaintiff's gun is or is not a match with the evidence bullets will provide testimony based on "scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). This is true even if the witness's opinion was formed during the course of work performed for the parties rather than as a specially retained litigation expert. A witness "is providing expert testimony if the testimony consists of opinions based on 'scientific, technical, or other specialized knowledge' regardless of whether those opinions were formed during the scope of interaction with a party prior to litigation." *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 757 n.2 (7th Cir. 2004); *Alsadi*, 2020 WL 4035169, at *14 ("Plaintiffs are incorrect in

their claim that Dr. Garcia can testify about his treatment of Plaintiff without regard to Rule 702.  If he expresses opinions formed during the course of treatment, those opinions likely will be based on based on Dr. Garcia's scientific, technical, or other specialized knowledge and therefore will be subject to the requirements of Rule 702.").

Thus, to the extent that any witness in this case will testify that Plaintiff's gun is or is not a match with the evidence bullets, that witness's opinion must be admissible under Rule 702.  The testimony must also have been disclosed under Rule 26(a)(2) as expert testimony, but a violation of that disclosure obligation requires consideration of whether the nondisclosure was substantially justified or harmless.  Fed. R. Civ. P. 37(c)(1).  The parties do not address these issues, and the Court therefore cannot determine at this point whether any criminalist's opinion should be excluded for nondisclosure under Rule 26.

### C.    Hearsay Objections.

Defendant argues that reports written by Haag, Murdock, and Klees are inadmissible hearsay.  Docs. 335 at 2-3, 336 at 3.  Plaintiff appears to suggest that at least some of the reports are admissible under Rule 801(d)(2) because they have either been adopted by Defendant or were issued as agents of Defendant.  Doc. 355 at 5-6.  This argument is not developed in any detail by either side.

### D.    Criminalist Conclusions.

For reasons explained above, the Court will not exclude opinions of criminalists simply because they were formed after Plaintiff's arrest.  The Court will require the parties to provide further briefing on two issues: (1) if the witnesses were not disclosed under Rule 26(a)(2), is their nondisclosure substantially justified or harmless under Rule 37(c)(1); and (2) are the expert reports admissible under Rule 801(d)(2) or some other hearsay exception.  The parties shall file memoranda on these issues, not to exceed 8 pages each, by **August 28, 2020**.[1]

/ / /

---

[1] Defendant also argues that neither Murdock nor Klees will be testifying at trial and their expert opinions cannot be "bootstrapped" into the case by Plaintiff's retained expert, Weller.  Doc. 336 at 3.  This argument is resolved below.

**II.     Defendant's Motion to Exclude Weller Testimony (Doc. 331).**

Defendant seeks to exclude all four opinions to be offered by Plaintiff's ballistics expert, Todd Weller.  The Court will provide general background information and then discuss Weller's four opinions in reverse order.

**A.     Background.**

Weller provides this description of his expertise:

> I am the president and owner of Weller Forensics, LLC, a Burlingame, California-based forensic science consulting firm.  I am the current chair of Organization of Scientific Area Committees (OSAC) Firearms and Toolmarks Subcommittee and the past-President of the California Association of Criminalistics.  I am a certified diplomate of the American Board of Criminalistics (ABC).  I have worked as an independent forensic consultant since October 2016.  Before that, I was employed as a forensic scientist for over 16 years at the Oakland Police Department.  I have performed firearm and toolmark examinations on thousands of evidence items during my career.  I  have been recognized by the trial courts in California and Missouri as an expert in the area of firearms identification.  I hold a Bachelor of Arts in Biochemistry/Molecular Biology from Dartmouth College and received my Master of Science in Forensic Science from the University of California, Davis.   I have specialized training and experience in Firearm and Toolmark Identification, shooting reconstruction, drug analysis, forensic biology (DNA), crime scenes, and crime lab operations.
>
> I am a member of the Association of Firearm and Toolmark Examiners (AFTE), California Association of Criminalistics (CAC), and Academy of Forensic Sciences (AAFS).

Doc. 331-1 at 1.  Weller has testified 23 times in the last five years – 22 times on firearm examinations and once on DNA  evidence – and has co-authored four papers related to firearms examinations.  *Id.* at 2-3.

**B.     Weller's Fourth Opinion – Tire Deflation.**

Weller testified that the BMW tire would have deflated within minutes of being struck by a bullet, and that Defendant's experts are incorrect in their opinions that the tire could have retained air during the days it was parked at the airport.  But Weller's training on the effect of a bullet striking a tire is very limited.  It consists of a one-hour segment in

a one-week course, less than an hour in two one-day courses, watching three tires being shot during one of these training segments, and reviewing three to four pages in a textbook on crime scene reconstruction.   Doc. 331-3 at 3-7, 15.   Weller has never worked on a tire-deflation case (*id.* at 3), admits that he does not have specialized expertise in tires (*id.* at 16), and has never had training on a run-flat tire like the one in this case (*id.* at 7).

In an attempt to show he is qualified to opine on bullets striking tires, Plaintiff emphasizes that Weller has "witnessed shooting numerous automobile tires."  Doc. 363 at 3. But Weller made clear in his deposition that he observed the shooting of three tires within a one-hour period during one of his brief training courses.  Doc. 363-1 at 14.  Plaintiff also asserts that Weller relied on a "vast experimental data base" in forming his opinion (Doc. 363 at 3), but the data base Weller referred to in his deposition was Lucien Haag's data base, not Mr. Weller's, and was not reviewed by Weller.  *See* Doc. 363-1 at 20.  Finally, Plaintiff notes that Weller conducted a literature search to find instances of tires being shot and retaining air, and could find none.  Doc. 363 at 3.  But a non-expert's inability to find contrary literature does not make him an expert, and Weller does not identify the sources he searched (other than the ATFE Journal), the methods he used, or how he identified potential locations for such information.  Doc, 363-1 at 21.

Mr. Weller is qualified as an expert in firearms examination, but Plaintiff has failed to show by a preponderance of the evidence that he is qualified as an expert on tire deflation after a bullet strike.  *See Triant v. Am. Med. Sys. Inc.*, No. CV-12-00450-PHX-DGC, 2020 WL 4049844, at *2 (D. Ariz. July 20, 2020) ("The proponent of expert testimony has the ultimate burden of showing by a preponderance of the evidence that the requirements of Rule 702 have been satisfied.").  Mr. Weller therefore cannot testify on the effects of the bullet striking the BMW tire, and this opinion will be excluded.

### C.   Weller's Second and Third Opinions.

Defendant seeks to exclude Weller's opinions that the DPS Crime Lab violated forensic standards and department policy, and that the Crime Lab's quality assurance response was inadequate.  The sole basis for this request is Defendant's assertion that the

knowledge of civilian forensic scientists cannot be imputed to investigating officers. Doc. 331 at 3. The Court has rejected this argument (Doc. 374), and will deny this portion of Defendant's motion.

### D.    Weller's First Opinion – Plaintiff's Gun Was Not A Match.

Weller opines that Kalkowski misidentified Plaintiff's pistol as the gun that fired the evidence bullets. Doc. 331-1 at 10. Weller explains that "[f]irearm and toolmark examination is a two-part test." Doc. 331-1 at 5. "The first step involves characterizing any class characteristics present on fired evidence." *Id.* "The second examination step involves the use comparison microscopy to compare individual toolmarks." *Id.* at 6. Weller did not follow these two steps in forming his opinion that Plaintiff's gun did not fire the evidence bullets. Doc. 331-3 at 17. He bases his opinion on two other conclusions.

First, he concludes that the BMW's tire would have deflated rapidly after being shot, and notes that Plaintiff's gun was in the pawn shop when the rapid deflation occurred. He therefore concludes that the gun could not have shot the BMW bullet. For reasons explained above, however, Weller is not qualified to give the tire-deflation opinion on which this conclusion rests. Without that opinion, Weller's first conclusion is not based on reliable principles and methods applied reliably, and therefore is not admissible under Rule 702. Further, he testified that firearms examiners should not consider outside evidence, such as the details and timing of the BMW shooting, when forming opinions about whether a weapon fired a bullet. Doc. 331-1 at 18-19. And yet that is precisely what he does in forming his first conclusion.

Second, Weller notes that three ballistics experts – John Murdock, Greg Klees, and Lucien Haig – did not find a match, and opines that it is not reasonable to conclude that all three could be wrong:

> The DPS crime lab . . . concluded that [the evidence bullets] were all fired in the same firearm. Mr. Haag also concluded that evidence bullets were fired from a single firearm. Mr. Haag concluded there was insufficient agreement for identification when comparing evidence items to test fires from the Hi-Point pistol. This provides evidence that DPS had insufficient data to conclude an identification to the Hi-Point for any of the evidence. Mr.

Haag's analysis is supported by two additional independent examinations that also concluded there was insufficient toolmark agreement to reach an identification conclusion. One analysis was conducted by Mr. Murdock and the other by Mr. Klees. The evidence has undergone substantial reanalysis. None of the re-analysis supports the DPS conclusion that Merritt's Hi-Point pistol fired the recovered evidence. All three independent examiners, Lucian Haag, John Murdock and Gregory Klees, reached an inconclusive result. This means that when these examiners compared evidence items to test fires from Item 4, they concluded there was insufficient agreement of firearm produced marks to reach an opinion of identification. This is different to the Arizona DPS results, where it was determined there was sufficient agreement to reach an identification. Given the low error rates of the profession, the chance of all three independent examiners reaching the same conclusion and all being incorrect is not reasonable.

Doc. 331-1 at 11 (footnotes and citations omitted).

This conclusion is not based on forensic analysis; it is based on the probability of Haag, Murdock, and Klees being wrong. And yet Weller is not an expert in statistics, as he admitted in his deposition. Doc. 331-1 at 21. Defendant also asserts that this second conclusion "simply attempts to parrot that of Haag, Murdock and Klees, and vouches for their veracity over that of the five DPS Crime Lab forensic scientists." Doc. 331 at 3. The Court agrees. Weller's explanation is little more than a comment on the evidence. He finds the witnesses who support Plaintiff's position to be credible and the witnesses who support Defendant's position not credible, but he does not do the work necessary to form his own forensically-based opinion on whether Plaintiff's weapon fired the evidence bullets. As the Court has held in other cases, experts are not "permitted at trial to simply parrot the opinions of other experts, or to vouch for those experts[.]" *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 495188, at *3 (D. Ariz. Jan. 22, 2018).

Weller's two conclusions in support of his misidentification opinion are not the product of reliable principles and methods applied reliably. Fed. R. Evid. 702 (c), (d). His misidentification opinion therefore is not admissible under Rule 702.

/ / /

9

**III.    Plaintiff's Motion Regarding Vouching for Crime Lab (Doc. 292).**

Plaintiff asks the Court to preclude Defendant from presenting "argument or evidence that the [DPS crime lab] has a reputation for providing credible ballistic identifications." Doc. 292 at 1. But the jury must determine whether, under the totality of the circumstances known to officers at the time of the arrest, a reasonable person would believe Plaintiff committed the freeway shootings. This includes a determination of whether the information relied upon was reasonably viewed as credible. *State v. Crowley*, 41 P.3d 618, 623 (Ariz. Ct. App. 2002) (for probable cause, informant's veracity, reliability, and basis of knowledge are relevant in determining the value of the informant's information); *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (totality of the circumstances approach requires that a judge consider "all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information" when determining whether probable cause exists). Plaintiff's motion will be denied.

**IV.    Plaintiff's Motion Regarding Lodging of Bullet in Tire (Doc. 293).**

Plaintiff asks the Court to preclude Defendant from introducing argument or evidence that a bullet lodged in the BMW tire, asserting that the Court has precluded defense expert Noedel from giving such an opinion and that Defendant failed to disclose John Maciulla as an expert. Doc. 293 at 1. But Plaintiff overlooks the fact that the Court denied his motion to exclude expert Joseph Grant from giving this very opinion. Doc, 269 at 10-12. Plaintiff also asserts that the lodged bullet theory was developed after his arrest, but Defendant presents evidence to the contrary. *See* Doc. 353 at 1. This is a jury question. The Court will deny Plaintiff's motion.

**V.    Plaintiff's Motion Regarding Grand Jury Indictment (Doc. 295).**

Plaintiff asks the Court to preclude Defendant "from arguing, implying, or insinuating the plaintiff's guilt because he was indicted by a Maricopa County Grand Jury." Doc. 295 at 1. Defendant responds that it "does not intend to argue that Defendant is guilty because he was indicted by the grand jury." Doc, 352 at 2. In a lengthy footnote, however,

Defendant suggests that it should be permitted to show the jury in this case what evidence was before the grand jury, and that "[i]t would be contradictory for a grand jury to exercise their authority and find such probable cause, but then allow another court to consider the same facts and determine there was not probable cause." *Id.* at 2 n.1. Defendant argues that it "should be permitted to put forth evidence from which a jury could find that the evidence presented to the Maricopa County Grand Jury, which found probable cause to indict Merritt, was not materially different than the evidence considered by the officers at the time of arrest." *Id.* Defendant seems to be suggesting that it should be allowed to argue to the jury in this case that it should find probable cause because the grand jury did.

The Court does not agree. The Arizona Court of Appeals has held that it was reversible error for a trial court in a false arrest case to admit evidence of a subsequent grand jury indictment and to instruct the jury that the indictment was evidence of probable cause to arrest. *Reams*, 701 P.2d at 601-02. "Admission of evidence of the indictment and the trial court's corresponding instruction to the jury could only serve as a kind of imprimatur on the statements of the prosecution's witnesses, and were inherently prejudicial." *Id.* at 602.

In light of the clear holding in *Reams*, the Court will preclude Defendant from presenting evidence of the grand jury indictment and from arguing that the indictment constitutes evidence of probable cause. Although this is not precisely the relief sought by Plaintiff, the Court must avoid plain error and the law of Arizona on this point is clear. The parties should seek to agree on a stipulation that can be read to the jury to explain that Plaintiff's false arrest claim extends only from the date of his arrest to September 24, 2015 (the date of his indictment), and should present it to the Court before the final pretrial conference.

**VI.    Plaintiff's Motion Regarding Facebook Pages (Doc. 296).**

Plaintiff asks the Court to preclude Defendant from presenting various categories of Plaintiff's Facebook posts to the jury. As noted above, the jury will be required to consider the totality of the information considered by Defendant in finding probable cause, and

Defendant asserts that Plaintiff's Facebook posts were in fact considered, something that would make them relevant.  Whether the probative value of particular pages is substantially outweighed by the danger of unfair prejudice can best be determined during trial.  To avoid unexpected prejudice, Defendant is instructed to discuss with the Court any Facebook posts it intends to present to the jury, before mentioning the posts in court.  Plaintiff's motion will be denied.

**VII.    Plaintiff's Motion Regarding Family Members (Doc. 297).**

Plaintiff asks the Court to preclude Defendant from presenting evidence of his dysfunctional family, his parents' substance abuse and incarceration, and other problems Plaintiff has encountered during his life.  Defendant responds that this information is relevant to the jury's consideration of his claim for emotional distress damages, and notes that Plaintiff's own damages expert took these facts into account.  Because this is an issue that must be addressed during trial, the Court will deny the motion.  Before mentioning these matters to the jury, however, Defendant should raise them with the Court outside the hearing of the jury.

**VIII.   Plaintiff's Motion Regarding Past Contact With Law Enforcement (Doc. 299).**

Plaintiff asks the Court to exclude from evidence various police contacts in his personal history.  Defendant responds that these contacts were considered in determining whether there was probable cause to arrest Plaintiff, and that these contacts are relevant to Plaintiff's claim for emotional distress damages.  The relevancy of these incidents and whether they should be precluded under Rule 403 due to a danger of unfair prejudice must be decided at trial.  The motion will be denied, but Defendant should raise these instances with the Court before presenting them to the jury.

**IX.    Plaintiff's Motion Regarding Search Warrants (Doc. 303).**

Plaintiff asks the Court to preclude evidence of various search warrants obtained by Defendant as part of the investigation that led to his arrest.  Defendant responds that search warrants that produced evidence after his arrest are not relevant, but that it should be permitted to show the extent of its investigation if Plaintiff argues that the investigation

12

was faulty.  The Court sees no relevancy in the search warrants themselves, and will grant the motion.  If Plaintiff argues at trial that Defendant's investigation was deficient, Defendant may raise with the Court the possibility of presenting evidence of the investigation to rebut this charge, including evidence of search warrants.

## X.     Plaintiff's Motion to Preclude Defense Expert Bernie Click (Doc. 315).

Plaintiff asks the Court to exclude Bernie Click, a police practices expert, from testifying at trial because (1) he did not consider the possibility that Plaintiff did not commit the shooting or that the DPS crime lab could have erred, (2) he opines that public safety is a factor to consider in deciding whether probable cause exists, (3) he opines that Defendant might have faced civil liability if it did not arrest Plaintiff, and (4) he relied on the untrue fact that Plaintiff attempted to remove material from his Facebook page.  Doc. 315.  None of these arguments justifies exclusion of Click's testimony.

(1) Defendant notes that Click states no opinion on the accuracy of the crime lab's determination, and Plaintiff cites no authority for the proposition that his testimony is inadmissible because he has not considered Plaintiff's possible innocence.  Doc. 348 at 3-4. (2) Defendant asserts that Click does not consider public safety as part of the analysis for probable cause, and supports the assertion with a statement to that effect from Click's deposition.  *Id.* at 5.  (3) Defendant asserts that Click "does not offer any opinions about civil liability."  *Id.* at 6.  (4) Defendant presents evidence that Plaintiff did attempt, after his arrest, to remove material from his Facebook page.  *Id.* at 5.[2]

In short, Plaintiff selects individual statements from Click's deposition and attempts to weave them into a basis for precluding his opinions altogether.  Plaintiff does not challenge his qualifications and fails to undercut the broad factual basis for his opinion. The motion will be denied.

/ / /

/ / /

---

[2] Because this event occurred after Plaintiff's arrest, it is not relevant to probable cause and will not be admissible.  But it shows that Click's statement is not unfounded.

XI.     **Defendant's Motion on Extra-Judicial Comments (Doc. 316).**

Defendant asks the Court to restrain Plaintiff's counsel from making comments to the press in advance of trial.  Defendant cites a newspaper article published several months ago that quoted from a filing Plaintiff made in a state court case, and asserts that the state court filing misrepresented facts found by this Court in its summary judgment ruling.  Defendant expresses concern that Plaintiff's counsel will attempt to taint the jury pool by making similar comments to the press in advance of trial.  Doc. 316.

Both parties cite *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1075 (1991), for the proposition that a Court may restrain a lawyer from making pretrial comments that the lawyer knows present a "substantial likelihood of material prejudice" to the trial.  Plaintiff's counsel assert that they have not talked to the press and understand the ethical and court rules that limit press contact.

On this record, the Court does not find a sufficient basis to enter an order limiting comments made by counsel on either side.  But the Court provides the same admonition Judge Teilborg provided in another case:

> This Court would remind counsel for both parties that they have a duty to refrain from attempting to gain leverage in this case by speaking to and through the media.  . . . Local Rule of Civil Procedure 83.8 prohibits a lawyer in a civil action from "making an extrajudicial statement, other than a quotation from or reference to public records . . . if there is a reasonable likelihood that such dissemination will interfere with a fair trial . . . ."  Similarly, Rule 3.6(a) of the Arizona Rules of Professional Conduct prohibits attorneys from making any "extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter."  Although neither Local Rule of Civil Procedure 83.8 nor Rule 3.6 of the Arizona Rules of Professional Conduct create an absolute prohibition on all statements to the media, counsel for both parties are cautioned to use professional discretion and limit any statements to what is explicitly authorized by the applicable Rules.  In the event that future extrajudicial statements to the media threaten the integrity of these proceedings, the Court will address the issue at that time.

14

*Mizioch v. Montoya*, No. CV10-01728-PHX-JAT, 2011 WL 4900033, at *8 (D. Ariz. Oct. 14, 2011) (footnote omitted).  The Court will deny Defendant's motion.

**XII.    Defendant's Motion on Criminal Charges and Detention (Doc. 326).**

Defendant asks the Court to preclude Plaintiff from presenting evidence that the charges against him were eventually dismissed and evidence regarding the length of his detention.  Because Plaintiff's damages are limited to the six-day period between his arrest and indictment, Defendant contends that this evidence is irrelevant and unduly prejudicial. Doc. 326.  Plaintiff responds that the jury must know of the dismissal of charges to avoid any speculation that he was found guilty of the offenses for which he was arrested and to understand the full factual context of this case.

The Court sees merit in the arguments of both sides, and concludes that a carefully crafted jury instruction will be necessary to apprise the jury of relevant facts but avoid speculation and unwarranted conclusions.  The Court therefore will instruct the jury that (a) the trial concerns only Plaintiff's claim of false arrest on September 18, 2015; (b) Plaintiff was actually in custody until April 2016, when charges against him were dismissed, but the Court has ruled, for legal reasons, that Plaintiff may recover damages for false arrest, if any, only for the six-day period between September 18 and 24, 2015; (c) the jury should not speculate as to why the charges against Plaintiff were dismissed, should not consider the dismissal of charges as a fact in favor of or against any party, and should confine its attention to Plaintiff's claim that his arrest on September 18, 2015 lacked probable cause and his claim for damages during the following six days.  The parties should confer and see if they can agree upon a stipulated instruction that covers these and related relevant points and should present it to the Court before the final pretrial conference. Defendant's motion will be denied.

**XIII.   Defendant's Motion Regarding PCAST and Similar Studies (Doc. 327).**

Defendant moves to preclude any evidence or argument about the September 2016 President's Council of Advisors on Science and Technology Report on Forensic Science in Criminal Courts (the "PCAST Report"), or any other scientific study not known to law

1   enforcement at the time of Merritt's arrest, as irrelevant and likely to confuse the issues

2   and mislead the jury.  Doc. 327.  Defendant notes that the report was issued a year after

3   Plaintiff's arrest and could not have been known to the arresting officers.

4         The Court cannot rule on Defendant's concern in advance of trial.  As Plaintiff notes,

5   criminalists and ballistics experts may testify during trial about studies related to ballistics

6   evidence, and opposing counsel may seek to use published studies in cross-examination of

7   various witnesses.  *See* Fed. R. Evid. 803(18).  The Court cannot conclude at this time that

8   all such uses would be improper, and therefore cannot grant Defendant's motion.  The

9   Court will rule on objections as they are made during trial.

10  **XIV.  Defendant's Motion on Daws Report, Opinions, and Attachments (Doc. 328).**

11        Defendant asks the Court to preclude the use of the report and opinions of John W.

12  Daws, a tire-deflation expert retained by Plaintiff for this case, who unfortunately died

13  before he could be deposed or testify at trial.  Doc. 328.  Plaintiff responds that no witness

14  should be permitted to express tire deflation opinions formed after Plaintiff's arrest – a

15  position with which the Court does not agree – and, alternatively, that Daws's opinions and

16  reports may be used at trial because defense experts relied on them, and for impeachment

17  of defense experts.  Doc. 346.

18        Mr. Daws is not available to testify at trial, and his report is an out-of-court

19  declaration that would be offered for the truth of the matter asserted.  Plaintiff may not

20  present such hearsay as direct evidence.  *Ariz., Dep't of Law, Civil Rights Div. v. ASARCO*,

21  *L.L.C.*, 844 F. Supp. 2d 957, 965 (D. Ariz. 2011) ("The court finds that Dr. Pitt's report is

22  nevertheless inadmissible, because it is hearsay – indeed, 'classic' hearsay – because it

23  represents Dr. Pitt's out of court declaration offered for its truth.").  Nor does the fact that

24  Plaintiff intends to use the report as impeachment overcome the hearsay problem; the Court

25  is not aware of an impeachment exception to the hearsay rule.

26        If Defendant's experts testify on direct that they have relied on the Daws report,

27  Plaintiff may cross-examine them about the report.  If Plaintiff believes a defense expert

28  has testified in a way that permits Plaintiff to cross-examine with the Daws report, Plaintiff

1    shall raise that issues outside the hearing of the jury.  Otherwise, Defendant's motion will

2    be granted.

3    **XV.   Defense Motion to Preclude Claims of Evidence Fabrication, etc. (Doc. 329).**

4            Defendant asks the Court to preclude Plaintiff from arguing or introducing evidence

5    on matters the Court has already determined no reasonable jury could find, including:

6    (1) DPS fabricated ballistics results; (2) Officer Baroldy perjured himself; and (3) DPS

7    withheld exculpatory information from Plaintiff, including the license plate reader,

8    honeypot website, pole cameras, or Hackbarth's second interview.  Doc. 329.  Plaintiff has

9    filed no response.  The Court will grant the motion as follows: Plaintiff is precluded from

10   asserting that DPS intentionally fabricated ballistics evidence or that Officer Baroldy

11   committed perjury before the grand jury, and from asserting that DPS withheld the

12   identified categories of allegedly exculpatory evidence from Plaintiff.

13   **XVI.   Defense Motion Regarding Aaron Saucedo (Doc. 330).**

14           Defendant moves to preclude Plaintiff from arguing or introducing evidence about

15   Aaron Saucedo (referred to in the media as the "Maryvale Serial Shooter"), including that

16   he was arrested and charged with a number of shootings and murders.   Doc. 330.

17   Defendants base this motion on Rule 401 and 403.  *Id.* at 2.

18           In response, Plaintiff identifies 23 facts that, he claims, should have caused

19   Defendant to investigate Saucedo as the freeway shooter.  Doc. 339.  These facts include

20   that Saucedo was eventually arrested for a murder that occurred before Plaintiff's arrest;

21   Saucedo purchased ammunition shortly before two of the freeway shootings and in a

22   location that would have allowed him to be at the places of the shootings when they

23   occurred; a license plate reader placed more than 800 vehicles at two or more of the freeway

24   shooting locations, including a vehicle with license plate BLA 7520, which is only one

25   digit different from Saucedo's plate of BLA 7920; Saucedo's gun was one of seven

26   Hi-Point Model C9's collected by Defendant from pawn shops, and yet was not tested; and

27   similar facts.  Plaintiff claims that these facts "would have caused reasonable investigators

28

to investigate Saucedo further and not to arrest the plaintiff until this investigation excluded Saucedo as a suspect." *Id.* at 5.

The issue in this case will be whether Defendant had probable cause to arrest Plaintiff on September 18, 2015, well before most of the crimes with which Saucedo is charged occurred.  The focus of the trial will be on the facts Defendant relied on to form probable cause.  Although an argument that Defendant failed to investigate another suspect could be marginally relevant, the Court concludes that Plaintiff's assertions about Saucedo would devolve into a minitrial (or a major trial) on the investigation of Saucedo, and that any probative value of the Saucedo evidence would be substantially outweighed by the danger of wasting time and confusing the jury.  Fed. R. Evid. 403.  The Court accordingly will grant Defendant's motion.

**XVII. Defense Motion Regarding Ivan Mathew (Doc. 332).**

Defendant asks the Court to exclude Ivan Mathew, a criminal defense lawyer, from testifying at trial because his focus is whether the prosecutors' actions violated the standard of care, and if so, whether prosecutorial actions were a cause of harm to Plaintiff.  Doc. 332 at 2.  Defendant notes that the actions of prosecutors are not at issue in this case given the settlement with the Maricopa County Defendants.

Plaintiff provides a confusing response.  He asserts that "Mathew will testify that but for Detective Falcone's misleading presentation to prosecutors, prosecutors would have either not filed charges or would have dismissed them before April 25, 2016."  Doc. 356 at 3.  But the Court has ruled that Plaintiff may assert only claims for false arrest and false imprisonment (which, the parties agree, are essentially the same claim), and can seek damages only through September 24, 2020.  Doc. 278.  The case no longer contains a malicious prosecution claim.  Plaintiff does not explain what input, if any, prosecutors had in his arrest, and asserts that he "will not ask Mathew to opine on probable cause to arrest," which is the key remaining issue in this case.  Doc. 356 at 3.  Because the Court can see no relevance to the remaining issues in this case, the Court will grant Defendant's motion.

/ / /

**XVIII.  Defendant's Motion Regarding Honeypot, LPRs, and Pole Camera (Doc. 333).**

Defendant seeks to exclude evidence of the honeypot website, license plate readers ("LPRs"), and pole cameras as irrelevant and confusing.  Doc. 333.  In response, Plaintiff states that he "does not intend to introduce evidence about the Honey Pot or Pole Cameras." Doc. 362 at 1.  The Court will grant the motion with respect to these two categories.

With respect to LPRs, Plaintiff returns to his arguments about Aaron Saucedo.  He asserts: "Under the totality of the circumstances, along with the information known to the defendant before plaintiff's arrest about Saucedo's ownership of a Hi-Point C9, the purchase of ammunition minutes before the shootings, and his association with a recent murder, the LPR data is relevant."  *Id.* at 2.  The Court has concluded above that the Saucedo argument would result in a minitrial that would waste time and confuse the jury, and therefore is inadmissible under Rule 403.

The Court previously reached this conclusion regarding the LPRs:

Plaintiff provides the results of a request made to the Arizona Vehicle Theft Task Force to access the National Vehicle Location Service database and determine whether there were any license plates that appeared repeatedly in areas and times related to the I-10 freeway shootings.  Sergeant Mapp requested eight incident locations and times, and the report presumably gave a list of vehicles seen around those locations and times, noting that five vehicles were seen at four of the locations.  The report noted that these "hits" were "mostly from resident locations just north of the freeway incident locations and can be deemed normal travel to and from work or considered normal travel for the resident's area."  Sergeant Mapp did not consider this report helpful because the LPRs were not on the freeway and were owned and operated outside of DPS, and he was not sure where they were located. Aside from asserting that this report is "highly exculpatory" for failing to place Plaintiff anywhere near the shootings, Plaintiff offers no explanation about how to interpret the report.

The nondisclosure of the report does not rise to the level of bad faith.  It is from an outside database derived from LPRs stationed in unidentified areas around, but not actually at, the shooting sites, and Plaintiff has not shown that the LPRs covered all relevant areas or shooting times.  With these unknowns, it is not clear what conclusions, if any, the report supports with respect to Plaintiff's presence in the areas of the shootings.  Even when drawing all inferences in Plaintiff's favor, no juror could reasonably find that

the inconclusive report would have deterred the grand jury from finding probable cause.  Further, considering that the DPS did not itself use LPRs in the investigation, and that the DPS officers learned nothing of value from the report, it is not at all clear that the officers lied when they testified that LPRs were not used to investigate these shootings.

Doc. 278 at 20-21 (record citations omitted).

Plaintiff also argues that Mr. Mathew will testify that the LPRs would have been relevant to the prosecutor's decision to charge Plaintiff.  But as noted above, the prosecutors' decision is no longer at issue in this case and Mr. Mathew's testimony has been excluded.  The Court will grant Defendant's motion.

**XIX.   Defendant's Motion to Exclude Roger Clark Opinions (Doc. 337)**.

Defendant seeks to preclude Roger Clark from testifying as an expert that DPS officers violated their standard of care by not disclosing LPR data, honeypot website data, and pole camera video.  Doc. 337.  Defendant argues that any such opinions are not supported by sufficient facts.

Plaintiff responds that "defendant withheld exculpatory LPR data and lied to prosecutors about its existence because the LPR information implicated Aaron Saucedo as the Freeway Shooter and dissipated the defendant's claim of probable cause to arrest the plaintiff."  Doc. 364 at 2.  Plaintiff also again states that this evidence will be relevant to the Mathews opinions.  The Court has rejected these arguments above, and will grant Defendant's motion.

**XX.   Joint Motion to Amend Pretrial Order (Doc. 338)**.

The parties stipulate that the final pretrial order should be amended to provide that Exhibit 11 (Tweet of Governor Douglas Ducey) will be admitted into evidence.  The motion will be granted.

**XXI.  Remaining Issue.**

As noted above, the Court will also address a remaining issue: whether evidence arising after the indictment date, but reflecting what was known on the date of arrest, should

1   be admissible to prove lack of probable cause to arrest.  *See* Doc. 374.  The parties provided

2   supplemental briefing on this issue.  Docs. 341, 370.

3   Defendant argues that the post-arrest conclusions of Haag, Murdock, and Klees are

4   irrelevant to what was known at the time of arrest.  Doc. 341 at 7-8.  The Court has rejected

5   this argument in section I.A. above.  Defendant argues that other evidence – unidentified

6   cell phone records and text messages, the pawn records of Aaron Saucedo, and phone

7   records of Glenn Merritt – are inadmissible.  The Court has ruled on the Saucedo evidence

8   in this order, but does not know the contents of the other evidence identified by Defendant.

9   As noted, the test for probable cause must focus on what was known to the officers and

10  Kalkowski at the time of arrest.  Post-arrest evidence that sheds light on what was known

11  at the time of the arrest may well be relevant and admissible.  The Court will rule on

12  objections as they are made at trial.

13  **XXII.   Conclusion.**

14  When asked about whether a bench trial was possible in this case in light of the

15  COVID pandemic, the parties were unable to agree, but indicated that the Court's rulings

16  on motions in limine could alter the contours of the trial.  Doc. 381 at 2.  Within one week

17  of the Court's rulings on the motions at Docs. 290, 335, and 336 (after the supplemental

18  briefing is received), the parties shall file a joint memorandum (1) stating whether they can

19  agree on a bench trial, and (2) identifying the numbers of days required for trial in light of

20  the Court's rulings.

21  **IT IS ORDERED:**

22  1.   The motions in limine at Docs. 290, 335, and 336 are taken under advisement.

23       The parties shall file supplemental memoranda, not to exceed 8 pages each, by

24       **August 28, 2020**.

25  2.   Defendant's Motion to Exclude Opinions and Testimony of Todd Weller

26       (Doc. 331) is **granted in part and denied in part** as set forth above.

27  3.   Plaintiff's Motion Regarding Vouching for Crime Lab (Doc. 292) is **denied**.

28  4.   Plaintiff's Motion Regarding Lodging of Bullet in Tire (Doc. 293) is **denied**.

5.   Plaintiff's Motion Regarding Grand Jury Indictment (Doc. 295) is **granted**. The parties should work to agree on the stipulation as described above.

6.   Plaintiff's Motion Regarding Facebook Pages (Doc. 296) is **denied**. Defendant shall raise Facebooks posts with the Court before mentioning them to the jury.

7.   Plaintiff's Motion Regarding Family Members (Doc. 297) is **denied**.  Before mentioning these matters to the jury, Defendant will raise them with the Court outside the hearing of the jury.

8.   Plaintiff's Motion Regarding Past Contact With Law Enforcement (Doc. 299) is **denied**.   Defendant should raise these instances with the Court before presenting them to the jury.

9.   Plaintiff's Motion Regarding Search Warrants (Doc. 303) is **granted**.

10.   Plaintiff's Motion to Preclude Defense Expert Bernie Click (Doc. 315) is **denied**.

11.   Defendant's Motion on Extra-Judicial Comments (Doc. 316) is **denied**.

12.   Defendant's Motion on Criminal Charges and Detention (Doc. 326) is **denied**. The parties shall propose a jury instruction as stated above.

13.   Defendant's Motion Regarding PCAST and Similar Studies (Doc. 327) is **denied**.

14.   Defendant's Motion on Daws Report, Opinions, and Attachments (Doc. 328) is **granted**, with the qualifications noted above.

15.   Defendant's Motion to Preclude Claims of Evidence Fabrication, etc. (Doc. 329) is **granted** as set forth above.

16.   Defendant's Motion Regarding Aaron Saucedo (Doc. 330) is **denied**.

17.   Defendant's Motion Regarding Ivan Mathew (Doc. 332) is **granted**.

18.   Defendant's Motion Regarding Honeypot, LPRs, and Pole Camera (Doc. 333) is **granted**.

19.   Defendant's Motion to Exclude Roger Clark Opinions (Doc. 337) is **granted**.

20. The Joint Motion to Amend Pretrial Order (Doc. 338) is **granted**. The final pretrial order is amended to state that Exhibit 11 (Tweet of Governor Douglas Ducey) shall be admitted into evidence.

21. Within one week of the Court's rulings on the motions at Docs. 290, 335, and 336, the parties shall file a joint memorandum (1) stating on whether they can agree on a bench trial, and (2) identifying the numbers of days required for trial in light of the Court's rulings.

Dated this 21st day of August, 2020.

David G. Campbell
Senior United States District Judge

23