UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Leslie A. Merritt, Jr.,                )
                                       )
                   Plaintiff,          ) CV 17-04540-PHX-DGC
                                       )
        vs.                            ) Phoenix, Arizona
                                       ) October 9, 2020
State of Arizona, et al.,              ) 1:04 p.m.
                                       )
                   Defendants.         )
_____)

BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

FINAL PRETRIAL CONFERENCE

Official Court Reporter:
Patricia Lyons, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Ste. 312
401 West Washington Street, SPC 41
Phoenix, Arizona  85003-2150
(602) 322-7257

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared with Computer-Aided Transcription

1                          **A P P E A R A N C E S**

2

3      For the Plaintiff:

4              Law Offices of David J. Don, PLLC
               By: **DAVID J. DON,** ESQ.
5              301 E. Bethany Home Rd., Ste. B-100
               Phoenix, AZ  85012
6
               Law Office of Jason D. Lamm
7              By: **JASON D. LAMM,** ESQ.
               2501 N. 7th St.
8              Phoenix, AZ  85006

9

10

11     For the Defendants:

12             Polsinelli, PC
               By: **EDWARD F. NOVAK,** ESQ.
13             By: **MELISSA S. HO,** ESQ.
               By: **JONATHAN G. BRINSON,** ESQ.
14             1 E. Washington St., Ste. 1200
               Phoenix, AZ  85004
15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

13:04:42 1

2

3          THE COURTROOM DEPUTY:  This is case number CV

4     17-4540, Leslie A. Merritt versus State of Arizona.  On for

13:05:20 5     final pretrial conference.

6          Counsel, please announce for the record.

7          MR. DON:  Good afternoon, Your Honor.  David Don for

8     the plaintiff.

9          MR. LAMM:  Good afternoon, Your Honor.  Jason Lamm

13:05:28 10    also for the plaintiff.

11         MR. NOVAK:  Good afternoon, Your Honor, Ed Novak,

12    John Brinson, Melissa Ho, and Andrew Fox for the Defendant

13    State of Arizona.

14         THE COURT:  All right.  Good afternoon.  Let me get

13:05:43 15    organized here.

16         All right.  Counsel, what I want to do is first go

17    through the Final Pretrial Order.  It was filed some time ago,

18    but we're nonetheless working with that.  We'll then talk a

19    bit about jury selection, we'll talk about the motions that

13:06:49 20    are pending, we'll then talk about jury trial procedures in

21    light of the COVID pandemic, and at the end I want to have us

22    all walk down to the special proceedings courtroom downstairs,

23    which is where we'll be choosing the jury, so you can see how

24    it's laid out and how that's going to work.

13:07:09 25         So let's run through the Joint Proposed Final

13:07:11   1   Pretrial Order, which is at Docket 334.  You have on pages 2

2   and 3 six stipulations.  What I typically do is read the

3   stipulations to the jury before Counsels' opening statements

4   so those are facts that are already established for the trial.

13:07:39   5   I'm happy to do that.  Or if there's some other way in which

6   you want those stipulated facts presented, I'm happy to

7   consider that.

8         MR. DON:  Your Honor, we would request they also be

9   included in the preliminary instructions.

13:07:57  10         THE COURT:  Well, I'll be reading them 30 seconds

11   after I finish the preliminary instructions.  Before your

12   opening statements.  So you'll get them at essentially --

13         MR. DON:  Then I think that addresses my issue.  Yes.

14         THE COURT:  How about from defendants?

13:08:15  15         MR. NOVAK:  That's acceptable, Your Honor.

16         THE COURT:  Okay.  Let me make a note.

17         All right.  Let's talk for a little bit about the

18   issues that you have identified.  You couldn't agree on

19   issues.  I do want to start with a comment.  You all have been

13:09:12  20   unable to agree on the most elementary matters in this case.

21   I want that to change for trial.  We're going to have a

22   cooperative trial and a transparent trial.  There's no need to

23   be splitting hairs like we've done on a lot of issues where

24   the dispute is not of any consequence.

13:09:32  25         And so going forward, that's what we're going to do.

13:09:35   1    So please make sure you've exhausted every opportunity to

2    agree on matters before you bring them to me.

3         With respect to the issues that the plaintiff

4    identifies, which are pages 4 through 9, it is subdivided way

13:09:51   5    too thinly.  We don't have 11 issues in this case, we have two

6    issues in this case.

7         And that is whether the arrest was supported by

8    probable cause and, if not, what are the plaintiff's damages.

9         And we're going to need to obviously phrase that

13:10:09  10    probable cause issue in terms of the correct statement of the

11    law in Arizona.  We'll do that for purposes of the jury

12    instructions, but we're not going to subdivide them into a lot

13    of smaller issues.

14         The same thing is true with the defendant's statement

13:10:29  15    of the issues, which begins on page 9.  Of course, some of

16    these issues are related to defenses that I've since ruled

17    against, like number 2, but basically we've just got two

18    issues in the case, and that's the way we're going to pursue

19    it with the jury.

13:10:44  20         So please keep that in mind in terms of as you're

21    preparing arguments or you're directing cross-examination.  I

22    really want this case to be clear to the jury that those are

23    the two matters that they're going to have to decide.

24         I do have a question on legal issues.  The

13:11:01  25    plaintiff's legal issues start on page 9.  They all appear to

13:11:07  1   me to be fact issues, not legal issues.  That is, whether or

2   not burden of proof has been met by the evidence in the case

3   really is the issue.  So I don't see any legal issues in

4   plaintiff's legal issues.

13:11:23  5       In defendants' list of legal issues, issue number 1

6   at the top of page 12 is no longer in the case, which is the

7   bond issue.

8       Issue number 2 I've resolved, which is whether the

9   knowledge of the crime lab can be imputed.

13:11:40 10       Issue number 3 is whether the State can aid and abet

11   itself, and that's something I want to talk to you all about

12   for a minute.

13       I denied the Defendants' motion on the aiding and

14   abetting count, so it's still in the case.  However, Count 10

13:11:59 15   of the complaint, which is an aiding and abetting count, was

16   originally asserted against the State, the county, and

17   Bill Montgomery.  And in that context it probably made some

18   sense because you would be arguing that the county and

19   Mr. Montgomery aided and abetted whatever the State did.  But

13:12:19 20   with Montgomery and the county out of the case, it's hard for

21   me to see what we have in the way of an aiding and abetting

22   claim.

23       And the reason I raise it now is that if we have it

24   in the case and we present it to the jury, I'm pretty sure I'm

13:12:34 25   going to grant judgment on it at the close of the plaintiff's

13:12:38   1   evidence, because there's nobody in the case to aid and abet

2   what the defendant has done.  His liability is at stake.  We

3   can do that.  I don't think that would be unduly confusing.

4   But it seems to me it's unnecessary.

13:12:52   5           And I guess it's up to plaintiff's counsel as to

6   whether you want it included in the case given the high

7   probability that I'll be entering judgment and telling the

8   jury I've entered judgment on it at the close of the

9   plaintiff's case.

13:13:10  10           MR. DON:  Your Honor, from the plaintiff's

11   perspective, the aiding and abetting issue as it exists in

12   this posture of the case is necessary to prevent the jurors

13   from reaching an incorrect assumption that the civilian

14   employees of the State were not liability producing agents, as

13:13:40  15   we contend.

16           So long as it's clear otherwise in the instructions

17   that the plaintiff's claim arises from the liability of all of

18   the DPS employees and they're in the course and scope of

19   employment.  If that's not an issue, then the plaintiff is

13:14:02  20   okay with dismissing the aiding and abetting claim against the

21   State.  So that's a -- it's a contingent way of making the

22   argument.

23           THE COURT:  Well, let me ask you this question.  I

24   think I understand what you're saying and I want to hear what

13:14:18  25   the defendants think, but here's the question I have, Mr. Don.

13:14:22  1        Whom has the State aided and abetted in this case?

2   Because the only liability you're trying to establish at trial

3   is the State's.  The only value of an aiding and abetting

4   claim, therefore, will be for the jury to find the State

13:14:39  5   liable as an aider and abettor, and there's no other -- I

6   guess that's what I'm struggling with.  You're claiming the

7   State acted wrongly in its investigation and its arrest.  So

8   whom could the State have aided and abetted?

9        MR. DON:  The assumption behind your question is well

13:15:08  10   taken and it only makes sense so long as we have either a

11   stipulation that all the DPS employees are in the course and

12   scope of employment or that the civilian DPS employees can be

13   liability producing agents.  Because those individuals aided

14   and abetted the State, through the State, the sworn officers.

13:15:38  15        THE COURT:  Well, I have not yet spent any time on

16   the final jury instructions.  I will be doing that.  But it is

17   typical in a civil case where there's a corporation or an

18   entity as a defendant to instruct the jury that the entity is

19   liable for the actions of its employees within the scope and

13:15:56  20   course of their employment.

21        Now, you have to prove it's within the scope and

22   course.  Unless the State wants to stipulate to that.

23        So I think there will be a clear instruction to the

24   jury that the State is liable if its employees acted in a way

13:16:14  25   to make it liable.

13:16:16   1          But that, to me, is not an aiding and abetting issue.

       2   It's the liability of the State you're trying to establish at

       3   trial, not the liability of an employee who aided and abetted

       4   it.

13:16:28   5          So I'm just having trouble seeing why -- assuming the

       6   instructions are clear, that the State's responsible for the

       7   actions of its employees, what is added by an aiding and

       8   abetting claim, and why wouldn't it be eliminated right at the

       9   close of your case.

13:16:47  10          MR. DON:  I don't see a value provided that we a

      11   *respondeat superior* type argument or instruction.

      12          THE COURT:  All right.  Thoughts from the defense

      13   counsel?

      14          MR. NOVAK:  I agree with the Court's statements.  If

13:16:58  15   there is an instruction at the conclusion of the case, if the

      16   Court thinks it's appropriate with respect to the conduct of

      17   the employees of the State having been in the course and scope

      18   and having been proven in the course and scope, that's

      19   acceptable.  And I'll suggest to you, Judge, that there hasn't

13:17:18  20   been any evidence so far one way or the other in this case.

      21   So we're -- I mean, I'm not surprised by this issue because we

      22   raised it, but, like you, Your Honor, I don't know how the

      23   State can aid and abet itself.  I think it's self-explanatory.

      24          But the confusion that I think -- that I'm concerned

13:17:41  25   about is that the caption of this case reads The State of

13:17:46   1   Arizona and all of the individual defendants.  I understand

2   that they have been dismissed out.  But the judgment that the

3   Court will enter if we are successful following a jury verdict

4   will ultimately push them out completely.

13:18:03   5        So if they hear the caption, including all those

6   individuals, and they hear an aiding and abetting count, I'm

7   just concerned that they may be confused about whether they

8   are to assume that employee A aided and abetted employee B, as

9   opposed to the State aiding and abetting itself.

13:18:23  10        And maybe that doesn't make any sense, Judge, but it

11   is confusing to me.

12        THE COURT:  All right.  Well, we'll make this clear

13   in the jury instructions that the State is liable for actions

14   of its employees within their scope and course.  It will be up

13:18:38  15   to plaintiff, obviously, to prove that, which you'll do during

16   the evidence.  I don't think you'll have trouble with the

17   scope and course issue.

18        And then I'm not going to instruct the jury on the

19   aiding and abetting claim because I think we would just pull

13:18:50  20   it away from them again and there's not a lot of point in

21   doing that.

22        Are you all right with that, Mr. Don?

23        MR. DON:  We'll agree to that, yes.

24        THE COURT:  Okay.

13:19:04  25        The issue number 4 on page 14, which is whether

13:19:08 1    there's really a difference between false arrest and false

2    imprisonment, I'm going to look at those cases.  We'll deal

3    with that during the finalization of jury instructions.

4         Issue 5 has been resolved by my rulings.  So that's

13:19:28 5    not in the case.

6         That takes care of the issues that are going to be

7    addressed.  So I don't think there's any outstanding legal

8    issues other than what we settle in jury instructions.

9         And the factual issues that we've identified are

13:19:41 10   whether there was probable cause to arrest and whether there

11   were damages.

12        Any thoughts or disagreements or issues on those

13   points?

14        MR. NOVAK:  No, Your Honor.

13:19:52 15        MR. DON:  The one issue that I feel we would benefit

16   from clarity on is the scope of damages.  And in the motion in

17   the Court's order regarding summary judgment the Court used

18   language indicating that the plaintiff is limited to seeking

19   damages that accrued between the dates of the arrest and the

13:20:27 20   dates of the indictment.

21        In subsequent orders from the Court, there wasn't --

22   there was slightly different language regarding the scope of

23   permissible damages.  And that's an important issue as far as

24   we're concerned.

13:20:45 25        We believe that the accrual of damages is different

13:20:50  1    from the duration of damages, the nature and quality and

2    duration of damages is a separate issue.  And we need some

3    clarity on what the Court's instruction is going to be as far

4    as that goes.

13:21:06  5         So, in other words, our reading of the ruling and the

6    law is that the claims that accrued between September 18th and

7    September 24th are the dates when the claims came into

8    existence, and the damages that accrued on that day are

9    permitted to be recovered for.  And that's a separate issue

13:21:28 10    from the duration of those injuries, which the evidence will

11    show has extended well beyond that six-day period.

12         THE COURT:  Well, I think I understand what you're

13    asking.  Let me share my thoughts, and defense counsel can

14    tell us if they disagree.

13:21:42 15         My view is that we ought to -- well, that the damages

16    ought to be the same as if Mr. Merritt had been arrested on

17    September 18th and released on September 24th.  So, you know,

18    if there were six days of lost wages, he gets those.  But if

19    there was mental trauma or emotional trauma that plagued him

13:22:07 20    after that as a result of those six days, he gets to recover

21    those as well.

22         What the jury has to be satisfied of is that those

23    damages were caused during that six-day period.

24         So I think that's your point, Mr. Don, is that if

13:22:23 25    he's suffering emotional and mental distress a year later

13:22:27  1   because of what happened during those six days, he can recover

2   it, but you've got to prove it resulted from those six days,

3   because that's the period of damages.  We can make that clear

4   in instructions.

13:22:40  5              So I think that responds to your issue, doesn't it?

6              MR. DON:  Yes, Your Honor.

7              THE COURT:  Do defense counsel see it any

8   differently?

9              MR. NOVAK:  I don't see it differently, Your Honor,

13:22:48 10   but I think that -- let me just offer an example.

11              It's clear to us that one of the facts that plaintiff

12   would like to bring out is that he was surveilled after he was

13   released from jail and that his surveillance, according to

14   Dr. Hayes in her report, is a part of his continuing anguish.

13:23:14 15              That happened after he was released from jail, it

16   happened after September 24th.  I don't think that that should

17   be included in the damages.

18              In other words, let me articulate that just a bit

19   clearer.

13:23:28 20              So anything which occurred after September 24th which

21   causes him to have exacerbated his mental trauma should not be

22   exposed to the jury.

23              THE COURT:  Any thoughts on that, Mr. Don?

24              MR. DON:  I would disagree with that.  I mean, if the

13:23:50 25   injury accrued at the time of the arrest and the subsequent

13:23:55 1    actions merely were instances that exacerbated the initial

2    arrest and injured his healing.

3            THE COURT:  Well, let me ask you this question,

4    Mr. Don:  Let's assume hypothetically that in June 2016, after

13:24:15 5    his release, he was followed by law enforcement during the day

6    and that brought back all of his anxiousness and anxiety.

7            What happened on that day in June of 2016 was not a

8    false arrest and not a false imprisonment.  It was not caused

9    by the false arrest or false imprisonment that occurred

13:24:40 10   September 18th of 2015.  And so it seems to me that any

11   additional damage that was inflicted at that later date is not

12   caused by the harm for which you are suing in this case and

13   that you have to tie any damages that are going to be

14   recovered to the harm from the arrest and the following

13:25:02 15   six-day period he was incarcerated.

16           What's wrong with that thinking?

17           MR. DON:  I think what's wrong with that thinking,

18   Your Honor, is that from the initial arrest, the evidence will

19   be that Mr. Merritt suffered post-traumatic stress disorder

13:25:22 20   and that as a result of that ongoing condition there are

21   certain events, whether lawful or unlawful, that trigger his

22   initial trauma, and that's the condition.

23           So if there is surveillance, if there is -- and there

24   will be testimony, I expect, that, you know, when there are --

13:25:46 25   when Mr. Merritt sees the police or has certain events that,

13:25:52   1   because of his condition, trigger his initial trauma, that's

2   just an aspect of his damages.

3        So I agree to the extent we're not going to argue

4   that surveillance, for instance, was unlawful or a new injury.

13:26:14   5   It's merely an event that he experienced that exacerbates the

6   ongoing injury.  It's not a new accrual date, it's just

7   continued damages.

8        THE COURT:  Well, let me ask you this question:  So

9   in theory, with that approach, you could present to the jury

13:26:38  10   all 152 times he's seen a police car since he was released and

11   say each of those incidents exacerbated his injury and

12   therefore should increase his damages; right?

13        MR. DON:  If that's the testimony.  I mean, I think

14   the argument would be that he's suffered an emotional trauma

13:27:00  15   and as a result of that there's certain events that cause him

16   suffering.  And one of those will be observations or certain

17   encounters with the police.

18        THE COURT:  So what is it you intend to present the

19   jury in terms of these additional encounters with the police

13:27:23  20   or this continuing surveillance?

21        MR. DON:  I'm sorry, I didn't hear --

22        THE COURT:  What is it you intend to present to the

23   jury in terms of evidence of this continuing surveillance or

24   these continuing contacts he has?

13:27:38  25        MR. DON:  If we're just limited to -- in your

13:27:40  1    question we're talking about the surveillance --

2              THE COURT:  Under your theory that you just

3        described, what do you intend to tell the jury or have a

4        witness tell the jury about this ongoing surveillance?

13:27:56  5          MR. DON:  That there were -- well, there have been

6        admissions of ongoing surveillance.

7              THE COURT:  What do you intend to tell the jury?

8              MR. DON:  That Mr. Merritt is aware of the admissions

9        from the defendant that there was ongoing surveillance and as

13:28:14 10    a result it causes him anxiety and stress.

11             THE COURT:  So is he only aware of them because the

12       defendants have admitted it or did he see it?

13             MR. DON:  No, he'll also testify that he -- that he

14       experienced surveillance and saw, you know, police officers

13:28:35 15    appearing to be following him.

16             THE COURT:  And you will have him describe that to

17       the jury, I take it?

18             MR. DON:  Yes.

19             THE COURT:  And you'll ask defense witnesses, isn't

13:28:46 20    it true that you continued to surveil him?

21             MR. DON:  Potentially, yes.

22             THE COURT:  All right.

23             MR. NOVAK:  Dr. Hayes says in her report that one of

24       her opinions is as a result of the ongoing surveillance and

13:29:08 25    pronouncements from law enforcement, so that's

13:29:12  1    Director Silbert's press conference after Mr. Merritt's

       2    release from jail in which he opined on Mr. Merritt's

       3    innocence and one other pronouncement, that he now has

       4    hypervigilance.  That didn't arise as a result of his six days

13:29:32  5    in jail.  She's pretty clear about that.  It's those types of

       6    events that, as Your Honor has put it, are not directly caused

       7    by the arrest and the six days of incarceration caused by

       8    extraneous superseding events that postdate September 24th.

       9         THE COURT:  Well, let me ask this question:  Let's

13:29:59 10    assume that Mr. Merritt testifies or the expert testifies that

      11    as a result of being arrested and incarcerated for six days,

      12    he is traumatically affected and every time he sees a police

      13    officer, it affects him, and he'll presumably describe how it

      14    affects him, and particularly so when he sees the police

13:30:23 15    officer in his rearview mirror, and on the following occasions

      16    he saw himself being followed by a police officer, which

      17    caused him great trauma as the result of his arrest, is it

      18    your view that that is impermissible damages testimony?

      19         MR. NOVAK:  I think it's impermissible unless -- and

13:30:43 20    now that counsel knows this, and perhaps preps him properly,

      21    he'll probably say, yeah, all of this is from those first six

      22    days and it just carried on for 222 days.

      23         So I don't think he can separate the first six from

      24    the last whatever it is, 214 -- 216, 216 days.

13:31:08 25         And the psychiatrist -- psychologist, Judge, excuse

13:31:12  1   me, certainly can't do that.  I know Dr. Lett can't.  I don't

2   think Dr. Hayes can either.

3       THE COURT:  So are you suggesting we shouldn't let

4   him testify, then, about the lingering effects of the trauma

13:31:27  5   of being arrested?

6       MR. NOVAK:  I think he can testify that there have

7   been lingering effects from the six days he spent in jail.

8   Without going into the detail of, "And I was surveilled, and

9   there were these pronouncements, and every time I see a police

13:31:44 10   car, including when I came to this deposition this morning,

11   when I was traveling to Dr. Lett's office for the IME, when I

12   was in Florida and a cop car came up behind me."  It wasn't

13   152, I don't think, Judge, but --

14       THE COURT:  What is the legal basis for precluding

13:32:00 15   that testimony?  You certainly can argue to the jury and on

16   cross-examination that he can't prove that it was caused by

17   the six days, but what is the legal basis for excluding that

18   testimony?

19       MR. NOVAK:  Because he can't say that it is a direct

13:32:14 20   result of the lack of probable cause to arrest and incarcerate

21   him for six days.

22       THE COURT:  Well, am I to decide what he thinks he

23   can attribute his trauma to?  I mean, there's no legal

24   principle I can see that says I can step into the testimony of

13:32:29 25   a plaintiff and say, no, you can't claim that kind of an

79

13:32:34  1   injury is attributed to this event because I just don't think

2   it is attributed to that event.  And that's not my role.

3           MR. NOVAK:  I didn't mean to interrupt.

4           THE COURT:  You didn't.  That's all right.  Go ahead.

13:32:50  5           MR. NOVAK:  I think he's entitled to say that the six

6   days -- "The arrest and the six days has left me with some

7   lingering issues."  But what I don't think he's entitled to

8   say is, "And those have been exacerbated," maybe he doesn't

9   use that word, "by the 216 days that followed the first six"

13:33:19 10   and the -- things like the pronouncements of law enforcement,

11   "Every time I see an officer," "Every time I see a cop car in

12   my rearview mirror."  I don't think he can say that.  I think

13   you can preclude that evidence, Judge, while still allowing

14   him to testify about having some lingering concerns that

13:33:38 15   result from his arrest and six days of incarceration.

16           THE COURT:  All right.  I understand the parties'

17   positions.  Here are my thoughts on it, and I'll make actual

18   rulings at trial.  I'm not going to preemptively slice up his

19   testimony and decide today what he can and can't say in terms

13:33:56 20   of the effects of the six days he was in custody.  Nor would I

21   think it appropriate to say you can't give any examples to the

22   jury.

23           You said something, Mr. Novak, during your last

24   answer, which is he can't say, "Yeah, I was traumatized during

13:34:13 25   the six days and was it was exacerbated by the following 214

13:34:18  1    days."  I agree with that.  The damages are not caused by the

2    events he was incarcerated after September 24th.  He's seeking

3    damages for those six days.  But if he says and testifies

4    under oath, "I was traumatized.  In fact, those first six days

13:34:36  5    were the worst and they've left me anxious every time I see a

6    police officer, and certainly when I see them in my rearview

7    mirror."  I don't think at this point that it is appropriate

8    for me to say you can't give that testimony.

9         Now, I will make rulings at trial on objections as

13:34:52 10    they're made and try to draw lines where I think they're

11    appropriate to, but I'm not going to foreclose that at this

12    point.

13         And -- but the clear view I have going in is the

14    evidence the plaintiff can present are damages attributable to

13:35:05 15    the six days of incarceration that remain at issue in this

16    case.

17         And I think that's the best I can do in terms of

18    sharing my view, and otherwise we'll just have to resolve that

19    at trial.

13:35:15 20         Let me just make a note here.

21         MR. NOVAK:  Judge, does that mean that plaintiff

22    cannot ask the DPS officers about the surveillance that

23    occurred post dismissal?

24         THE COURT:  I'm not making that ruling at this point.

13:35:48 25    You can certainly object if they ask the question, and I'll

13:35:52  1   have a much better sense when we're in trial and how the

2   evidence is coming out as to whether or not I think that is

3   going to confuse the jury or --

4           MR. NOVAK:  Excuse me, Judge.  If you don't make the

13:36:03  5   ruling or -- or give us some advisement, we're going to hear

6   about it in opening statement.

7           THE COURT:  Well, that's easy.  Don't mention

8   surveillance during opening statement.  You certainly can

9   mention it during closing if I allow you to present the

13:36:16  10  evidence.  But otherwise I need to make that judgment call at

11  trial.

12          MR. NOVAK:  Thank you.

13          THE COURT:  All right.  Let me ask you a question

14  about depositions.

13:36:31  15      I have some lengthy deposition excerpts that were

16  submitted with your Final Pretrial Order.  I have a hunch

17  those will have changed some in light of my motion in limine

18  rulings.

19      But what I want to know is what depositions you are

13:36:49  20  intending to present by video because I need to rule on

21  objections before that's presented so that you know how to

22  edit the tape.

23      If you're just going to read a transcript because

24  it's not on video, then I'll rule on objections as they come

13:37:05  25  up during reading.  But I can't do that in the middle of a

13:37:10  1    video.  So if you're going to do a video deposition, I'm going

2    to have to rule ahead of trial.

3              So tell me who's going to be presented by video.

4              MR. LAMM:  Your Honor, per 334 Exhibit -- 334-2

13:37:23  5    Exhibit A, plaintiff will be offering the video deposition, or

6    at least designated portions, of Jennifer Crane, C-R-A-N-E,

7    and Glenn Merritt Senior, and the transcripts are attached to

8    the submittal.

9              THE COURT:  How about from defendants?

13:37:52  10   MR. NOVAK:  We will be offering portions of the video

11   deposition of Eddina Saucedo and possibly Cynthia Saucedo,

12   although I think that's unlikely, Judge.

13             THE COURT:  Am I correct in my assumption that the

14   designations that were done back in February need to be

13:38:20  15   revised in light of my motion in limine rulings?

16             MR. LAMM:  On behalf of plaintiffs, with respect to

17   Ms. Crane and Mr. Merritt Senior, I do not -- I will go back

18   and read them again, Your Honor, but knowing the nature of

19   their testimony, I don't believe that is affected by the

13:38:40  20   motions in limine.

21             THE COURT:  Well, let me ask you a question, then.

22   As I look at Exhibit A to the Final Pretrial Order and I look

23   at the chart that is at the front of, say, for example,

24   Ms. Crane, I've got things in there that say, "subject pending

13:39:10  25   MIL."  There's several of those in Mr. Merritt, as well.  It

13:39:17  1    seems to me that stuff may well have been affected by how I

2    ruled on a motion in limine.

3          MR. LAMM:  Your Honor, I am quickly perusing with

4    respect to Ms. Crane, pages 5 through 20, because I believe

13:39:39  5    that's where the defendant's objections to motions in limine

6    arise.

7          And, respectfully, Judge, nothing that relates to a

8    motion in limine catches my eye.  Insofar as it was the

9    defendant's objection, perhaps they could shed light as to --

13:40:11  10         THE COURT:  Well, I think you all ought to talk about

11   this.  I don't want to go through this a line at a time now.

12         I'd also note that on objections, sometimes there's

13   just a dash.  Does that mean -- is that a ditto, the same

14   objection above, or does that mean there's no objection?

13:40:27  15         MR. LAMM:  I believe Mr. Fox and I worked on this

16   portion together, and my recollection is that a dash would

17   indicate the absence of an objection.

18         MR. FOX:  Correct, Your Honor.

19         THE COURT:  Okay.  Well, there are, by my count, ten

13:40:50  20   places in the depositions of Crane and Mr. Merritt Senior

21   where it says subject to motion in limine.  I think you ought

22   to go through and confer and if -- if you change the

23   designations, just resubmit this chart with what the

24   designations are, what the objections are, and I will go

13:41:15  25   through those pages that are objected to and I'll dictate an

13:41:19   1   order that rules on each of the objections so you know whether

2   evidence is in or out for purposes of editing the videotape.

3         MR. LAMM:  Your Honor, just as an example, and I

4   don't mean to do this piecemeal, but page 107 of Ms. Crane,

13:41:33   5   and just for context for Your Honor, Ms. Crane is the paternal

6   aunt of the plaintiff.  Mr. Merritt's father has a sister

7   named Jennifer Crane.

8         And there's reference at approximately line 11 on

9   page 107 -- page 107, "My older brother Leslie was

13:41:52  10   incarcerated."  This is Leslie Merritt Senior.  And I believe

11   in the motions in limine, the Court defers any specific ruling

12   on past criminal histories of Mr. Merritt's family members --

13   Mr. Merritt Senior, Leslie Merritt Senior --

14         THE COURT:  I don't remember that coming up in any

13:42:13  15   motion in limine.

16         MR. NOVAK:  I can't tell you off the top of my head

17   whether it did or didn't.  I do, however, have an

18   understanding that before we brought up the criminal history

19   of Mr. Merritt, and I assumed that included his family

13:42:28  20   history, which would be his dad's two stints in prison, we

21   would talk to you first.  So I don't think --

22         THE COURT:  I want you to confer.  Decide what is

23   objected to, what's not, resubmit the chart, the beginning of

24   Exhibit B with respect to Crane and Merritt, and I will rule

13:42:46  25   on those objections and I'll get them back to you at least a

13:42:51   1   week ahead of trial so you've got time to do the deposition

2   editing.

3   And with respect to Ms. Eddina Saucedo, let's do the

4   same thing, I would like you to just go through -- there's a

13:43:08   5   lot more objections to her than to others.  Go through and see

6   if everything that was previously designated is still

7   designated.  And if not, then let's take out the objections so

8   I don't to have spend time on those, and resubmit, if you

9   would, the chart that's at the beginning of Exhibit B with

13:43:23   10   respect to her.

11   In terms of Cynthia Saucedo --

12   MR. LAMM:  Your Honor, I'm sorry, she'll be called

13   live as a witness.

14   THE COURT:  Who will?

13:43:35   15   MR. LAMM:  Cynthia Saucedo will be called by the

16   plaintiff.

17   THE COURT:  If that's true, I assume you're not going

18   to play the deposition.

19   MR. LAMM:  She was never -- designations were never

13:43:45   20   submitted by the defendant for Cynthia Saucedo.

21   THE COURT:  Do you agree, Mr. Novak?

22   MR. NOVAK:  Yes.

23   THE COURT:  So just do Eddina Saucedo and the other

24   two.  And if you can get those to me, say by the middle of

13:43:56   25   next week, then I'll try to turn them around within a week so

26

13:44:00  1   you've got time to do the editing before trial.

2        MR. NOVAK:  Judge, can I make a suggestion about

3   Eddina Saucedo.  I won't know exactly what I want to use from

4   her deposition testimony until after Mr. Merritt testifies.

13:44:10  5   She'll be later in our case.  It may be that we use little or

6   nothing from her.  I'd hate to see the Court take the time to

7   go through that when I can tell you, assuming Mr. Merritt

8   testifies on the first or second day of trial, I'll be able to

9   tell you over the weekend what I'm going to do or don't do

13:44:26 10   with Eddina Saucedo's deposition.

11        THE COURT:  That's fine with me.  I'm happy to deal

12   with it then.  But recognize that if you get it -- you'll need

13   to get it to me several days before you want to call or

14   present her videotape because I may not be able to get to it

13:44:42 15   that evening.

16        MR. NOVAK:  Will do.

17        THE COURT:  Yeah, I don't want to spend any time on a

18   deposition that's not going to be played either.

19        MR. NOVAK:  Judge, can we -- I'm sorry, can we stay

13:44:53 20   on Jennifer Crane and Glenn Merritt Senior for one second,

21   Your Honor.

22        I understand your order on the motion in limine to

23   preclude post arrest activity, which would mean the phone

24   records indicating that a call was made to

13:45:13 25   Glenn Merritt Senior on August 29th, it would include

13:45:18  1   Glenn Merritt Senior's testimony that he received a voicemail

2   from his grandson sometime that weekend, he's not sure whether

3   it's the 28th or the 29th, and that the aunt, Jennifer Crane,

4   was there at the house when the voicemail came through, and

13:45:40  5   she heard it.  But none of this was known --

6        THE COURT:  I have no idea what you're referring to,

7   Mr. Novak.  What's this phone call?  What does it have

8   anything to do with?

9        MR. NOVAK:  None of this was known to DPS until after

13:45:53  10  the arrest.

11       THE COURT:  How does it have anything to do with the

12  case?  I'm not understanding.

13       MR. NOVAK:  Exactly, Judge.  Thank you.

14       THE COURT:  No.  Tell me what was said in the phone

13:46:01  15  call.

16       MR. NOVAK:  Plaintiff has persisted in putting this

17  in the exhibits and intends to introduce the testimony that a

18  phone call was made, and then on August 29, at 11:04 a.m. and

19  then -- by Leslie Merritt, and then say that he couldn't have

13:46:26  20  committed the Escalade shooting which occurred around that

21  time, or the Kia shooting which occurred around that time

22  because he received this phone call.  Which may be the case,

23  but DPS didn't know that.

24       THE COURT:  Excuse me, you confused me.  I thought

13:46:42  25  you were talking about August of 2016 because you said after

13:46:46  1    the arrest.

2         MR. NOVAK:  DPS didn't learn these events until after

3    the arrest, when the phone records were obtained by warrant

4    and when Mr. Lamm made some disclosure in the state court

13:47:00  5    criminal case in October of 2015.

6         So the events that Jennifer Crane and Glenn Merritt

7    Senior want to testify about are events that were not known to

8    DPS at the time of the arrest.

9         THE COURT:  How is it exculpatory?  I'm not

13:47:21  10   understanding what this call was about, what the timing had to

11   do with anything.

12        MR. NOVAK:  Sure.  Okay.  So the morning of

13   August 29th there is a shooting on the I-10 eastbound, occurs

14   about 11:04 a.m.  It's the shooting of an Escalade.  A few

13:47:42  15   minutes later, westbound on the I-10, just a little bit

16   further west than where the Escalade was shot, a bus is shot.

17   There is a phone record from Eddina -- from the phone Eddina

18   Saucedo used, that a call was made from that phone to

19   Glenn Merritt Senior in Florida at 11:04 a.m., August 29,

13:48:11  20   2015.  The location of the cell tower is about five miles,

21   maybe, north of the I-10, which would indicate some difficulty

22   in both making the phone call and being on the I-10 at the

23   same time.  I get that.  I understand.

24        THE COURT:  Okay.  I understand that now.

13:48:34  25        MR. NOVAK:  But that is nothing DPS knew at the

13:48:37  1    time --

2            THE COURT:  I understand your point now.  Okay.  I

3    just didn't understand what that phone call had anything to do

4    with.

13:48:42  5            MR. LAMM:  Your Honor, if I may, and I'm going to do

6    just a moment of factual context that I hope is helpful to the

7    Court.

8            The first two criminal charges or shootings, if you

9    will, with which Mr. Merritt was charged both occurred on

13:48:51  10   Saturday, August 29, 2015.  The first vehicle was a Cadillac

11   Escalade that was shot.  That was at 11:03 a.m. at

12   approximately 19th Avenue and the I-10.  About two minutes

13   later, a Vanar, V-A-N-A-R, tour bus was shot at 43rd Avenue

14   and the I-10.

13:49:13  15           Now, Mr. Merritt placed a call to his grandfather at

16   11:04, smack dab in the middle, and that came back to a GPS

17   location in Glendale.

18           Now, I disagree with opposing counsel's assertion

19   that it was not known until after the arrest.  And here is

13:49:36  20   why.  There are two reasons.

21           Number one, the Court has certainly learned

22   Mr. Merritt was arrested on Friday, September 18th at about

23   6:45 at night.  That day, a number of law enforcement

24   officials congregated at the emergency operations center at

13:49:59  25   22nd Avenue and Buckeye.  Among those individuals was a

13:50:03  1    Phoenix police officer by the name of Edward DeCastro.  He at

       2    the time was a Phoenix homicide lieutenant who was brought in

       3    to assist DPS -- pardon me -- giving his violent crime

       4    experience.

13:50:16  5          He is now a commander and -- I apologize, I don't

       6    have his deposition on this laptop, but I will make an avowal

       7    to the Court that he testified in his deposition prior to

       8    Mr. Merritt's arrest and upon his arrival, one or more DPS

       9    officers represented to him, to Commander DeCastro, that DPS

13:50:42 10    had GPS evidence that put Mr. Merritt's phone and vehicle at

      11    the scenes of the shootings.

      12          Now, that is a false statement because it has been

      13    undisputed in discovery that there has never been any evidence

      14    to put Mr. Merritt at the scene.

13:50:58 15          Secondly, if Ms. Boucher can pipe in my laptop, I may

      16    be able to show something to the Court that will --

      17             THE COURT:  Just tell me what it is.

      18             MR. LAMM:  Sure.  Judge, there was an end of day

      19    meeting report from September 17, 2015.  That is Exhibit 5 for

13:51:20 20    trial.  And specifically there is a notation at the top, and

      21    if you would, I realize the Court doesn't have it right in

      22    front of it, but various officers report on their findings of

      23    the day, and there is discussion, this is before the arrest,

      24    of cell phone tower dumps.  And we would produce testimony

13:51:45 25    basically saying that when you're on the phone and you're

13:51:49  1   utilizing a cell tower, the cell tower will capture your phone

2   number, and then basically you can dump all the numbers in a

3   given period of time that were in contact with the tower.

4            And, indeed, on September 17, 2015, quote, 59 common

13:52:04  5   numbers that hit on shooting locations 1 through 4, locations

6   3 and 4 are close and similar around the wrong time,

7   et cetera.  Numbers going to the FBI tonight.

8            Now, this is extremely relevant because, one, it does

9   show that prior to the arrest there was knowledge of cell

13:52:26 10   tower usage at the shooting locations.  It has been testified

11   to that Mr. Merritt was not one of -- that no number

12   associated with him was linked up to these cell tower dumps,

13   again, known pre-arrest, and, again, Commander DeCastro will

14   affirmatively testify that at a time prior to the arrest, it

13:52:46 15   was represented to him by DPS personnel that they had GPS data

16   that put Mr. Merritt at the scene, and that is a falsehood.

17            THE COURT:  What does any of that have to do with a

18   call from Eddina Saucedo's phone in Glendale?

19            MR. LAMM:  Because, again, the cell tower data at the

13:53:08 20   shooting locations gathered from August 29th specifically did

21   not have Mr. Merritt.  And, again, if he was not at that

22   location, it is showing the rest of the story, if you would,

23   Rule 106 --

24            THE COURT:  No, hold on just a minute.

13:53:27 25            MR. LAMM:  It's not Ms. Saucedo's phone.  It is a

```
13:53:30   1    phone both Ms. Saucedo and Mr. Merritt used.  We have a

           2    voicemail --

           3              THE COURT:  Hold on just a minute.

           4              MR. LAMM:  Yes, sir.

13:53:36   5              THE COURT:  Do you have any evidence that the

           6    defendants knew of the Glendale call before the arrest?

           7              MR. LAMM:  We have evidence that representations were

           8    made that he was -- that Mr. Merritt's phone was at the scene.

           9              THE COURT:  That wasn't the question I asked.  Do you

13:53:52  10    have any evidence that they knew of the Glendale call before

          11    the arrest?

          12              MR. LAMM:  We know that the numbers went to the FBI

          13    on September 17th.  And we know that a report was produced by

          14    an FBI agent shortly thereafter, and that's where we, if you

13:54:16  15    would, place him or map him in Glendale.

          16              THE COURT:  Well, are you saying they did know of the

          17    call?

          18              MR. LAMM:  I'm sorry, I can't hear --

          19              THE COURT:  Are you saying they did know of the

13:54:25  20    Glendale call?

          21              MR. LAMM:  They had the data in their possession,

          22    because also on the day of the arrest they were gathering

          23    records of Mr. Merritt's phone numbers.  That's also in a

          24    different exhibit, how they were acquiring information and

13:54:41  25    processing that data before 6:47 on September 18th.
```

13:54:47  1          THE COURT:  Do you have a document that shows that

2    they had in their possession the Glendale call before the

3    arrest?

4          MR. LAMM:  They had the data that would have given

13:54:56  5    them the Glendale call.  I don't know the format, Your Honor,

6    respectfully, but --

7          THE COURT:  So you're saying they collected data for

8    cell towers in Glendale in addition to those along the I-10?

9          MR. LAMM:  I believe they collected data as to

13:55:11 10    Mr. Merritt specifically on September 18th, prior to the

11    arrest.

12          THE COURT:  Well, but if this is a cell tower dump,

13    you've got to ask for certain cell towers.  What did they do,

14    ask for every cell tower in Arizona and look for where his

13:55:28 15    number was?

16          MR. LAMM:  Two separate issues, Your Honor, I'm

17    sorry.

18          The cell tower dump was along the I-10 freeway

19    locations.  That's one issue.  We know that happened on the

13:55:37 20    17th.

21          As to the 18th, prior to the arrest -- I'm looking

22    for the specific exhibit.  Mr. Don is going to assist me in

23    trying to find the specific report -- that at the emergency

24    operations center that I mentioned a moment ago, they were

13:56:00 25    acquiring phone records belonging to Mr. Merritt, and that

34

13:56:05 1    that occurred prior to his arrest and they acquired the

2    information.

3         What they did with them, Your Honor, I don't know.

4    But the reality is it still goes to the issue of probable

13:56:17 5    cause because if the data was in their possession and they did

6    not timely analyze it or what have you, it nonetheless -- it's

7    constructively in their possession, so I would answer yes.

8         THE COURT:  Well, I am not going to allow this

9    evidence in unless you can show me that they had that data.

13:56:40 10   So I'll put that on your shoulders so you can pull that up.

11   Raise it with me before you mention in front of the jury this

12   notion that this call was placed at 11:04 on August 29th.

13        And my question to you will be what evidence is there

14   that they had that data in their possession before the arrest.

13:57:02 15   And then I'll make the decision as to whether or not it is

16   admissible.

17        But if they didn't have the data, then I don't think

18   it is relevant.  And I understand what you're saying,

19   Mr. Lamm, but you can't be definitive today, I think, because

13:57:16 20   you haven't got it in front of you --

21        (Simultaneous speaking.)

22        MR. LAMM:  -- report, but certainly I can -- please

23   correct me if I'm wrong.  I do not hear Your Honor saying that

24   there's any issue with Commander DeCastro's testimony.  With

13:57:29 25   or without a subsequent --

13:57:30  1        THE COURT:  That's a different question, and we're

2   not going to start going through every piece of evidence

3   that's going to come out at trial.

4        MR. LAMM:  Very good.

13:57:36  5        Your Honor, Mr. Novak brought this up, and I think we

6   were still talking about the deposition designations, and I

7   think we took a bit of a detour, but, Your Honor, I know is

8   going to address motions.  But there was one motion concerning

9   depositions designations of Stephen Deady, D-E-A-D-Y, which is

13:58:05 10   Docket 412 --

11        THE COURT:  We'll get to the motions.

12        MR. LAMM:  I didn't know if the Court wanted to do it

13   then or within the context of designations.

14        THE COURT:  We'll get to those.

13:58:13 15        MR. NOVAK:  Judge, I think we had Director Milstead's

16   deposition designations.  We're not calling Director Milstead,

17   former Director Milstead.  We're not going to use his

18   deposition designations if there were any.

19        THE COURT:  Thank you.  I'm only going to look for

13:58:28 20   Crane and Merritt Senior.  And then if you decide you're going

21   to use Eddina Saucedo, I'll look for hers later during trial.

22        Otherwise, if there's a deposition you're not going

23   to play by videotape that you're just going to read from the

24   transcript, have a copy of the transcript for me and I'll rule

13:58:45 25   on and preserve objections as we go through it.

13:58:48    1          Let me make a note about what we just talked about.

            2          Let's talk about a couple of other issues.

            3          One of the motions that's a joint motion that has

            4    been submitted is to revise the exhibit description and

13:59:37    5    objection list, which I will do.  I'm going to simply take the

            6    motion, which is at Docket 420, and I will substitute the

            7    pages in the motion for the pages in the Final Pretrial Order

            8    that contain the exhibits and objections.

            9          So Exhibit 420 will, in effect, be a part of the

13:59:56   10    Final Pretrial Order.

           11          As you know, the trial dates and times will be

           12    August 28th, 29th -- pardon me, October 28th, 29th, and 30th,

           13    and then the five days of the next week, the 2nd through the

           14    6th.  That is a total of eight days, but it is shorter than

14:00:18   15    what we had set aside in February, because we were going to

           16    pick the jury the week beforehand.

           17          So in that eight days -- and by the way, we have no

           18    wiggle room on either side because we are booking trials in

           19    the two courtrooms that are available in this courthouse right

14:00:32   20    now for COVID trials back to back, so we're locked into those

           21    eight days, but we're losing a day, in effect, because we

           22    don't have the jury selection happening ahead of time.

           23          So the time that will be available to each side will

           24    be 19 hours rather than 22 hours because we've lost that day.

14:00:47   25    So please keep that in mind for purposes of the trial.

14:00:52  1          I will keep track of your time.  I will count when

2     you're on your feet in front of the jury -- not voir dire but

3     once we started the trial.  So it will include opening

4     statements, it will include direct and cross-examination, it

14:01:03  5     will include closing statements.  And I will tell you every

6     day at noon and at the end of the day how much time you've

7     used so you can keep track of it and budget your way through

8     the trial.

9          Is the rule of exclusion going to be invoked?

14:01:22  10          MR. LAMM:  Yes, Your Honor.

11          THE COURT:  Okay.  I'll leave it to you to advise

12     your witnesses not to come into the courtroom.

13          There is a split of authority in the case law about

14     what effect the rule of exclusion has outside of the

14:01:34  15     courtroom.  Obviously it means that a witness who is excluded

16     can't be handed a transcript of the testimony that evening.

17     But my view is it does allow lawyers to prepare witnesses.

18          But you shouldn't otherwise be reciting testimony or

19     evidence or arguments to witnesses that's been made in the

14:01:55  20     courtroom unless it's necessary in your witness preparation.

21          Let's talk about jury selection.

22          I need to have you prepare for me a joint list of

23     trial witnesses and get it to Christine, if you would, the

24     Friday before trial.  I can't remember what date that is.

14:02:22  25     October -- it's probably the 22nd.  Twenty-first?

14:02:28  1        What we will do with that list is we will give it to

2   the jurors when they check in that morning and ask them to

3   look it over.  So when they come into the special proceedings

4   courtroom, one of the questions I will ask them on the voir

14:02:41  5   dire will be do you know any of these witnesses.

6        So, please, if you would, get together and just put a

7   list of witnesses.  You don't need to put plaintiff's or

8   defense, you just need a list.  But if they are a DPS officer

9   or something like that, that's helpful.  Put that after so it

14:02:59 10  can help people know if they know these individuals.

11       So we will look for that joint list of witnesses from

12  you by the Friday before trial so we can duplicate it and hand

13  it out to the jurors as they come in.

14       You should have received my proposed voir dire.  Do

14:03:13 15  you have those that were handed to you?

16            MR. NOVAK:  Yes, Your Honor.

17            THE COURT:  Look over those.  My intent is to ask

18  those, obviously in addition to what we're learning in the

19  jury questionnaires.  If you think more needs to be in that

14:03:26 20  proposed voir dire, please plan to raise that with me when we

21  get together on October 23rd to go through the questionnaires

22  and decide who we're excluding.  It's pretty short because

23  we've got a pretty comprehensive questionnaire.

24       But when you get to question witnesses during jury

14:03:46 25  selection, I don't want you to launch into a new subject.  You

14:03:49  1    can certainly ask follow-ups to what's in the jury

2    questionnaire and you can ask follow-up to the voir dire

3    answers I get with that voir dire, but if you think the voir

4    dire and the questionnaire are missing a topic, please be sure

14:04:01  5    to raise that on October 23rd so we can get it into the voir

6    dire if I think it's appropriate.

7              Any questions on that?

8              MR. LAMM:  No, Your Honor.

9              MR. DON:  No, Your Honor.

14:04:13 10              MR. LAMM:  No, Your Honor.  I did locate the phone

11    document that we were speaking of a moment ago when the Court

12    is ready.

13              THE COURT:  As I mentioned, we'll go down to the

14    special proceedings courtroom at the end of this to look over

14:04:24 15    the layout for jury selection.

16              I previously indicated we will seat eight jurors.  As

17    you know, there are no alternates in a civil trial.  So if

18    there's eight left at the end of trial, all eight deliberate.

19    If we lose one or two, the lower number deliberates.

14:04:41 20              With eight jurors, that means we need 14 before

21    peremptory strikes, since there are three per side.

22              I talked to the jury office, and their recommendation

23    is we that have 40 people come in that day.  Those will be 40

24    people who have been prescreened for COVID and for publicity

14:04:58 25    of the trial.  I think that's a safe number.  And that number

14:05:05  1   will fit in the special proceedings courtroom.

2   So our plan will be to voir dire a panel of 40 on

3   October 28th.  And with the questioning, I think we can be

4   done by noon and start the case first thing in the afternoon

14:05:20  5   on the 28th.

6   The rest of my jury procedures are pretty standard.

7   I voir dire the entire panel, by the way.  I don't rotate

8   people through a jury box.  So we'll voir dire all 40 of them.

9   You'll ask your follow-up questions to all 40.

14:05:37  10   We'll then excuse the jurors, and I'll hear any

11   challenges for cause, and then you'll exercise your peremptory

12   strikes, and we'll call the jurors back and identify the eight

13   who have been chosen to serve.

14   MR. NOVAK:  And I'm -- Judge, I'm asking this

14:05:52  15   question without having looked at the special proceedings

16   courtroom.  Will there be an opportunity if a juror wants to

17   discuss an issue in private to not have to dismiss the whole

18   panel and do it to the side somewhere?

19   THE COURT:  Yeah.  What I do on that is I just have

14:06:08  20   them -- I tell them if they want to raise a matter privately,

21   to do that, but just to identify themselves, and then we just

22   have them stay behind when we excuse the rest.  So there will

23   be an opportunity to do that.

24   I'm not going to have them come up to a sidebar, just

14:06:25  25   because of the COVID issues.  But we'll have them stay behind.

41

14:06:32   1        Thanks, Christine.

2        What we're also going to do before we go downstairs

3   is we're going to go in the courtroom next door because that's

4   where the case is going to be tried.  Not in here.  It's like

14:06:43   5   this, but it's just flipped.  It's the mirror image.  We're

6   doing that because that is one of the courtrooms, one of the

7   two courtrooms in the courthouse that are being deep cleaned

8   every night, and we're telling the juries we will deep clean

9   the courtroom every night.  So that's where we'll hold the

14:06:59  10   trial, is in 602, not here in 603.

11        As I was saying, the rest of my jury instructions --

12   jury practices are pretty standard.  I do not allow jurors to

13   ask questions of witnesses.  They'll each be given a notepad

14   for taking notes.  I do instruct them not to discuss the case

14:07:19  15   until the end of the trial.

16        Any questions on jury selection?

17        MR. NOVAK:  No, Your Honor.

18        MR. DON:  No, Your Honor.

19        THE COURT:  Let's talk about the issue that was

14:07:49  20   raised regarding the Superior Court's action.  Is it called a

21   Notice of Clearance?

22        MR. DON:  Notation of Clearance.

23        THE COURT:  Notation of Clearance.

24        I know the plaintiff has his withdrawn its motion,

14:08:01  25   Rule 401.

14:08:02  1         There is a countermotion from the State that is still

2    pending.  But let me tell you what my thought is.  If you turn

3    to the preliminary jury instructions that were handed to you,

4    you should have them at the table, and turn in two pages, you

14:08:18  5    will find a statement of the case.  The first paragraph of

6    that is what we included in the jury questionnaire.  It's been

7    slightly tweaked, but it's same language.

8         The second paragraph is what I propose we tell the

9    jury.  That will deal with this issue of the Notification of

14:08:36 10    Clearance.  It doesn't mention it.  Take a minute and read

11    that, and then we can talk about it.

12         Have you all had a chance to read it?

13         MR. DON:  Yes, Your Honor.

14         THE COURT:  Here's my thinking.  I don't think I

14:09:44 15    should tell the jury that the charges were dismissed without

16    prejudice and can be refiled, because as things stand now with

17    the Notification of Clearance, it appears they can't be

18    refiled.  I don't think I can tell them that the charges can

19    never be refiled because, as things stand now the State's

14:10:02 20    trying to intervene and get that decision changed.  We just

21    don't know for sure where that will end up.

22         It seems to me the safest thing is to tell them the

23    charges were dismissed, say nothing more, but then instruct

24    them clearly don't consider that one way or the other.

14:10:19 25         I also included the grand jury in this paragraph

73

14:10:21  1    because I think it is inevitable that during the trial, the

       2    jury's going to learn that at some point there was a grand

       3    jury proceeding.  I could be wrong about that, but I was

       4    assuming at some point that will become clear or they will

14:10:32  5    know that's clear if he was kept in custody until April.

       6           What I wanted to do was tell them as well, you

       7    shouldn't be influenced one way or the other by the fact that

       8    there was a grand jury proceeding in the case.

       9           So that's why I wrote it the way that I did.

14:10:52 10    Obviously we will take out the reference to aiding and

      11    abetting in light of our previous discussion.

      12           I'm interested in your thoughts on this.

      13           MR. DON:  Just confining my comments to the second

      14    paragraph, the third sentence indicates:  "The Court has

14:11:23 15    previously ruled, for legal reasons, that plaintiff may

      16    recover damages for his claims, if any, only during -- only

      17    for the six-day period between his arrest," et cetera.

      18           That language, plaintiff objects to because it does

      19    not distinguish between the accrual of his damages and the

14:11:51 20    duration of the damages.  So it needs to be clear.

      21           Plaintiff's position also is that any mention of the

      22    grand jury should just be excised from the instruction.  I

      23    don't believe that it's going to be raised at trial.  I can't

      24    imagine plaintiff would raise it.  And I don't think -- the

14:12:17 25    indictment itself was Exhibit 139 in Document 420, and it's

74

14:12:23  1   been withdrawn.

2        Also, the instruction beginning from the sentence:

3   "Your task will be to decide first whether or not defendant

4   had probable cause to arrest the plaintiff," and then it

14:12:51  5   continues.  Our preference would be just to excise that -- the

6   entire rest of that paragraph.

7        THE COURT:  Rest of what paragraph?

8        MR. DON:  From:  "Your task will be to decide first

9   whether or not defendant had probable cause to arrest the

14:13:10  10   plaintiff on September 18, 2015, and second, if not, what

11   damages, if any, plaintiff incurred between September 18th and

12   September 24th, 2015."

13        And then, the next sentence -- there's two sentences

14   after that.

14:13:27  15        THE COURT:  So you don't want me to tell them that

16   they shouldn't consider -- or you don't want me to instruct

17   them not to consider the dismissal of the charges?

18        MR. DON:  No.  I don't think that it's necessary.  I

19   mean, I think the only -- so that would be our first

14:13:45  20   preference.  If the Court's not inclined to do that, I would

21   request our instruction -- our proposed additional jury

22   instruction at Document 417, where it indicates that the

23   plaintiff was cleared of any allegations or charge arising

24   from defendant's investigation against him.

14:14:08  25        That is a quote from the Notation of Clearance.

14:14:12   1          THE COURT:  That might get set aside.  I'm not going

           2    to do that.  I'm not going to quote the Notation of Clearance

           3    or tell them about it because I just think that is a big

           4    question mark at this point.  But I do think they need to know

14:14:23   5    charges were dismissed and he was released.

           6          MR. DON:  On the -- to respond to your comment about

           7    whether it's a question mark, the Notation of Clearance, it's

           8    got Rule 54 language in it under the Rules -- the Arizona

           9    Civil Procedure.  It's a final judgment.  There's been no time

14:14:45  10    extending motion filed that would extend the time to appeal.

          11    That time has expired.  No one appealed it.  It's a final

          12    judgment.

          13          THE COURT:  Has there been a ruling on the motion to

          14    intervene?

14:14:58  15          MR. DON:  There's been no ruling on the motion to

          16    intervene, but there's not a remedy that would overturn that

          17    ruling.

          18          THE COURT:  Well, as indicated, I am not going to,

          19    because I don't think I can accurately be definitive in front

14:15:16  20    of the jury on whether or not the charges can be re-brought.

          21    But I do think they should be told that the charges were

          22    dismissed.  I don't think I should tell them they can be

          23    refiled for the same reason.

          24          I understand your point about the damages.  I will

14:15:29  25    look at that language to see if this gives the impression --

14:15:32  1    an impression inconsistent with the discussion we had a few

          2    minutes ago about damages.

          3           And I guess I'm interested in the defense's view of

          4    whether we can try this case with no mention of the grand

14:15:44  5    jury.  If we can, I'm happy to take it out.  I just assumed

          6    that in eight days of evidence it's going to be hard for the

          7    jury not to conclude that at some point there was a grand jury

          8    indictment.  And maybe that's wrong.

          9           MR. NOVAK:  Let me start by saying, Judge, in the

14:16:03 10    spirit of not being contentious, the second paragraph is

         11    acceptable to the defendant.  Thank you.

         12           The -- it wasn't our intention to introduce testimony

         13    about the indictment, because my understanding of the Court's

         14    rulings were the opposite of that, that we were not to be

14:16:32 15    talking about the indictment.  So I wasn't going to have any

         16    witness talk about it.

         17           I do think that you are correct, Judge, there needs

         18    to be some answer to the questions that these jurors are going

         19    to have about what happened to this case.  And we all know

14:16:51 20    that we're infallible, and you'll give an instruction about

         21    not using the internet, but somebody's going to do it.  And

         22    this way, at least they have some resolution from you about

         23    what has happened.  It may not be perfect in their minds, but

         24    it's something.  And it's certainly better than what we had

14:17:15 25    before.

14:17:18   1          As to -- and I apologize for being lengthy on this.

2          With respect to the damages, when you said toward the

3     end of that second paragraph, damages plaintiff incurred

4     between September 18th and September 24th, that language was

14:17:36   5     acceptable.

6          THE COURT:  Okay.  I think what I'm going to do is

7     this:  I'm going to take the grand jury reference out of this

8     preliminary instruction, and let's see how things go during

9     trial.  The intent will be to avoid the grand jury.  And if at

14:17:52   10    the end of trial I don't think that's become an issue, we'll

11    just leave it be.  If it has come up, if it was mentioned,

12    then we can talk then about how to clarify that during the

13    closing instructions.

14         So I will take out the two references to grand jury

14:18:05   15    in this paragraph, and I will look at the damages language in

16    light of the plaintiff's concern.  If I change it, I'll let

17    you know.  But I understand it's acceptable to the defense.

18         MR. NOVAK:  If I may, Judge, Mr. Don brought up the

19    ruling in the state court, and I understand what you said

14:18:29   20    about that.  My concern is that there will be a claim of

21    innocence by Mr. Merritt during the course of the trial and

22    probably in opening statement.  A claim of innocence that

23    would be consistent with the state court pleadings that I

24    haven't seen because they're sealed, but inconsistent with the

14:18:53   25    issues that are in front of this jury, which are:  Was there

14:18:58  1   probable cause to arrest and were any damages the result

2   therefrom.  Not whether Mr. Merritt was innocent or not.

3         So if I'm wrong about that, Judge, please tell me.

4   But if I'm correct that there should not be a claim of

14:19:12  5   innocence by Mr. Merritt, I'd like your advice to the parties

6   with respect to that.

7         THE COURT:  I think that's another one I can't rule

8   on at this point.  I mean, clearly -- for example, if -- if

9   Mr. Merritt is on the witness stand and says this traumatized

14:19:51 10   me because I didn't commit these shootings and the whole world

11   thought I did, I don't think it would be appropriate for me to

12   strike that testimony and say you can't claim innocence.  If

13   the jury -- if in closing argument plaintiff's counsel says

14   there was no probable cause because he didn't shoot the BMW,

14:20:13 15   his gun was in pawn, and these officers knew it and there's no

16   way that they had probable cause, that's a claim of innocence.

17   I don't think I can foreclose them.

18         Clearly, the trial is not going to be about his guilt

19   or innocence in the case.  And if plaintiff started going into

14:20:31 20   lengthy evidence or argument about the fact that he is an

21   innocent man, then I think that would raise relevancy and 403

22   issues.

23         But I think that, again, is a matter where I'm going

24   to have to draw lines during the course of the trial.  I don't

14:20:49 25   think I can be definitive at this point.

14:20:52  1          MR. NOVAK:  We -- if I may, Judge, we still have

        2    Exhibits 4 and 214, which are basically the same exhibit.

        3    It's the list of Hi-Point C9 gun owners with guns in pawn and

        4    from -- and we have proposed a redaction of that exhibit to

14:21:15  5    show only Mr. Merritt's name.

        6          Plaintiff wants Aaron Saucedo's name on there, which

        7    they -- which, if you allow it to stay, they will use to say,

        8    See, here's the guy that they should have gone after and they

        9    didn't, because Mr. Merritt didn't do this.

14:21:37 10          THE COURT:  I don't want to try to anticipate every

       11    argument that's going to be made.

       12          MR. NOVAK:  I understand, Judge.  My concern is that

       13    all of this is going to come out in opening statement, and

       14    then when you give an instruction after Aaron Saucedo's name

14:21:57 15    isn't admitted into evidence or there's no testimony about it,

       16    the jury's going to be thinking, well, who is this guy

       17    Aaron Saucedo that was mentioned in opening statement.

       18          MR. LAMM:  Your Honor, if I may, Exhibit 4 is an

       19    evidence inventory or roster of handguns that were impounded

14:22:17 20    by Detective Graff, G-R-A-F-F, on September 17, 2015.

       21          Exhibit 214 is a printout from what's known as a pawn

       22    database, whereby an officer can check for certain items

       23    within -- I think it's sheriff's office database.  That was

       24    dated September 14th.  And a list of Hi-Point C9 handguns,

14:22:44 25    along with their respective owners, were listed.  Mr. Merritt

14:22:47  1    was one of those, Mr. Saucedo was one, and there was probably

       2    about a half a dozen other folks who are listed on both those

       3    documents.

       4         We have no intention of focusing on any one person.

14:22:59  5    We don't have any intention of mentioning Mr. Saucedo's name.

       6    However, the issue that we are concerned about is that

       7    redacting everyone's name except Mr. Merritt causes a

       8    situation of undue prominence.  I assure the Court, I assure

       9    Mr. Novak, we are not trying to back door anything in with

14:23:18 10    Mr. Saucedo, that we very mindful of the Court's ruling and

      11    will abide by it.  It is just simply a 106 issue.  His name is

      12    there.  But so are half a dozen other people.

      13         MR. NOVAK:  I accept that representation and the

      14    exhibits can go.

14:23:33 15         THE COURT:  Okay.  All right.  That takes care of it.

      16         All right.  Let's keep moving.  We've been at this

      17    for an hour and a half and we're not halfway through my list

      18    yet, so I want to keep moving along.

      19         So in light of what we're going to do in that opening

14:23:47 20    instruction, and we'll put something like it in the closing,

      21    it seems to me the motion that the defense filed as a

      22    cross-motion on the notification of clarification is moot.

      23    We're not going to be talking about it.

      24         MR. NOVAK:  I agree.

14:24:02 25         THE COURT:  Do you agree?

14:24:03  1                MR. DON:  Yes, Your Honor.

          2                THE COURT:  So that takes care of that issue.

          3                Let's talk about a couple others.

          4                On Motion 409, or the motion at Docket 409, is

14:24:19  5     Plaintiff's motion to amend the final pretrial order to add

          6     the DVDs of the videos of the interrogation of plaintiff and

          7     his fiancee.

          8                Is there any objection from the defense?

          9                MR. NOVAK:  Yes, Your Honor.

14:24:36 10                THE COURT:  What's the basis?

         11                MR. NOVAK:  The Court's --

         12                THE COURT:  Did you respond to that motion -- no, I

         13     told you not to.  That's right.  Go ahead.  Tell me today.

         14                MR. NOVAK:  The Court's pretrial order says the

14:24:47 15     witnesses must be specifically listed and that you cannot rely

         16     on a catchall reference to the other side's witnesses.

         17                Noedel and Deady were never listed by the plaintiff.

         18     They did list some of our witnesses on their list, so they

         19     knew to list specific witnesses.  They didn't list Noedel and

14:25:06 20     Deady.  Noedel is cumulative to Haag.  And Deady is --

         21                THE COURT:  If I can interrupt you for a minute.

         22     These are videos of their interrogations.

         23                MR. LAMM:  409.

         24                THE COURT:  This is Docket 409.  And the transcripts

14:25:23 25     of the interrogations are already listed.

14:25:26  1          MR. NOVAK:  I apologize, Judge.  Maybe I

     2  misunderstood where you were.  I didn't hear what you were

     3  asking me to respond to.

     4          THE COURT:  Okay.  So do you have an objection to

14:25:37  5  409, which would add the DVDs of the interrogations to the

     6  exhibit list in addition to the transcripts of the

     7  interrogations?

     8          MR. NOVAK:  Yes.

     9          THE COURT:  What's the basis for that objection?

14:25:50 10          MR. NOVAK:  The transcript of the interrogation

    11  includes -- we're talking about Mr. Merritt's --

    12          THE COURT:  And his fiancee's.

    13          MR. NOVAK:  His fiancee.  Right.

    14          Mr. Merritt's interrogation includes his claim of

14:26:07 15  innocence and his offer to take a polygraph.

    16          If we excise out his claim of innocence and his offer

    17  to take a polygraph, they can have the transcript, they can

    18  have the video.

    19          THE COURT:  Well, the transcript's already in the

14:26:21 20  final pretrial order; right?

    21          MR. NOVAK:  Well --

    22          THE COURT:  Isn't the transcript already listed?

    23  That's what you said in your motion.

    24          MR. LAMM:  43 and 48, Your Honor.  I believe they're

14:26:33 25  Plaintiff's 43 and 48.

14:26:35  1          THE COURT:  So the transcript's already listed.  All

2      they want to do is add the DVD.  You can make objections about

3      what comes in regarding them.

4          Are you objecting to the DVDs going on the witness --

14:26:43  5      or on the exhibit list?

6          MR. NOVAK:  Yes.  It's post arrest, Judge.

7          THE COURT:  Are you objecting to the transcript on

8      that basis?

9          MR. NOVAK:  Yes.  And I was trying -- what I was -- I

14:26:54  10      short-circuited myself as I was trying to offer the Court some

11      middle ground, which is if Your Honor's inclined to admit

12      those exhibits, despite the fact they're post arrest, at least

13      excise out the claim of innocence and the polygraph.

14          THE COURT:  I'm not deciding admission today.  The

14:27:12  15      question is can the DVDs be in the Final Pretrial Order as

16      exhibits.  I'll decide admissibility later.

17          I'm going to allow them in.  The transcript is in.

18      You can object to anything that's in them that they want to

19      play and I'll rule on it.  But I don't see a reason to keep

14:27:28  20      the video out if the transcript is already in it the Final

21      Pretrial Order.  All it does is list it as a possible exhibit

22      at trial.

23          So I'm going to grant Motion 409.

24          The next one is the defendant's motion for witnesses

14:27:45  25      Shaw and Figeralli, F-I-G-E-R-A-L-L-I, to testify by video

14:27:53  1    remotely.  Any objection?

2              MR. LAMM:  No, sir.

3              THE COURT:  I granted a similar motion from the

4    plaintiff earlier.

14:28:01  5          As you may know, there's a federal rule of civil

6    procedure on this, it's Rule 43(a), that says that remote

7    testimony at a trial can only be allowed for good cause in

8    compelling circumstances with adequate safeguards.

9              So for the record, I want to make the finding that in

14:28:18  10   light of the COVID pandemic I think it is appropriate to let

11   these witnesses testify remotely.  So I will grant the motion

12   at Docket 410 for witnesses Shaw and Figeralli as I granted

13   the plaintiff's previous request for remote testimony.

14             The next motion, which is at 412, is to amend the

14:28:43  15   Final Pretrial Order with respect to witness Deady, D-E-A-D-Y.

16             The problem is that -- well, plaintiffs have

17   identified -- they don't know if Deady is going to testify at

18   trial, and apparently the defense won't tell them.  I read the

19   e-mail which says, We don't have to tell you.  That's the kind

14:29:13  20   of thing I want to see stop from here on.  We tell each other

21   what we know.  And if you don't know yet, you can say we don't

22   know, but to say we don't have to tell you isn't correct.  I

23   want you to be communicating about who is going to be called,

24   and we're going to talk about that in a minute.

14:29:28  25             So I guess the question is whether there is an

14:29:30  1   objection to the motion to amend the final pretrial order to

2   include Deady, or can Defendants say today you know, he's

3   going to be called?  If so, we don't need to amend the Final

4   Pretrial Order.

14:29:45  5           MR. NOVAK:  We object to the inclusion of Deady.

6           And, Judge, I'm not trying to be difficult.  I don't

7   know whether I'm going to use Mr. Deady in this trial or not.

8   It will depend upon how the testimony of Mr. Haag, Mr. Clark,

9   Mr. Weller, the other experts plays out.

14:30:03  10           THE COURT:  Hold on a minute, Mr. Novak.  Do you

11   agree that the reason they didn't list him was because you

12   said he was going to be at trial?

13           MR. NOVAK:  Yes, absolutely, Judge.

14           THE COURT:  So that's why they didn't put him in.

14:30:14  15   Now you say you don't know.  Isn't it fair to put him in?

16           MR. NOVAK:  Judge -- Judge, I'm just trying to hold

17   them to the same standard we've held ourself to with respect

18   to the obligations under your pretrial orders, which is

19   specifically list the witnesses.  If they wanted these

14:30:32  20   witnesses, they should have specifically listed them.  And

21   they didn't.  And they're cumulative.

22           THE COURT:  This is a deposition transcript, right?

23           MR. NOVAK:  Yes.

24           THE COURT:  That they say they didn't include when

14:30:49  25   you said he would be live.

14:30:50   1          MR. NOVAK:  All of that is correct, Judge.

2          THE COURT:  And now you say he may not be live and

3     they can't list his deposition.  So he may not be at trial and

4     they can't use him as a witness, even though they relied on

14:31:00   5     the fact he would be live.

6          MR. NOVAK:  If we don't use Mr. Deady in our case,

7     and they want to use part of Mr. Deady's transcript in their

8     rebuttal case, and Your Honor thinks that is appropriate, I'm

9     fine with that.

14:31:16  10          THE COURT:  All right.  I'm going to grant the motion

11     at Docket 412 and allow the Deady transcript to be included in

12     the Final Pretrial Order.  It will be become unnecessary if he

13     testifies, but if not, they can use the transcript.

14          We've already dealt with Docket 420, which is the new

14:31:41  15     exhibit lists.

16          Although I didn't understand a couple of things.  In

17     the new chart that you gave me that's going into the Final

18     Pretrial Order, sometimes all in caps is the word "withdrawn."

19     I assume that means the objection is withdrawn rather than the

14:31:56  20     exhibit?

21          MR. LAMM:  I believe the exhibit is being withdrawn.

22          THE COURT:  Well, the exhibit numbers are different

23     from what was in the original Final Pretrial Order, so I

24     assumed if an exhibit was withdrawn, you just didn't include

14:32:08  25     it in this chart.

14:32:09  1          MR. LAMM:  I'll let Mr. Fox weigh in because he and I

       2    were working on this.  Certain exhibits, the parties decided,

       3    were not going to be used and we withdrew them.  However, in

       4    the interest of not reshuffling the deck and causing even more

14:32:28  5    confusion, we simply left -- if you would, that particular

       6    number blank, I'm looking -- for example, 180 was withdrawn by

       7    defendant.  Rather than shift everything up and we were

       8    cognizant that we would be leaving a hole in the exhibit list,

       9    if you would, we thought it would be more confusing to

14:32:47 10    reshuffle the numbers, and we tried to keep consistency with

      11    the exhibit list that was in 334.

      12          And Mr. Fox seems to be nodding his head.

      13          THE COURT:  So all of these where there's an exhibit

      14    number and a description and then the word "withdrawn" means

14:33:01 15    the exhibit is withdrawn?

      16          MR. FOX:  Correct, Your Honor.

      17          MR. LAMM:  I would agree.

      18          THE COURT:  Okay.  The other question I have is

      19    sometimes in the objection line it says "for identification

14:33:13 20    only."  I don't know what that means.

      21          MR. LAMM:  Essentially neither party will seek to

      22    admit it.  It is being marked by the clerk for use by a

      23    witness and neither party will seek to admit it into evidence.

      24          MR. FOX:  Correct.  Refresh recollection or

14:33:28 25    impeachment.  I think we were trying to be candid with each

14:33:30  1    other about impeachment exhibits as well, Your Honor.

2             THE COURT:  Okay.  So that is referring to the

3    exhibit as well and not the objection.  Okay.  That answers

4    it.  Thank you.

14:33:42  5             There is a motion pending with respect to Ms. Peloza.

6    I'm going to grant the defendant's request to file a surreply

7    because there was new information presented in the reply

8    brief, and I think defendants should have a chance to respond

9    to it before I rule.

14:34:01 10             How soon can the defense file a reply?  And I don't

11   mean by Monday, but --

12             MR. NOVAK:  Wednesday.

13             THE COURT:  Wednesday would be great.  Okay.  If you

14   file a surreply by Wednesday, then I will rule on the Peloza

14:34:16 15   motion with that surreply in hand.

16             So that means I'm granting the motion that is

17   Exhibit -- pardon me, is at Docket 411 to file a surreply and

18   denying the motion to strike that is in the same docket.

19             Okay.  Let's talk for a minute, then, about -- well,

14:34:42 20   coming back to you, Mr. Novak, the point that you had stood up

21   to raise about witnesses wasn't in any of those motions that

22   are pending, so I don't know if I jumped over something or

23   missed something.

24             MR. NOVAK:  I think you've covered everything, Judge.

14:35:01 25             THE COURT:  Okay.  I just wanted to make sure I

14:35:02  1   hadn't -- when we switched to Exhibit 409 that I hadn't --

2   MR. NOVAK:  Give me one second.

3   THE COURT:  Yeah.

4   MR. NOVAK:  Two things, Judge.  One, plaintiff, on

14:35:29  5   the day before the final pretrial order was submitted -- I'm

6   sorry, the joint pretrial order back in February, added a name

7   of Officer Barcello.  It was well past the close of discovery.

8   Barcello -- no deposition was taken by either side with

9   respect to him, and it was a late disclosure of Barcello.  We

14:36:00  10  considered filing a motion in limine, but decided to wait and

11  bring it up with you today.  That's one point.  And then I

12  have one other point once we resolve that.

13  THE COURT:  Well, that is listed -- Mr. Barcello is

14  listed on page 19 as a witness the plaintiff may call at

14:36:18  15  trial.

16  Do you intend to call him?

17  MR. LAMM:  Your Honor, Mr. Barcello is a foundational

18  witness for authentication, and throughout this case I was

19  assured we would not have issues with authentication and we

14:36:30  20  would be playing quite civilly.

21  Now there's a document that Mr. Barcello signed off

22  on.  There's no question that he's a DPS employee.  He's a

23  police officer.  And apparently now there's a challenge to

24  that individual.  So perhaps we erroneously relied --

14:36:47  25  THE COURT:  So are you saying he would only be called

14:36:48  1    in as a custodian of records to authenticate documents?

2         MR. LAMM:  Basically, yes, Your Honor.

3         THE COURT:  Do you have an objection to his use for

4    that purpose?

14:36:58  5         MR. NOVAK:  No.

6         THE COURT:  Okay.  He's in the Final Pretrial Order.

7    If you decide to use him, you can use him for that purpose,

8    but only that purpose.

9         What was the next issue, Mr. Novak?

14:37:07 10         MR. NOVAK:  With respect to all of the cell phone

11   data, the data that was -- I know this is repeating a little

12   bit of what we've already covered, Judge, so forgive me.

13        I understand that Mr. Merritt's cell phone and Eddina

14   Saucedo's cell phone were collected at the time Mr. Merritt

14:37:35 15   was arrested.  That was the first time that DPS knew their

16   phone numbers.

17        Search warrants were being prepared during the course

18   of the day to secure phone records, but the phone number to be

19   associated with those warrants was not known until the phones

14:37:55 20   were collected from Merritt and Ms. Saucedo.

21        The fallout from that includes the call to grandpa,

22   which we already talked about.

23        THE COURT:  Includes the what?  Includes the what?

24        MR. NOVAK:  The alleged phone call to Glenn Merritt

14:38:12 25   Senior in Florida.  It includes a cell site analysis that is

14:38:19  1   Plaintiff's Exhibit 13, it includes a text message that is

2   Exhibit 54, and a number of other records, 37 through 39, none

3   of which were known by DPS until after the arrest.

4           I can object to all of this at trial, but my concern,

14:38:39  5   as I stated earlier, was this is going to be mentioned in the

6   opening and we're not going to have an answer for it, and it's

7   going to be left out there and the jury's going to wonder why

8   it was that cell phone information was talked about, never

9   introduced, and I don't want to have to try to make up a story

14:38:58  10   for something that didn't occur, and I don't want to have to

11   ask the Court for an instruction to have the jury disregard

12   what they've already heard.

13           THE COURT:  So the basis for your assertion is that

14   DPS did not know the phone numbers for either the --

14:39:14  15           MR. NOVAK:  I'm prepared to submit a memo this

16   afternoon.

17           THE COURT:  Hold on a minute.  Let me finish my

18   question.

19           You're saying that DPS didn't know the plaintiff's

14:39:20  20   phone number or Ms. Saucedo phone number before the arrest.

21           MR. NOVAK:  Correct.

22           THE COURT:  Do you agree with that?

23           MR. LAMM:  I do not.

24           If the Court wants to give me a monitor, a picture is

14:39:30  25   worth a thousand words.

14:39:32  1          THE COURT:  Just tell me what it is.

2          MR. LAMM:  I'm looking at Exhibit 29.  It was a log

3   off -- dictated by Captain Jennifer Pinnow, September 18,

4   2015, 0925 hours.  Log started.  Suspect Number 1, Leslie

14:39:48  5   Allen Merritt.  Biographical information.  Phone number

6   480-532-3973.  That is the phone number that was calling at

7   11:04.  As I scroll down, Your Honor, to the time stamp in the

8   log, if counsel needs it, it is page 5 of 9 on Exhibit 29 --

9   let me just get to the right page.

14:40:19  10          At 12:17, Coleman, which is Captain Coleman, said the

11  480 POS, Peter Oscar Sam, phone as -- should be "has" -- not

12  been turned on all day per Verizon.

13          Verizon was the carrier.  That is indisputed through

14  testimony.

14:40:36  15          THE COURT:  Okay.  I don't need to hear more about

16  plaintiff's phone.  How about Ms. Saucedo's.

17          MR. LAMM:  Well, this is -- but the 480 number, this

18  is Mr. Merritt's phone because this is at 0925 hours.  The

19  DPS-generated document before the arrest lists the 480 number

14:40:52  20  that at 11:04 --

21          THE COURT:  I heard that.  I heard that.  I'm not

22  understanding -- you said that was Mr. Merritt's phone.

23          MR. LAMM:  That's Mr. Merritt's phone, and we have

24  testimony to support that --

14:41:01  25          THE COURT:  What about Ms. Saucedo phone?

14:41:03  1          MR. LAMM:  They shared a phone.

2          THE COURT:  Is it the same number?  Same phone?

3          MR. LAMM:  Yes.  Yes.  And Mr. Merritt, his voice is

4      on the voicemail.

14:41:10  5          THE COURT:  Okay.  That's fine.

6          Mr. Novak, what is your response to that?

7          MR. NOVAK:  We dispute that, Judge.  The 480 number

8      that was used to call Glenn Merritt Senior was a number that

9      was assigned to Cynthia Saucedo.  Not to Eddina.  Not to

14:41:29 10     Leslie.

11          THE COURT:  I'm sorry, let me interrupt you for a

12     minute.  I thought we were talking about something different.

13     You said that all the other evidence about plaintiff's cell

14     phone is irrelevant because they didn't know that number until

14:41:41 15     after the arrest.  And it sounds like they knew it --

16          MR. NOVAK:  That was my understanding.  I haven't

17     looked at this exhibit today.

18          THE COURT:  On that issue, whether or not I should

19     say now none of the cell phone information comes in because

14:41:55 20     they didn't have the phone number, I can't rule because it

21     sounds like they did have the phone number.

22          MR. NOVAK:  And I apologize for taking your time,

23     Judge.

24          THE COURT:  No, that's okay.

14:42:03 25          I want to say on that point, clearly I can't rule at

14:42:06  1   this point.  I think that was the issue you had raised.

2   MR. NOVAK:  Yes.

3   THE COURT:  Okay.  Did you have any other point you

4   wanted to raise?

14:42:15  5   MR. NOVAK:  No, Your Honor.

6   THE COURT:  Okay.

7   MR. LAMM:  Your Honor, on that last issue, there was

8   one other entry that may assist Your Honor.

9   THE COURT:  I'm not ruling now.  I guarantee,

14:42:22 10   Mr. Lamm, I won't remember this tomorrow so there's not a lot

11   of point in telling me for trial.  We'll have to talk about it

12   then.

13   MR. LAMM:  Okay.

14   THE COURT:  Okay.  Let's talk, then, for a minute

14:42:33 15   about court procedures.

16   I want you to tell each other who you're going to

17   call as a witness 48 hours in advance.  Now, I recognize

18   sometimes that can change the day before trial, and if it

19   does, let each other know.  But I want both sides to have the

14:42:50 20   opportunity to prepare their cross-examination ahead of time.

21   It will be shorter, it will be more effective.

22   Obviously, if you tell them I'm calling somebody the

23   day after tomorrow, and you decide tomorrow that you're not

24   and you're calling somebody else instead, just tell them.  But

14:43:06 25   I want you to use your best estimate to keep each other

14:43:09   1   informed of not only that, but when you're going to rest so

2   the other side can be ready to go and have their witnesses

3   teed up.

4           Let's talk about COVID trial procedures.  We're all

14:43:26   5   going to wear masks all of the time.  I know it makes it hard

6   to hear sometimes.  One exception will be the witness.  As you

7   can see, we've got a plexiglass barrier around the witness.

8   The same is true next door.  So we'll have witnesses take off

9   their masks when they testify.  We'll wipe down their area

14:43:44  10   before the next witness comes up.  But otherwise, we all wear

11   masks all the time and the jury will be told to wear masks all

12   the time.  And we're going to require masks.  Face shields

13   aren't as effective.  So that's one of the steps we'll be

14   taking.

14:43:59  15           We are going to be spaced out.  We can put eight

16   jurors in the box and have them be six feet apart from each

17   other.  Because it's a civil case, all of the jurors will be

18   in the box.  In criminal cases we're having to put them behind

19   you in rows.  I'm glad we don't have to do that.

14:44:16  20           There also needs to be space at counsel table.  The

21   next courtroom is like this one.  The plaintiff's table, which

22   is by the jury box, can only accommodate two people.  So that

23   means that if Mr. Merritt wants to sit by you, he's going to

24   have to be behind that barrier in the row behind.  We're not

14:44:35  25   going to have people sitting behind you in the chairs because

14:44:38  1   that is closer than six feet.

2          On the defense side, we can put three people six feet

3   apart.  So if you've got a fourth, you'll need to have them --

4   a lawyer behind you.  And if you want a client representative,

14:44:53  5   you can have them as one of the three at counsel table or you

6   can have them sit behind as well.  But we're going to be

7   spaced out with three people on the two tables for defense

8   counsel.

9          You'll see in the next courtroom when we go in, that

14:45:09  10  there are blue dots on the seats in the gallery every other

11  row that are six feet apart.

12         We have them too?  I didn't know that.

13         That means we can only seat people every other row,

14  six feet apart.  If we have some attorneys in the front row,

14:45:29  15  that means we can put ten observers in the courtroom, and no

16  more.

17         So a question I have is whether you think we're

18  likely to have more than ten observers for this trial, given

19  COVID.  Are people going to come in and be willing to sit with

14:45:44  20  masks through the entire trial?  Because if so, we're going to

21  have to set up a closed-circuit relay to a different courtroom

22  and have the people sit in there.

23         What are your thoughts?

24         MR. LAMM:  On behalf of plaintiffs, we think it would

14:45:57  25  be prudent.

14:45:58  1          THE COURT:  Tell me why.

2          MR. LAMM:  Your Honor, respectfully, this is a case

3     that is known, it has garnered media attention.  I think there

4     will be interest in this case.  If Mr. Don and I bring in one

14:46:12  5     or two assistants during trial, that will eat up, I know

6     Mr. Fox, Mr. Dawson, they're there, we have three at counsel

7     table.  And certainly I'm not casting any aspersions, but the

8     reality is just the presence of counsel and their staff in a

9     case with this much discovery and this many moving parts will

14:46:31 10     eat up a good bit of the allotment of seating for the public.

11          THE COURT:  Well, if you take that row, there will be

12     ten seats.  Do you think we'll have more than ten observers?

13          MR. LAMM:  Your Honor, I don't want to be

14     speculating, but if I had to bet on it I would say yes.

14:46:47 15          THE COURT:  Okay.  What do you think, Mr. Novak?

16          MR. NOVAK:  We don't anticipate any visitors,

17     Your Honor, other than staff.  And Mr. Dawson, who has been

18     mentioned, is our paralegal, Your Honor.  And we'll have a

19     client representative who will be here some of the time,

14:46:59 20     hopefully most of the time.  But no one else.

21          THE COURT:  Okay.  Well, I think what I will do is I

22     will have the courthouse staff ready to turn on a video feed

23     if it turns out we need more seating than that.

24          And I'll have a courtroom ready where the overflow

14:47:22 25     witnesses can go to, but we're not going to pack people into

14:47:26  1    the courtroom, obviously, because of the assurances we've

2    given the jurors.

3            MR. LAMM:  Your Honor, will marshals be at the door,

4    obviously in plain clothes, governing traffic?

14:47:35  5            THE COURT:  Well, you mean in terms of allowing

6    people into the courtroom?

7            MR. LAMM:  Yes, Your Honor.

8            THE COURT:  They won't be marshals.  We may have my

9    judicial assistant.  If we think -- do you think we need

14:47:48  10   security for some reason?

11           MR. LAMM:  No, no, no, Your Honor.  I only say that

12   because I know Judge Bolton has a trial right now and there

13   were two marshals at the door.  I believe they were marshals.

14           THE COURT:  It's probably a criminal case, then.

14:47:58  15           MR. LAMM:  No, no.  It's civil -- it's a civil

16   matter.

17           THE COURT:  We don't plan to have any marshals here

18   unless there's a security concern you have.

19           MR. LAMM:  I have no reason to think that will be an

14:48:11  20   issue.

21           THE COURT:  Okay.  The jury, the eight-person jurors

22   will be assigned four to each jury assembly room, which is in

23   the hallway next to the courtroom, so they can go in there and

24   not be close to people and use the restroom during a break.

14:48:25  25   But when they deliberate, they'll deliberate in the courtroom

14:48:27  1    so they can be spaced out.

2         Sidebars.  During the course of trial will be one

3    person from each side.  We'll do them at the side of the bench

4    in there, and we'll just have you stand back, and then when

14:48:43  5    you need to speak, we'll have you step up to the microphone

6    and I'll slide back and we'll just talk to each other that

7    way.  And the sound system should block out what is said.  But

8    we can only have one person from each side come to sidebar and

9    maintain the spacing that we need to, to keep everybody safe.

14:49:00  10    That means clients don't come to sidebar either.

11    There's just no other way to do that.  I wish we had the

12    technology to involve more people in sidebar, but we don't in

13    this courtroom or the next one.  So that's what we'll do on

14    sidebars.

14:49:24  15         What I'm going to do is --

16         Christine, if could you help me remember this.

17         -- I'm going to have my office send to you a brochure

18    that was prepared by the administrative office of the U.S.

19    Courts on jury trial practices during COVID.  It is just --

14:49:41  20    it's a well done half-dozen page booklet on all of the things

21    you should do during trial to protect people.  It includes

22    handling of exhibits and all kinds of issues.  Number of

23    people in elevators, et cetera.  Just so you're aware of what

24    we're going to be doing elsewhere in the courthouse.

14:49:59  25         For example, we'll only allow four people in an

14:50:01   1    elevator at a time.  We're going to tell the jurors where they

2    can go and can't go during breaks.  We're just going to try to

3    be really careful to follow through on our commitment to them

4    that they will be safe while they are here.

14:50:18   5            Any questions about COVID procedure?

6            MR. NOVAK:  No, Your Honor.

7            MR. LAMM:  No, Your Honor.

8            There was one legal issue, but whenever the Court's

9    ready.

14:50:28  10            THE COURT:  Unless there's no COVID issues, let's

11   talk about your --

12            MR. DON:  Well --

13            MR. LAMM:  Go ahead.

14            MR. DON:  I've got one issue that is arising because

14:50:38  15   of the COVID-related restrictions, having to do with the

16   masks.  And I know the Court earlier said that it's not

17   inclined to permit juror questions, written questions to

18   witnesses or to counsel.  It wouldn't hurt to ask.

19            I think the challenge that we, as advocates, are

14:51:03  20   going to have is trying to calibrate our presentation to the

21   jurors when it would be -- when it's going to be very

22   difficult to read their facial expressions, if not impossible.

23            It would be helpful to get -- to allow juror

24   questions so that at least we can have some gauge to -- to how

14:51:24  25   to calibrate the presentation and perhaps run the trial more

14:51:27  1    efficiently.

2              So I'll throw that out there.  That would be

3    plaintiff's request, to permit written jury questions.

4              THE COURT:  What are the defense thoughts?

14:51:36  5    MR. NOVAK:  I don't have a position either way,

6    Your Honor.

7              THE COURT:  You know, the one factor to take into

8    account, Mr. Don, is, as you know, if we do that it reduces

9    the time that is available for direct and cross-examination

14:51:50  10   because at the end of each witness, we need to collect the

11   questions, I need to review them, I need to talk to you about

12   them before we ask them of the witness.  That can take 10, 15

13   minutes.

14             So if we do that over the course of an eight-day

14:52:05  15   trial, we'll lose an hour or two per side, probably, of your

16   time.  And that's a factor to consider.  Since we're already

17   down to 19 hours, do you want to have that additional

18   time-consuming activity?  If you do, I'll think about it.

19             I mean, if I understand your point about masks and

14:52:22  20   the fact that you won't be able to see facial expressions,

21   that might be a good reason to do questions.  But it does take

22   time out of the time we've allotted.  And as I've indicated,

23   we don't have the luxury of going into the next week.

24             MR. DON:  I did not consider the Court's point about

14:52:41  25   the time required to do the questions.  Can I think about it?

14:52:44  1          THE COURT:  Yeah.  Yeah.  Think about that.  If you

       2   want to do the questions, raise it when we get together on the

       3   23rd, and we can talk about it then again.

       4          You had a legal issue, Mr. Lamm?

14:52:55  5          MR. LAMM:  Your Honor, yes.  Thank you.

       6          In Docket 387, there was discussion of the report of

       7   Gregory Klees, K-L-E-E-S.  He was the gentleman with the

       8   Bureau of Alcohol, Tobacco, and Firearms, and the Court asked

       9   that if plaintiff intended to pursue any of his testimony or

14:53:14 10   his findings, that we should raise it at the final pretrial

      11   conference.  And that is what I'm doing.

      12          I understood the Court's concern to be two-fold.

      13   One, foundational, and what has been marked for identification

      14   as 61 --

14:53:28 15          THE COURT:  Hold on just a minute, Mr. Lamm.

      16          MR. LAMM:  Yes, sir.

      17          THE COURT:  What page are you on in 387?

      18          MR. NOVAK:  Page 5, Your Honor.

      19          MR. LAMM:  Thank you.

14:53:39 20          THE COURT:  Let me get there just so I can remember

      21   what the issue is.  Give me just one minute to look back at

      22   this and refresh my memory.

      23          Okay.  I've looked that over again.

      24          Go ahead, Mr. Lamm.

14:55:55 25          MR. LAMM:  Your Honor, if I'm understanding the Court

14:55:57   1   correctly, the Court's concerned about two issues; one is

  2   foundation and the other is hearsay.

  3         Obviously, I would imagine that the hearsay portion

  4   needs to be borne out in the evidence.  But with regard to

14:56:07   5   foundation, Exhibit 61 has a face sheet which is an affidavit

  6   of a custodian of records from the Bureau of Alcohol, Tobacco,

  7   and Firearms, the chief operations officer of the lab.  It was

  8   received in September of 2017 and shortly thereafter disclosed

  9   to the defendant with the affidavit.

14:56:30 10       THE COURT:  Is it an affidavit -- that authenticates

11   it is an ATF document.  Is it one of the affidavits that

12   addresses the 803(6) or the 803(8) factors?

13       MR. LAMM:  I believe the relevant paragraph is "The

14   records were prepared in the ordinary course of business at

14:56:44 15   our office at or near the time of the act, condition, or event

16   described therein or received or maintained by our office in

17   the ordinary course of business."

18       THE COURT:  Okay.  So tell me exactly what you want

19   me to do on that today.

14:56:56 20       MR. LAMM:  Well, I don't know that we can deal with

21   everything today, but your order asked that we raise this

22   issue if we intend to use the Klees report, which is what we

23   do intend to do, Your Honor.

24       Candidly, it may come in through our quality

14:57:17 25   assurance expert or it could be impeachment.  One of the

14:57:21  1    issues, and I believe we've proffered this in our written

2    papers, is that the Department of Public Safety asked the ATF,

3    as part of their quality assurance process to do an

4    independent review of the ballistics, and the ATF, in fact,

14:57:37  5    did so.  They came to a different conclusion than the DPS

6    crime lab.  However, that conclusion was in line with Mr. Haag

7    and Mr. Murdock, who, of course, they won't be hearing about.

8    And then the DPS was very critical of the ATF's findings for

9    various reasons.

14:58:00  10         So those would essentially be the purposes that it

11    would be coming in.

12         THE COURT:  Mr. Klees, since he's not a witness,

13    obviously would not be here to testify about it.

14         MR. LAMM:  That is not our intent.

14:58:14  15         THE COURT:  So tell me how you use it at trial when

16    we've got the jury in the box.  What do you do with that

17    document?  Well, assuming for a minute it could satisfy 803(6)

18    or 803(8).

19         MR. LAMM:  Well, it's really two-fold.  Todd Weller,

14:58:28  20    W-E-L-L-E-R, is our quality assurance expert, and he'll talk

21    about the policies and what needs to be done as part of root

22    cause analysis.  We would certainly be showing it to

23    Mr. Weller.  He is an expert on root cause analysis quality

24    assurance policies and procedures within the crime lab.  So I

14:58:50  25    think it also would go to bolster his opinion as to what or

14:58:58  1   was not done correctly.

2         DPS has a rebuttal expert to Mr. Weller by the name

3   of John Maciulla, M-A-C-I-U-L-L-A.  He was referenced in your

4   opinion, although his potential testimony is limited to rebut

14:59:11  5   Mr. Weller.  It could be used to impeach him.

6         And then also, Mr. Silbert, who is now the director,

7   was extremely critical, not only of Mr. Klees, but Mr. Haag as

8   well, and I think it would be relevant as to Mr. Silbert's

9   bias essentially that we're right and the world is wrong.

14:59:36  10         THE COURT:  Defense counsel.

11         MR. NOVAK:  Mr. Weller and Mr. Maciulla are talking

12   about policies and procedures within the lab.  They want to

13   use Mr. Klees' report to talk about the accuracy of the

14   ballistics identification.

14:59:52  15         The report is hearsay, judge.  And neither of the two

16   individuals they talked about using the report with gave you

17   an expert report on identification of ballistics.

18         THE COURT:  What is your response about the

19   authentication certificate that addresses at least some of the

15:00:12  20   business record and public record exception elements?

21         MR. NOVAK:  Well, it's a little unclear to me whether

22   that certification, which is very general in nature, satisfies

23   the requirements of, as you pointed out, 902(4) and 901(b)(4).

24   It's not recorded or filed in a public office, which is

15:00:37  25   902(4).  It's not distinctive in its characteristics, which is

15:00:46   1   901(b)(4).  And to say it was an unusual request is an

2   understatement.

3           As plaintiff's counsel knows, it is rare that second

4   opinions are sought by labs, and so it would be rare for ATF

15:01:11   5   to render a second opinion.  So to say that this is a normal

6   course business activity for ATF is, I believe, an

7   overstatement.

8           THE COURT:  Well, why doesn't it come within

9   902(b)(4)?

15:01:30  10           MR. NOVAK:  Why do I not think --

11           THE COURT:  Why does it not come within 902(b)(4)?

12           MR. NOVAK:  Well, 902(b)(4), I don't have the Rules

13   of Evidence in front of me, but my -- the notes I wrote

14   earlier today said requires some distinctive characteristics.

15:01:46  15           THE COURT:  That's a different element.

16           MR. NOVAK:  I'm sorry?

17           THE COURT:  That's a different rule.  902(b)(4) is a

18   certified copy of a public record.  A copy of an official

19   record -- or a copy of a document that was recorded or filed

15:01:59  20   in a public office as authorized by law -- if the copy is

21   certified as correct by the custodian or another person

22   authorized to make the certification or it complies with

23   902(1), (2), or (3) or a federal statute.

24           All this does is authenticate it.  This doesn't get

15:02:20  25   the hearsay problem solved.  But it means you know it's an ATF

15:02:24  1    document.

2                    MR. NOVAK:  Thank you, Judge.

3                    And I believe that it is not a document that is

4    recorded or filed in a public office in the normal course.

15:02:38  5                    You can't go to ATF and get this file.

6                    Public doesn't have this file available to them.

7                    THE COURT:  All right.  So one objection is hearsay,

8    what was the other one?

9                    MR. NOVAK:  The other one is the lack of

15:02:52  10   authentication.

11                   THE COURT:  So one is authentication and one is

12   hearsay.  Those are the two objections?

13                   MR. NOVAK:  With respect to hearsay?

14                   THE COURT:  No.  Your two objections that --

15:03:05  15                   MR. NOVAK:  I'm sorry.

16                   THE COURT:  -- you are making are authentication and

17   hearsay.

18                   MR. NOVAK:  And -- and the fact that the use -- the

19   plaintiff wants to -- intends is with Mr. Weller, who isn't an

15:03:17  20   expert on ballistics identification, or Mr. Maciulla, who is

21   also is not testifying as an expert on ballistics

22   identification.  So it's coming in through the back door, two

23   experts who are giving not the same type of opinion.

24                   THE COURT:  Okay.  I understand.

15:03:34  25                   MR. LAMM:  Your Honor, respectfully, I think my

15:03:36  1  colleague misunderstands the purpose for which we seek to

2  offer this.  I'll just briefly address the authentication.  I

3  think there is adequate compliance with the rule and, once

4  again, we had assurance, at least I thought we did, that

15:03:49  5  authenticity was not going to be issue.  We had bigger issues

6  to worry about.

7          THE COURT:  Do you have a copy of this exhibit, by

8  the way?

9          MR. LAMM:  I'm sorry, Your Honor?

15:03:57  10          THE COURT:  Do you have a copy of this exhibit?

11          MR. LAMM:  I have it in a folder and left it at my

12  office.  I could easily --

13          THE COURT:  Just file it, would you, Monday.

14          MR. LAMM:  Absolutely.

15:04:05  15          THE COURT:  Just with a notice.  I want to look at

16  the authentication certification and the document when I rule

17  on this.  But go ahead and --

18          MR. LAMM:  I'll get that done before day's end,

19  Judge.

15:04:16  20          THE COURT:  Okay.

21          MR. LAMM:  With regard to Mr. Weller, Mr. Maciulla,

22  they're testifying as to policies and procedures.  And one of

23  the policies and procedures within the realm of quality

24  assurance is when there is an error that there needs to be a

15:04:29  25  root cause analysis.  And part of that is to do an independent

15:04:34  1    analysis when deemed appropriate, and this is one of those

2    occasions.

3              What Mr. Weller would specifically testify to is that

4    notwithstanding the fact that the root cause analysis work

15:04:48  5    that was commissioned and requested by the Department of

6    Public Safety in furtherance of their own policies was

7    inconsistent, further evidence of inconsistency with the lab's

8    finding, they did nothing to remediate the problem after being

9    put on, arguably, notice that an independent examiner

15:05:11 10    disagreed with their lab.

11              So it goes to the inadequate quality assurance

12    policies enforcement and DPS's follow-up on the root cause

13    analysis.

14              THE COURT:  Wouldn't -- wouldn't the inadequate

15:05:23 15    follow-up concern the next case and not this one?

16              MR. LAMM:  No, sir.

17              THE COURT:  I think you said that he said after this

18    issue came up, they didn't follow up and do what they needed

19    to do to correct the problem.

15:05:36 20              MR. LAMM:  Well, part of the problem, quality

21    assurance is not just going forward, but you have to look at

22    the individual case where the error was made.  And for the

23    purpose of our argument, I'm sure the defense will agree, we

24    believe that an error was made.

15:05:49 25              And when one does a root cause analysis and -- you

15:05:55   1    know, you are told that, yes, you have a problem in the case

2    before you -- we'll just say the Leslie Merritt case -- you

3    need to go back and then go back into your findings based on

4    what the independent work and the root cause analysis said.

15:06:08   5    It is not just simply moving forward, that the policies and

6    the procedures require them to go back to the Merritt case and

7    they, frankly, didn't do that because the -- the lack of any

8    sort of change is any evidence of policies and procedures,

9    frankly, before Mr. Merritt even became a suspect in this

15:06:30   10   case.

11            So part of the argument that Mr. Weller will be

12   making is that there is a systemic -- did I -- I'm sorry, the

13   Court's --

14            THE COURT:  I'm not understanding what you just said.

15:06:44   15   You said the lack of any sort of change --

16            MR. LAMM:  Well, the lack of any change --

17            THE COURT:  -- and any evidence -- hold on just a

18   minute.

19            MR. LAMM:  I'm sorry.

15:06:51   20            THE COURT:  You said the lack of any sort of

21   change -- sorry, it's moving, hold on just a minute.  I've got

22   to stop talking, I know.

23            You said the lack of any sort of change is evidence

24   of policies and procedures before Mr. Merritt even became a

15:07:15   25   suspect in this case.

81

15:07:17    1        MR. LAMM:  Yes, Your Honor.  And it shows a lack of

          2    reasonable reliability of the crime lab.  And given that

          3    the -- well, it was -- it's been testified multiple times that

          4    the ballistic evidence was the sole basis of arrest, and but

15:07:36    5    for that ballistic evidence, Mr. Merritt would not have been

          6    arrested.  It goes to the reliability of the conclusions and

          7    the fact that DPS did not follow policies with regard to this

          8    case.

          9        THE COURT:  Okay.  Yeah, file the document, if you

15:07:54   10    would, and I'll look at it on the hearsay issue.

         11        Mr. Novak, last comment.

         12        MR. NOVAK:  When you look at it, Judge, if I could

         13    ask you to remember that Mr. Klees' examination was well after

         14    the time Mr. Merritt was arrested and well after the time that

15:08:10   15    Mr. Kalkowski had done his examination and Mr. Shaw had done

         16    his verification.  Which may have been all the DPS officers

         17    knew at the time they arrested him.

         18        THE COURT:  What's that exhibit number, Mr. Lamm?

         19        MR. LAMM:  61, Your Honor.

15:08:38   20        THE COURT:  Okay.  I will look at that.  When I get

         21    the document.

         22        All right.  Anything else we need to raise while

         23    we're here?

         24        MR. LAMM:  Your Honor, one thing caught my attention,

15:08:54   25    and it may be something that the Court wants to deal with at

15:08:59   1   trial.  The defense intends to call Tracy Foster, common

2   spelling, who is an analyst at the Department of Public

3   Safety.

4         She was responsible for compiling various pieces of

15:09:15   5   data, and there are two exhibits that I believe relate

6   directly to her.

7         One interestingly, Exhibit 155, is called motion

8   alibi research.  And in Mr. Merritt's criminal case in state

9   court, there was a motion to modify release conditions.

15:09:38  10   Ms. Foster issued a report, motion alibi research, to

11   effectively rebut the claims that were made in the pleadings.

12   Obviously, much -- in our opinion, we, I believe, raised a

13   number of objections: hearsay, relevance, and 702, as well.

14   So we're concerned, we're putting it out there to the Court.

15:10:00  15         And also, Ms. Foster authored 192, which is a summary

16   of the investigation.  It's a different document.  That

17   document, and certainly we can provide these to the Court,

18   contain criminal histories of a lot of different individuals,

19   family members of Mr. Merritt, family members of Ms. Saucedo,

15:10:22  20   Facebook posts --

21         THE COURT:  Mr. Lamm, I'm sorry to cut you off.

22   What's the issue?

23         MR. LAMM:  Basically we are concerned that

24   undisclosed expert testimony will be coming in, and I raise

15:10:36  25   this simply prophylactically before the witness gets up

15:10:40  1    because, frankly, I interviewed her in the criminal case.

       2           THE COURT:  What's the undisclosed expert opinion you

       3    think is going to come in?

       4           MR. LAMM:  She said -- and I didn't bring these

15:10:49  5    notes -- how she believed that Mr. Merritt, his Facebook

       6    postings expressed anti law enforcement views that made him

       7    more likely to be a suspect.  She interpreted phone records as

       8    to patterns that she believed were present.  And I asked her,

       9    "What training do you have in this?" and she said, "My common

15:11:13 10    sense."

      11           Again, she just hasn't been disclosed as an expert.

      12    I want to cautiously bring it --

      13           THE COURT:  All right.  Do you intend to elicit those

      14    opinions?

15:11:25 15           MR. NOVAK:  I don't intend to elicit any commentary

      16    from Ms. Foster that wouldn't be appropriate.  And should we

      17    get into some area, I'll -- should we anticipate getting into

      18    that area, I'll advise the Court and counsel ahead of time.

      19           THE COURT:  Okay.

15:11:41 20           MR. NOVAK:  With respect to the plaintiff's criminal

      21    history, I'm advised by the Court's previous order that I need

      22    to bring that to the Court's attention before I ask any

      23    questions about it.

      24           THE COURT:  Okay.  All right.

15:11:56 25           Okay.  We will plan to see you on the 23rd.  As I

15:11:59  1    mentioned, you can pick up your copies of the jury

2    questionnaires.  I can't remember the date, but it's about a

3    week before that, and I will get you a list of those I propose

4    to excuse ahead of time, and we'll talk about those on the

15:12:14  5    23rd.  If there's other issues, voir dire or other matters

6    that come up, you can raise them then.

7             Let's not file motions between now and then.  If you

8    have an issue, raise it then and we'll deal with it.

9             And why don't you gather up your stuff and meet me

15:12:31  10   outside Judge Snow's courtroom in about five minutes.  We'll

11   look at that just so you can see how it's laid out, and then

12   we'll go down to the special proceedings courtroom and we can

13   look at that.

14            Anything else, Jeff?

15:12:45  15            THE LAW CLERK:  I had one question.

16            THE COURT:  Well, I'm glad Jeff raised this yeah,

17   we've got three witnesses who will be testifying remotely.

18   It's very important you talk with -- maybe you've already done

19   this, but with the Court IT folks, because they're going to

15:13:07  20   be -- probably need to go to a courthouse near where they

21   live.

22            THE COURTROOM DEPUTY:  I'm sorry, Judge.  They did a

23   test I think yesterday --

24            MR. LAMM:  Mr. Weller did his test with IT.  It was

15:13:19  25   good.

15:13:20   1          THE COURTROOM DEPUTY:  And because California is not

2     accommodating that right now with COVID.

3          THE COURT:  Oh, the courts aren't?

4          THE COURTROOM DEPUTY:  Uh-uh.  So they're using the

15:13:28   5     test -- they use Jabber to testify from home.

6          THE COURT:  So it sounds like that's being worked

7     out.  Be sure you've got it all squared away with how they're

8     going to testify.

9          And what will likely happen is there will be -- we'll

15:13:39  10     see it over in Judge Snow's courtroom, there's a big screen TV

11     that is on a cart.  That will be probably positioned in front

12     of me so the jury can see the individual and the lawyer

13     questioning can see the individual as well.  Maybe farther

14     back.  It's a pretty big screen, but it's not going to

15:13:57  15     encompass the wall.  And that's how they'll be seen in the

16     courtroom.

17          MR. NOVAK:  The issue that Mr. Figeralli raised with

18     us and the reason why we asked to have his testimony be remote

19     is that his wife is a cancer victim and he -- I don't know

15:14:18  20     that I can convince him to go to a courthouse.

21          THE COURT:  She just said that's not necessary.

22          MR. NOVAK:  Oh, I'm sorry.

23          THE COURT:  Apparently that's being worked out by

24     Jabber and it will work from home.  But make sure with our IT

15:14:30  25     folks it works with his computer.  They'll need to do a test

15:14:33  1    ahead of time.

         2              MR. NOVAK:  Yes, Your Honor.

         3              THE COURTROOM DEPUTY:  Your Honor, I'll e-mail

         4    counsel and give them a list of everything I need from them

15:14:40  5    and a contact number.

         6              THE COURT:  So Christine will get you an e-mail with

         7    everything she needs from you on that issue.

         8              Jeff, does that address your issues?

         9              Okay.  I'll see you outside of the courtroom in a few

15:14:52 10    minutes.

        11              (End of transcript.)

        12                          *  *  *  *  *

        13

        14

        15

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25

1                        **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14         DATED at Phoenix, Arizona, this 22nd day of October,

15   2020.

16

17

18

19

20                         s/ Patricia Lyons, RMR, CRR
                           Official Court Reporter
21

22

23

24

25