**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Leslie A. Merritt, Jr.,

          Plaintiff,

v.

State of Arizona, et al.,

          Defendants.

No. CV-17-04540-PHX-DGC

**ORDER**

      This action arises out of Plaintiff Leslie Merritt's arrest, detention, and prosecution for the I-10 freeway shootings in Phoenix, Arizona in August 2015. Plaintiff's false arrest and imprisonment claims against Defendant State of Arizona were tried to a jury last fall. The jury returned a defense verdict. *See* Docs. 463, 469.

      Pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure, Plaintiff now moves for judgment notwithstanding the verdict and a new trial. Doc. 502. The motion is fully briefed. Docs. 507, 510. The Court denies Plaintiff's request for oral argument because it will not aid the Court's decision. *See* Fed. R. Civ. P. 78(b); LRCiv 7.2(f). For reasons stated below, the Court will deny the motion.

## I.     Background.

      Three shootings occurred on the I-10 freeway on August 29, 2015, and a fourth between August 27 and 30, 2015. Plaintiff was arrested and indicted for the shootings in

September 2015.  *See State v. Merritt*, CR2015-144211 (Maricopa Cty. Super. Ct. 2015).
He was released from custody and the charges against him were dismissed in April 2016.

Plaintiff pawned a Hi-Point C9 9mm handgun around 5:30 p.m. on August 30, 2015,
about four hours before Plaintiff alleges the fourth shooting occurred.  The fourth shooting
involved Alfred Hackbarth's BMW.  Around 9:00 p.m. on August 30, Hackbarth landed at
Phoenix Sky Harbor Airport and returned to his BMW in the Terminal 2 parking garage,
where he had parked it three days earlier.  The BMW's front left tire lost pressure rapidly
on Hackbarth's drive home.  A bullet was found in the tire the next day.

The Arizona Department of Public Safety ("DPS") recovered four bullets during its
investigation of the shootings, including the bullet found inside the BMW tire.   On
September 7, 2015, the DPS crime lab identified all four bullets as coming from a Hi-Point
C9 9mm handgun.   On September 17, officers located from various pawn shops eight
Hi-Point C9 9mm handguns to submit to the DPS crime lab for ballistics testing.  The next
day, DPS criminalist Christopher Kalkowski identified one of the guns as the source of the
bullets recovered in all four shootings.  A DPS officer reviewed the list for the pawned
guns and identified Plaintiff as the owner of the gun in question.

DPS officers arrested Plaintiff without a warrant on September 18.  A grand jury
indicted him for the I-10 shootings six days later.  In February 2016, while preparing for
trial, the Maricopa County Attorneys' Office asked Lucien Haag to conduct an independent
firearms identification analysis.  Haag's findings were inconclusive – the four evidence
bullets could neither be excluded nor identified as having been fired from Plaintiff's gun.
As a result, Plaintiff was released from jail on April 19, 2016.  The charges against him
were dismissed without prejudice six days later.

Plaintiff filed suit against Maricopa County, various County officers and employees,
the State of Arizona, and various DPS officers and employees.  Docs. 1, 8.  Plaintiff later
dismissed the claims against the County Defendants.  Docs. 41, 224.  The remaining
Defendants – the State of Arizona and the DPS officers – moved for summary judgment.
Doc. 264.  The Court granted summary judgment on all claims except state law false arrest,

false imprisonment, and aiding and abetting, with respect to any pre-indictment damages. Doc. 278.[1]  The Court found that Defendants had failed to show as a matter of undisputed fact that they had probable cause to arrest and detain Plaintiff before the indictment issued given their failure to resolve the discrepancy between the ballistics evidence and the timing of the BMW shooting.  *Id.* at 4-14.

The false arrest and imprisonment claims against Defendant State of Arizona were tried to a jury over an eight-day period in October and November 2020.  *See* Docs. 447-63.[2] The jury found Defendant not liable on each claim.  Doc. 469.

## II.   Plaintiff's Motion for Judgment as a Matter of Law Under Rule 50.

Plaintiff asks the Court to enter judgment notwithstanding the verdict. Doc. 502 at 2.[3]  Rule 50(a)(1) provides for motions for judgment as a matter of law during trial:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may . . . grant a motion for judgment as a matter of law against [that] party[.]

Fed. R. Civ. P. 50(a)(1)(B).  Subsection (a)(2) states that a Rule 50(a) motion must be made "before the case is submitted to a jury."  Fed. R. Civ. P. 50(a)(2); *see Williams v. Gaye*, 895 F.3d 1106, 1131 (9th Cir. 2018) ("Under Rule 50, a party must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to the jury.") (quoting *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009)).

Plaintiff made no Rule 50(a) motion during trial.  *See* Doc. 507 at 2 & n.2. Defendant argues that this failure is fatal to Plaintiff's present motion under Rule 50.  *Id.*

---

[1] Because a post-arrest indictment cuts off the length of detention, and thus damages, stemming from a false arrest, any damages recoverable on Plaintiff's arrest-related claims were limited to the period between his arrest on September 18 and his indictment on September 24, 2015.  *See id.* at 6, 34-35 (citations omitted).

[2] Plaintiff dismissed the aiding and abetting claim.  Doc. 423.

[3] Plaintiff seeks a "judgment notwithstanding the verdict" (Doc. 502 at 1), but for more than a decade that phrase and the term "directed verdict" have been combined and simply termed "judgment as a matter of law."  *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1082 n.2 (9th Cir. 2009).

1    at 2-4.  The Court agrees, and will deny Plaintiff's Rule 50(a) motion as untimely.  Fed. R.

2    Civ. P. 50(a)(2); *see Williams*, 895 F.3d at 1131; *Tortu*, 556 F.3d at 1081-83.[4]

3    **III.    Plaintiff's Motion for a New Trial Under Rule 59.**

4    **A.    Rule 59 Standard.**

5           Rule 59 allows a district court to grant a new trial on all or some issues "for any

6    reason for which a new trial has heretofore been granted in an action at law in federal

7    court[.]"  Fed. R. Civ. P. 59(a)(1)(A).  Because "Rule 59 does not specify the grounds on

8    which a motion for a new trial may be granted," the court is "bound by those grounds that

9    have been historically recognized."  *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035

10   (9th Cir. 2003).  These "grounds include: 'that the verdict is against the weight of the

11   evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to

12   the party moving.'"  *Dawkins v. City & Cty. of Honolulu*, No. CIV. 10-00086 HG-KSC,

13   2012 WL 1982461, at *4 (D. Haw. May 31, 2012) (quoting *Molski v. M.J. Cable, Inc*., 481

14   F.3d 724, 729 (9th Cir. 2007)); *see also Crowley v. EpiCept Corp.*, 883 F.3d 739, 751 (9th

15   Cir. 2018) (a court may grant a new trial "to prevent a miscarriage of justice"); *Passantino*

16   *v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 510 (9th Cir. 2000) ("The trial

17   court may grant a new trial only if the verdict is contrary to the clear weight of the evidence,

18   is based upon false or perjurious evidence, or to prevent a miscarriage of justice.").

19          "[T]he district court, in considering a Rule 59 motion for new trial, is not required

20   to view the trial evidence in the light most favorable to the verdict."  *Goldstine v. FedEx*

21   *Freight Inc.*, No. C18-1164 MJP, 2021 WL 952354, at *1 (W.D. Wash. Mar. 11, 2021)

22   (quoting *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th

23   Cir. 2014)).  Instead, the court may "weigh the evidence and assess the credibility of the

24   witnesses[.]"  *Id.*  "Nevertheless, the burden of proof on a motion for a new trial is on the

---

26          [4] A party may file a post-trial "renewed motion" for judgment as a matter of law
27   under Rule 50(b), but only after having made a timely Rule 50(a) motion.  *See Tortu*, 556
     F.3d 1081 ("As explicitly stated in the Rule, a Rule 50(b) motion may be considered only
     if a Rule 50(a) motion for judgment as a matter of law has been previously made."); *Exxon*
28   *Shipping Co. v. Baker*, 554 U.S. 471, 486 n.5 (2008) ("A motion under Rule 50(b) is not
     allowed unless the movant sought relief on similar grounds under Rule 50(a) before the
     case was submitted to the jury.").

1    moving party, and the court should not lightly disturb a plausible jury verdict." *Anglo-Am.*

2    *Gen. Agents v. Jackson Nat. Life Ins.*, 83 F.R.D. 41, 43 (N.D. Cal. 1979) (citing 11 Wright

3    & Miller, Federal Practice & Procedure: Civil § 2806 at 49); *see Girbes-Pierce v. City of*

4    *New York*, No. 16-CV-7510 (JLC), 2019 WL 1522631, at *8 (S.D.N.Y. Apr. 9, 2019),

5    *aff'd*, 803 F. App'x 509 (2d Cir. 2020) (noting that "movants for a new trial are . . . held to

6    'a heavy burden'").

7          **B.**    **Ballistics Evidence and Probable Cause.**

8        Plaintiff argues that Defendant failed to produce a reliable ballistics identification

9    necessary to establish probable cause. Doc. 502 at 2-7. Plaintiff makes several different

10    arguments. He asserts that, contrary to the Range of Conclusions established by the

11    Association of Firearms and Toolmark Examiners ("AFTE"), which permits four findings

12    – identification, elimination, inconclusive, and unsuitable for examination – "[b]oth

13    Kalkowski and John Maciulla testified that the categories of the AFTE Range of

14    Conclusions are not mutually exclusive." *Id.* at 3-4 (citing Doc. 502-1 at 4); *see* Doc. 489

15    at 118-31.[5] He claims that Kalkowski and Maciulla "grossly overstated the certainty of

16    [their] purported ballistic identification and . . . presented ballistic evidence inconsistent

17    with the accepted scientific consensus." Doc. 502 at 2. He further argues that Defendant's

18    ballistics evidence "could not be offered to a degree of practical certainty, such that it

19    should never have been presented under Rule 702." *Id.* at 6. In his reply brief, Plaintiff

20    argues that Defendant's witnesses failed to establish the reliability of the ballistics evidence

21    to the "level of certainty" required of experts under Arizona law, and presented "evidence

22    of a claimed scientific ballistic identification that does not pass the rigors of Rule 702."

23    Doc. 510 at 3. For several reasons, Plaintiff's arguments are not persuasive.

24          **1.**    **Plaintiff Did Not Object Under Rule 702.**

25        Plaintiff argues in several places that the testimony of Kalkowski and Maciulla did

26    not meet the requirements of Rule 702. *See* Doc. 502 at 6, 13; Doc. 510 at 3. But Plaintiff

27    made no Rule 702 objection during the trial testimony of these witnesses. *See* Docs. 488

28

---

[5] Plaintiff cites to trial testimony from Maciulla, but not Kalkowski. *See id.*

1   at 124-36, 489 at 44-95 (Kalkowski); Doc. 489 at 110-31 (Maciulla).  "Having failed to
2   object at trial, the admission of this evidence cannot serve as the basis for a new trial unless
3   it resulted in 'plain or fundamental error where the integrity or fundamental fairness of the
4   [trial] is called into serious question.'"  *Estate of Brown v. Lambert*, 478 F. Supp. 3d 1006,
5   1027 (S.D. Cal. 2020) (quoting *Bird v. Glacier Elec. Coop.*, 255 F.3d 1136, 1148 (9th Cir.
6   2001)).

7          The Court cannot find that the testimony of Kalkowski and Maciulla resulted in
8   plain or fundamental error.  Both witnesses were qualified to testify under Rule 702 about
9   firearms examination and ballistics analysis.  Kalkowski has been a trained firearms
10  examiner for more than 24 years.  Doc. 488 at 124-25.  He is a member of AFTE,
11  consistently has passed required proficiency exams, and has an excellent reputation as a
12  forensic scientist.  *Id.* at 125; Doc. 489 at 31, 111, 114.  Maciulla has been a trained firearms
13  examiner since 2004 and was a technical lead in the DPS Crime Lab from 2014 to 2018.
14  *Id.* at 110-11.  He has been tasked by national organizations with reviewing the competency
15  of other crime labs.  *Id.* at 112-13.  Plaintiff moved to preclude Maciulla's expert testimony
16  before trial, but on the basis of non-compliance with the disclosure requirements of
17  Rule 26(a), not on a lack of expertise under Rule 702.  *See* Docs. 290, 382, 387.  What is
18  more, for reasons explained below, the testimony of Kalkowski and Maciulla was highly
19  relevant to the jury's task of assessing probable cause in this case.

20                    **2.      Plaintiff Mischaracterizes the Key Issue in this Case.**

21          Plaintiff asserts that the jury's defense verdict was unfounded because Defendant
22  failed to present the necessary level of expert testimony to show that Kalkowski's ballistics
23  match was correct: "Plaintiff's primary argument is that the jury's verdict fails to conform
24  to the evidence because Defendant fails to meet its burden of proof by failing to establish
25  a level of certainty to Kalkowski's ballistic conclusion."  Doc. 510 at 4.  Plaintiff cites
26  Arizona medical malpractice, medical causation, and tort cases for the proposition that
27  Defendant could prevail only if its experts testified that the bullets and his gun were a match
28  "to a reasonable probability."  *Id.* at 2.  This argument has three significant problems.

First, Plaintiff cites no case suggesting that the causation standard for tort cases applies to the probable cause defense in false arrest and false imprisonment cases.

Second, and more importantly, the argument misconstrues the key issue in this case. The jury was not required to determine whether Plaintiff's gun was a match to the four evidence bullets. Rather, the jury was required to determine whether Defendant had probable cause to arrest Plaintiff. The question was whether Defendant had a reasonably objective basis to believe, at the time of arrest, that Plaintiff had shot the four vehicles, not whether Plaintiff was actually guilty of the shootings. Thus, Plaintiff's tort causation cases, which require a level of certainty when the jury must determine whether the defendant actually caused the plaintiff's injury, are not relevant when the jury need not determine whether Plaintiff's gun actually fired the evidence bullets. Probable cause deals in reasonable probabilities, not absolute certainties. As the final jury instructions explained:

> Probable cause exists when, under all of the circumstances known at the time, an objectively reasonable law enforcement officer would conclude there is a fair probability that a particular person has committed a crime. Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept and cannot be reduced to a set of legal rules. It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity, but it may not be based on mere suspicion.

Doc. 461 at 14.

Third, even if a particular level of certainty in the testimony of defense witnesses was required, it was provided. As explained below, Defendant's firearms examiners testified unequivocally that their ballistics conclusion was correct, and Maciulla testified that identifications are made to the standard of a "practical certainty." Doc. 489 at 121.

### 3. There Was Ample Evidence to Support the Jury's Verdict.

Before the trial of this case, the Court reached the following conclusions regarding the question and proof of probable cause:

> "Probable cause to arrest exists where the arresting officer has reasonably trustworthy information sufficient to lead a reasonable person to believe that

an offense has been committed and that the person to be arrested committed it." *State v. Dixon*, 735 P.2d 761, 763 (Ariz. 1987); *In re Aubuchon*, 309 P.3d 886, 895 (Ariz. 2013) (citing *Dixon* standard). Probable cause must be evaluated by "the facts as they existed at the time of the arrest, and not afterward," *Reams v. City of Tucson*, 701 P.2d 598, 601 (Az. Ct. App. 1985), and must consider the "totality of the circumstances," *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994) (citation omitted). Although probable cause usually is a question of law for the court, *Sarwark Motor Sales, Inc. v. Woolridge*, 354 P.2d 34, 36 (Ariz. 1960), where "the evidence is conflicting, so that on one conclusion as to the facts therefrom probable cause exists, while from another it does not, it is then for the jury to determine the true state of facts and to apply the law as laid down by the court to those facts." *Id.*

Thus, the jury in this case will be required to determine whether, at the time of Plaintiff's arrest, a reasonable person would have had reasonably trustworthy information from which to believe that Plaintiff committed the freeway shootings. The jury must consider the totality of the circumstances, including the information known to all members of the investigation team whose knowledge is cumulated for purposes of determining probable cause. *See* Doc. 374. This includes the knowledge of Christopher Kalkowski, the DPS criminalist who made the primary match between Plaintiff's gun and the evidence bullets. *Id.* For the jury to decide whether a reasonable person with Kalkowski's knowledge would have made the match, the jury must determine whether Kalkowski's conclusion was reasonable and based on reasonably trustworthy information.

Conclusions of criminalists who agreed with Kalkowski and conclusions of other experts who did not are relevant to the jury's evaluation of whether Kalkowski's match was reasonable. That is true even for conclusions reached after Plaintiff's arrest, because it is the basis and strength of the conclusions, not their timing, that sheds light on whether Kalkowski's conclusion was reasonable. To be clear, post-arrest conclusions by any expert are not relevant as part of the facts known at the time of arrest – they were not known then. But they are relevant on the question of whether Kalkowski's match was reasonable.

Doc. 382 at 2-3.

Applying these conclusions, the Court permitted the parties to present evidence on whether Kalkowski's ballistics match was reasonable. Both sides presented such evidence, Plaintiff's witnesses testifying that the match was unreasonable and unscientific and

defense witnesses testifying to the contrary.  The jury was clearly instructed on its task to determine whether Kalkowski's match, and the DPS investigators' reliance on that match, were objectively reasonable:

> The standard for evaluating probable cause is objective.  You must ask what an objectively reasonable law enforcement officer would conclude. Therefore, the facts known to Defendant at the time of arrest or detention are relevant to your inquiry, but the intent, belief, or motive of individual officers is not relevant to your evaluation of whether probable cause existed.

> Because you must make a reasonableness determination – that is, you must determine whether an objectively reasonable law enforcement officer would have found probable cause to arrest or detain Plaintiff – you may take into account opinions expressed by expert witnesses who testified during trial, even though their opinions were formed after the arrest and detention.  These opinions may be considered only in evaluating the objective reasonableness of Defendant's probable cause decision.  The opinions were not known at the time of Plaintiff's arrest or detention, and therefore may not be considered as part of the totality of the circumstances that were known to Defendant at the time.

Doc. 461 at 14 (paragraph numbering omitted).

Defendant provided ample evidence from which the jury could find that Kalkowski's match, and the other investigators' reliance on it, were objectively reasonable. As noted above, Kalkowski has specialized training and more than 24 years of experience as a firearms examiner.  He provided the jury with a detailed explanation of how he conducts a firearm examination and how he reached his conclusions in this case.  Docs. 488 at 125-36, 489 at 44-93.  He testified that he stands by his conclusion that the evidence bullets match Plaintiff's gun, and remains confident of this opinion.  Doc. 489 at 94-95.

Cade Shaw, whose experience is also mentioned above, testified that he confirmed the match found by Kalkowski before it was shared with the DPS investigators.  His conclusion has not changed, and he has no doubt it is correct.  Doc. 490 at 12-13.

Vince Figarelli, Superintendent of the DPS Crime Lab who has more than 30 years' experience in forensic science, testified that Kalkowski and Shaw have fine reputations as forensic scientists and that their work in this case was excellent.  Doc. 489 at 31-32, 38-39.

1    He also noted that the crime lab is the second oldest certified crime lab in the country,

2    having been certified since 1982.  *Id.* at 23-24.

3          John Maciulla testified that Kalkowski and Shaw have never had difficulty in their

4    proficiency testing, have wonderful reputations, and followed the Crime Lab's policies and

5    procedures in this case.  *Id.* at 111, 114-15.

6          This evidence, along with other testimony and exhibits, provided a clearly sufficient

7    basis for the jury to find that DPS investigators acted reasonably in making and relying on

8    the ballistics match.  *See Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 235 F.3d 1184,

9    1192 (9th Cir. 2000) (weighing the credibility of conflicting witness testimony is the

10   province of the jury);  *Humetrix, Inc., v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001)

11   ("Authority to determine the victor in such a 'battle of expert witnesses' is properly reposed

12   in the jury.").

13         Plaintiff has not shown that the jury's determination from the conflicting ballistics

14   evidence was against the weight of the evidence, *see Molski*, 481 F.3d at 729, or was a

15   miscarriage of justice, *see Crowley*, 883 F.3d at 751.  Nor has Plaintiff shown that "the

16   integrity or fundamental fairness of the [trial] is called into serious question."  *Bird*, 255

17   F.3d at 1148.  The Court accordingly will deny Plaintiff's request for a new trial.  *See*

18   *Allman v. Smith*, No. 1:12-cv-00568-TWP-DML, 2017 WL 3970668, at *2 (S.D. Ind.

19   Sept. 8, 2017) ("Parties seeking a new trial under Rule 59 'bear a particularly heavy burden

20   because a court will set aside a verdict as contrary to the manifest weight of the evidence

21   only if no rational jury could have rendered the verdict.'") (quoting *Marcus & Millichap*

22   *Inv. Servs. of Chi., Inc. v. Sekulovski*, 639 F.3d 301, 313 (7th Cir. 2011)); *see also Crowley*,

23   883 F.3d at 751 (noting that the denial of a Rule 59 motion on a weight-of-the-evidence

24   basis will be reversed "only where there is an *absolute absence of evidence* to support the

25   jury's verdict") (citations omitted; emphasis in original).

26         **4.      Plaintiff's "Mutually Exclusive" Argument Is Unpersuasive.**

27         Plaintiff's motion focuses on defense witnesses' testimony about the AFTE Range

28   of Conclusions.  *See* Doc. 502 at 3-5.  Plaintiff argues that the four possible conclusions

10

within the range – identification, inconclusive, elimination, or unsuitable for comparison – are "mutually exclusive" and defense witnesses' testimony to the contrary was erroneous and prejudicial. *Id.* Plaintiff never clearly defines what he means by "mutually exclusive," but it appears to be an argument that two reasonable firearms examiners could never look at the same ballistic evidence and reach different conclusions, such as one finding an "identification" and the other finding the evidence "inconclusive." As support for this assertion, Plaintiff cites an affidavit of his own expert, Lucien Haag. *Id.* at 3 (citing Doc. 502-2). But the affidavit – which was not admitted at trial – does not appear to support Plaintiff's claim. The affidavit says: "These four categories of accepted conclusions are mutually exclusive from one another *when utilized by a properly trained and experienced forensic firearms or toolmark examiner*." Doc. 502-2 ¶ 5 (emphasis added). This seems to be saying that a single examiner cannot reach more than one of these conclusions, not that two different examiners can never disagree.[6]

Lucien Haag testified at trial that two well-trained firearms examiners "should" reach the same conclusion when examining the same evidence: "We should come to that same conclusion. It is either an inconclusive, we both say that, or we both say, yes, there's enough there to say this is the firearm." Doc. 481 at 45. But saying that two reasonable examiners "should" come to the same conclusion is not the same as saying that they can "never" reach different conclusions, as Plaintiff now appears to suggest. And Haag did not cite to any specific AFTE statement that supports Plaintiff's assertion. *See id.*

Most importantly, this issue was fully vetted before the jury. Kalkowski testified that the AFTE Range of Conclusions does not mention mutual exclusivity, and he disagreed with Haag's suggestion that it does. Doc. 488 at 136. Maciulla testified that two trained examiners can reach different conclusions about the same evidence, and he was

---

[6] Plaintiff also cites a response by AFTE to a 2016 report from the President's Council of Advisors on Science and Technology. Doc. 502 at 3. But the AFTE response, which also was not admitted at trial, does not support Plaintiff's assertion. The portion quoted by Plaintiff states: "It has been consistently demonstrated that when the AFTE Theory of Identification is properly applied, examiners are able to conduct quality, accurate analysis." *Id.* (citing https://afte.org/uploads/documents/AFTE-PCAST-Response.pdf). It does not say that two competent examiners can never disagree on an identification.

1   cross-examined in some detail on this point by Plaintiff's counsel.  Doc. 489 at 118-24.

2   "Authority to determine the victor in such a 'battle of expert witnesses' is properly reposed

3   in the jury."  *Humetrix*, 268 F.3d at 919; *see also Wyler*, 235 F.3d at 1192 ("Weighing the

4   credibility of conflicting expert witness testimony is the province of the jury.").  The

5   competing testimony about the AFTE Range of Conclusions provides no ground for a new

6   trial.

7          **C.  Notation of Clearance.**

8          Pursuant to A.R.S. § 13-4051, "[a]ny person who is wrongfully arrested, indicted or

9   otherwise charged for any crime may petition the superior court for entry on all . . .

10   records . . . a notation that the person has been cleared."  A.R.S. § 13-4051(A); *see State v.*

11   *Saucier*, No. 2 CA-CR 2018-0289, 2019 WL 1952732, at *1 (Ariz. Ct. App. Apr. 30, 2019).

12   On August 13, 2020, the state court granted Plaintiff's petition for a notation of clearance,

13   finding that, "for purposes of the [DPS] investigation resulting in the investigative reports

14   regarding Leslie Allen Merritt, Jr. and Maricopa County Superior Court Cause Number

15   CR2015-144211-001, Leslie Allen Merritt, Jr. has been cleared on any allegation or

16   charge[.]"  Doc. 415 at 2.[7]

17          Plaintiff contends that a finding of innocence is a necessary component of the state

18   court's ruling under § 13-4051, and, "under settled Arizona law, that the State had no

19   probable cause to arrest or imprison" him for the I-10 shootings.  Doc. 502 at 7-8.  But as

20   already noted, Plaintiff's innocence or guilt for the I-10 shootings was not at issue in this

21   civil case.  The key question was whether his arrest was supported by probable cause – "a

22   probability or substantial chance" that he was the I-10 shooter.  *Gates*, 462 U.S. at 243

23   n.13.  The fact that a state trial court, years later, issued a notation of clearance at the request

24   of Plaintiff's lawyers does not preclude a finding by the jury, based on all the evidence

25   before it, that probable cause existed at the time of his arrest.

26   _____

27          [7] *See also* Maricopa County Superior Court, *Criminal Court Case Information –*

28   *Case History*, http://www.superiorcourt.maricopa.gov/docket/CriminalCourtCases/caseInfo.asp?caseNumber=CR2015-144211 (noting only "Clearance of Record" for the case history) (last visited Apr. 9, 2021).

Courts have routinely held that "[t]he results of later criminal proceedings are not relevant in determining whether police officers on the scene had probable cause to make a warrantless arrest, as that determination is to be made in light of the facts confronting the officer[s] at the time of the arrest."  *Hita v. Stansell*, No. CIV 05-1088 LFG/LCS, 2006 WL 8443323, at *12 (D.N.M. 2006); *see Borunda v. Richmond*, 885 F.2d 1384, 1389 (9th Cir. 1988) ("The state's failure to prove guilt beyond a reasonable doubt does not mean in connection with the arrests that it did not meet the lesser probable cause standard – a reasonable belief that an offense has been committed and that the criminal defendant committed the crime."); *Baker v. McCollan*, 443 U.S. 137, 145 (1979) ("The Constitution does not guarantee that only the guilty will be arrested.  If it did, § 1983 would provide a cause of action for every defendant acquitted – indeed, for every suspect released."); *see also State v. Mohajerin*, 244 P.3d 107, 112 (Ariz. Ct. App. 2010) (explaining that "the remedy set forth in § 13-4051 is manifestly not directed at punishing unlawful or illegal police conduct" and "the statute does not allow a petitioner to seek damages for any past conduct by law enforcement that was unlawful or illegal").

Furthermore, Plaintiff stipulated before trial that he would not raise the notation of clearance with the jury.  *See* Joint Final Pretrial Order, Doc. 334 at 3 ("Neither party will elicit testimony about Plaintiff's Petition for Notation of Clearance that is currently pending adjudication in Maricopa County Superior Court."); Doc. 507-1 at 67 (January 29, 2020 email from Plaintiff's counsel to defense counsel stating that "[w]e will stipulate that no mention of the NOC will be made to the jury during trial").  Plaintiff later moved for issue preclusion based on the notation of clearance, arguing that "the jury should be advised that [he] is not the I-10 Freeway Shooter" (Doc. 401 at 1), but Plaintiff withdrew the motion before trial (Doc. 416).  Plaintiff acknowledges in his reply that he "agreed not to raise filing the notation of clearance with the jury" and "adhered to that position and did not mention the notation of clearance before the jury."  Doc. 510 at 5.

In light of these pretrial and trial positions, Plaintiff cannot now argue that the notation of clearance should have compelled the jury to find that no probable cause existed

13

for his arrest and pre-indictment detention.  "Although it should go without saying, . . . a party cannot obtain judgment as a matter of law or the grant of a new trial in reliance on evidence that was never admitted at trial [or] on the repudiation of positions it adopted before and during trial." *Third Wave Techs., Inc. v. Stratagene Corp.*, 405 F. Supp. 2d 991, 997 (W.D. Wis. 2005).[8]

### D.   Dissipation of Probable Cause.

"It is well-established that a 'person may not be arrested, or must be released from arrest, if previously established probable cause has dissipated.'"  *Nicholson v. City of Los Angeles*, 935 F.3d 685, 691 (9th Cir. 2019) (quoting *United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005)); *see also* Doc. 461 at 14 (final jury instruction on probable cause).

Plaintiff contends that the evidence presented at trial "unequivocally demonstrated" that any probable cause had dissipated between the time of his arrest on September 18, 2015 and the issuance of the indictment six days later.  Doc. 502 at 8.  Specifically, Plaintiff asserts that Trial Exhibit 1, a map generated by the Scottsdale Police Department on September 22, 2015, reflects that the BMW shooting occurred at 9:45 p.m. on August 30, 2015 – about four hours after Plaintiff had pawned his gun – and that he was in Glendale when the Escalade and bus shootings occurred.  *Id.* at 9.  Plaintiff further asserts that Trial Exhibit 13, historical cell phone site data generated by the FBI on September 22, 2015, places him in Glendale at the time of the first two shootings.  *Id.*  Plaintiff claims that these two trial exhibits negated any probable cause to detain him between September 22 and 24, 2015.  *Id.* at 10; *see also* Doc. 510 at 7.

Defendant responds that the map of shootings reflected in Trial Exhibit 1 was created by the Scottsdale Police Department, not DPS, and that it was never established at trial that DPS received the map on September 22 or that the map represented DPS's understanding of events in its investigation of the shootings.  Doc. 507 at 13 & n.9.

---

[8] The Court also notes that Defendant has long contended that the notation of clearance was obtained through misstatements of the evidence against Plaintiff.  *See* Doc. 507 at 12-13.

1      Defendant further notes that there was no testimony conclusively showing that DPS knew

2      about Trial Exhibit 13 (or its underlying data) prior to Plaintiff's indictment, and that there

3      was testimony to the contrary, including that the phone at issue belonged to Plaintiff's

4      fiancée, Eddina Sauceda.  *Id.* at 14-15 (citing Doc. 507-1 at 88-89, 127; Doc. 507-2 at 18,

5      22, 26-27, 52, 55).

6             The Court agrees with Defendant.  Whether the information in Trial Exhibits 1 and

7      13 reflected facts known to Defendant before the grand jury indictment on September 24,

8      2015, was hotly contested during trial.  The Court cannot conclude that the jury erred in

9      finding that probable cause did not dissipate before that date.

10            Defendant further argues, correctly, that Plaintiff ignores trial evidence that the

11     BMW tire may have been shot before Plaintiff pawned his gun, including: Hackbarth's

12     testimony that he believed the BMW's tire was shot before August 30, 2015; Detective

13     Baroldy's testimony about information learned from Hackbarth regarding the timing of the

14     tire being shot; expert Joe Grant's testimony that Hackbarth's observations and experience

15     were consistent with the tire having been shot prior to his arrival at the airport; Captain

16     Pinnow's testimony that she had professional experiences in which a shot tire did not lose

17     air immediately; and DPS's identification of Plaintiff's gun as the source of the bullets

18     recovered from the I-10 shootings.  *Id.* at 13-14 (citing Doc. 507-1 at 71-80, 84-87, 92,

19     96-111, 123-26, 129).  The timing of the BMW shooting was another vigorously contested

20     issue during trial.  Plaintiff has not shown that Trial Exhibits 1 and 13 compelled the jury

21     to find that probable cause to detain Plaintiff dissipated before the indictment issued.

22            **E.      Tracy Foster's Testimony.**

23            DPS criminal analyst Tracy Foster testified at trial about Plaintiff's prior police

24     contacts and certain posts he made on Facebook before his arrest.  Foster testified that DPS

25     investigators discovered these facts before Plaintiff's arrest, and that they were "indicators"

26     of the I-10 shooter that raised "red flags" with respect to Plaintiff.  Doc. 502 at 11-12 (citing

27     Doc. 502-6 at 3-8).  Plaintiff argues that a new trial is warranted based on three "significant

28     errors" in the admission of Foster's testimony.  *Id.* at 11.

Plaintiff first contends that Foster's testimony regarding "indicators"' included non-disclosed expert opinions about a "profile" of the I-10 shooter, and that Defendant violated the disclosure rules and a pretrial agreement between the parties precluding Foster from offering opinions at trial.   *Id.*; *see* Doc. 510 at 7-9.  Before Foster took the witness stand, Plaintiff argued that it would be "improper for her to offer opinions about her beliefs as to the background analysis" because she had "been disclosed as a fact witness, not an expert."  Doc. 495 at 6.  Defendant responded that it "[did] not intend to have Foster offer any opinions," and she would testify solely "as a fact witness to the information she and her analysts collected and provided to the investigators."   *Id.*  On the basis of non-disclosure, the Court precluded Foster from offering any opinions during her testimony about a "profile" she created of the freeway shooter, including opinions as to why certain Facebook posts were "significant" to DPS's investigation.  *Id.* at 10; *see also* Doc. 458 at 1 ("Ms. Foster is not permitted to offer any opinions."); Doc. 486 at 96-97 (same).  Consistent with this ruling, the Court later sustained Plaintiff's trial objection to profile testimony.  Doc. 495 at 81.

The Court also explained to the parties, however, that while it would preclude Foster from offering opinions that Plaintiff met a particular profile of the freeway shooter, it would not preclude her from testifying about facts gathered and considered by DPS during the investigation.  *Id.* at 10-11.  The Court recognized that there was a fine line "between what's an opinion and what's a fact[,]" and said it would draw those lines as needed during trial on a "question and answer" basis.  *Id.* at 11.  Plaintiff's counsel thus knew that further objections could made during trial if they felt Foster was straying into expert or profile testimony.

Plaintiff now complains that Defendant elicited testimony about certain "indicators" DPS considered during its investigation.  Doc. 502 at 11.  Foster testified that she and her team assisted the DPS investigators by gathering information about suspects' past contacts with law enforcement, criminal damage incidents, anger issues, anti-government social media posts, or posts related to the I-10 shootings.  Doc. 495 at 88.  She said they called

these "indicators." *Id.* at 87.  Defense counsel asked Foster a number of questions about her collection of information related to these indicators, and Plaintiff's never objected – not once.  *See id.* 495 at 87-91, 110, 122, 124, 126, 135.  Indeed, on cross-examination Plaintiff's counsel questioned Foster about the "indicators," eliciting testimony that they are not evidence of a crime, merely a basis for suspicion.  *Id.* at 138.  The Court cannot conclude that Foster's factual testimony about indicators considered in the investigation of Plaintiff was error.[9]

Plaintiff next contends that Foster's testimony was "immaterial to any permissible jury issue" under Rules 401 and 403 because "[n]one of the so-called 'indicators' suggested by Foster related to an element of any crime."  Doc. 502 at 12.  But Plaintiff's previous police contacts, Facebook posts, and other indicators were part of the "totality of the circumstances" DPS considered before arresting Plaintiff, and therefore were highly relevant to whether DPS had probable cause for the arrest.  *See* Doc. 382 at 11-12 (denying motion in limine regarding the Facebook posts); Doc. 495 at 96 (admitting Facebook posts over Rule 403 objections because they "are highly relevant to the question of whether [D]efendant had probable cause to make the arrest"); *see also United States v. Dunford*, No. 2:19-cr-00038-JRG-DHI, 2019 WL 5431614, at *5 (E.D. Tenn. Oct. 23, 2019) (defendant's Facebook post was relevant to probable cause when viewed "through the prism of the totality of the circumstances"); *United States v. Acevedo-Hernandez*, No. 2:14-CR-242 JCM VCF, 2015 WL 1546720, at *7 (D. Nev. Apr. 7, 2015) (Facebook images of the defendant hunting were relevant to probable cause on alleged wildlife violations); *Burrell v. McIlroy*, 464 F.3d 853, 858 (9th Cir. 2006) ("Although a prior criminal history cannot alone establish reasonable suspicion or probable cause to support a detention or an arrest, it is permissible to consider such a fact as part of the total calculus of information in these determinations.")  (citing *Brinegar v. United States*, 338 U.S. 160, 177 (1949)).

---

[9] While acknowledging that trials are adversarial, Plaintiff asserts that "litigants must be able to inherently trust that adversaries, particularly experienced trial lawyers, will act within the bounds of professionalism and good faith."  Doc. 502 at 13; *see also* Doc. 510 at 7.  That is true, but Plaintiff has shown no unprofessional conduct or bad faith on the part of defense counsel.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff further contends that the prejudicial effect of Foster's testimony was not adequately alleviated. Doc. 502 at 13. After overruling Plaintiff's Rule 403 objections to the Facebook posts, the Court offered to give a limiting instruction that the jury should consider the posts only on the question of whether Defendant had probable cause. Doc. 495 at 96. Discussions were held on the appropriate language for the instruction, and the Court received input from Plaintiff. Docs. 488 at 140-42, 489 at 4-8. Plaintiff agreed to the following instruction, which the Court gave to the jury at the close of evidence:

> You have received evidence about Plaintiff's contacts with law enforcement and posts he made on Facebook. This evidence has been admitted only on the question of whether Defendant had probable cause to arrest and detain Plaintiff. You should consider it for no other purpose.

Docs. 489 at 7-8, 490 at 134-135, 492 at 11; *see also* Doc. 461 at 9 (Instruction No. 8). The jury is presumed to have followed this instruction. *See Kipp v. Davis*, 971 F.3d 866, 882 (9th Cir. 2020); *Fields v. Brown*, 503 F.3d 755, 782 (9th Cir. 2007); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987).

The Court does not view Foster's testimony as unfairly prejudicial – it reflected facts DPS actually considered in deciding whether it had probable cause to arrest Plaintiff. And Plaintiff has not shown that the limiting instruction to which he agreed failed to ameliorate any potential unfair prejudice. *See* Doc. 502 at 13-14; *Maxwell v. Cty. of San Diego*, 714 F. App'x 641, 645 (9th Cir. 2017) (affirming the denial of a motion for new trial where any potential prejudice stemming from improper remarks were "addressed and ameliorated by the district court's curative instructions"); *United States v. Toliver*, 672 F. App'x 689, 690 (9th Cir. 2016) (finding no clear error where, "read as a whole, the jury instructions were sufficient to guide deliberations").

## IV.   Conclusion.

Plaintiff's request for relief under Rule 50 will be denied because Plaintiff made no motion for judgment as a matter of law during trial. Plaintiff's request for a new trial under Rule 59 will be denied because Plaintiff has not shown that the jury's verdict was against

the weight of the evidence, was the result of any unfairness at trial, or constituted a miscarriage of justice.

**IT IS ORDERED** that Plaintiff's motion for judgment notwithstanding the verdict and new trial (Doc. 502) is **denied**.

Dated this 20th day of April, 2021.

David G. Campbell
Senior United States District Judge